**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (SBN 263291)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Ave. NW, Suite 500
Washington, DC 20036
Tel: (202) 998-2299

**CLARKSON LAW FIRM, P.C.**
Chimaraoke Iko (SBN 367771)
*riko@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

**ROBERT P. COCCO, P.C.**
Robert P. Cocco (*pro hac vice*
forthcoming)
*bob.cocco@phillyconsumerlaw.com*
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
Tel: (215) 351-0200
Fax: (215) 827-5403

**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis (*pro hac vice*
forthcoming)
*jfrancis@consumerlawfirm.com*
John Soumilas (*pro hac vice* forthcoming)
*jsoumilas@consumerlawfirm.com*
Lauren KW Brennan (*pro hac vice*
forthcoming)
*lbrennan@consumerlawfirm.com*
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel: (215) 735-8600
Fax: (215) 940-8000

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLENE CRAWFORD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HOMETAP EQUITY PARTNERS, LLC and HOMETAP INVESTMENT PARTNERS II, L.P.,<br><br>Defendants. | Case No.   5:26-cv-03457<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Truth-in Lending Act (15 U.S.C. §1602 *et seq.*)<br>2. Unlawful Business Practices (Cal. Bus. & Prof. Code § 17200)<br>3. Unfair Business Practices (Cal. Bus. & Prof. Code § 17200)<br>4. Deceptive Business Practices ( Cal. Bus. & Prof. Code § 17200)<br>5. Usury (California Constitution, Article XV § 1)<br>6. Unconscionability (Cal. Civ. Code § 1670.5)<br>7. Declaratory Relief (Declaratory Judgment Act § 1060) |

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION ...................................................................................... 1

II.     JURISDICTION AND VENUE................................................................. 3

III.    PARTIES .................................................................................................. 3

IV.     FACTUAL ALLEGATIONS .................................................................... 4

        A.      Hometap contracts........................................................................ 4

        B.      Hometap's product misleads homeowners & puts vulnerable

                homeowners at risk. ..................................................................... 7

        C.      Hometap's product is a mortgage loan. ...................................... 10

        D.      Hometap's predatory business practices contribute to its rapid

                expansion.................................................................................... 15

        E.      Federal and state laws protect homeowners like Plaintiff from

                Hometap's loan. ......................................................................... 15

        F.      Plaintiff's experience is typical.................................................. 16

                i.      November 20, 2020 Contract........................................... 17

                ii.     July 14, 2021 Contract.................................................... 20

V.      CLASS ACTION ALLEGATIONS........................................................ 23

VI.     CAUSES OF ACTION........................................................................... 25

COUNT 1 ........................................................................................................ 25

COUNT 2 ........................................................................................................ 27

COUNT 3 ........................................................................................................ 30

COUNT 4 ........................................................................................................ 33

COUNT 5 ........................................................................................................ 34

COUNT 6 ........................................................................................................ 35

COUNT 7 ........................................................................................................ 37

VII.    PRAYER FOR RELIEF......................................................................... 38

VIII.   JURY DEMAND.................................................................................... 39

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

CLASS ACTION COMPLAINT

On behalf of themselves and all others similarly situated, Plaintiff Marlene Crawford, ("Plaintiff"), by and through her attorneys, respectfully alleges as follows:

## I.    INTRODUCTION

1.    Every few years, a new group of private-money interests finds a predatory and abusive mortgage loan product that they peddle to financially struggling homeowners, all the while believing that they have created something so original and unique that they can skirt traditional federal and state lending laws. The foreclosure crisis of 2008 displayed the danger of such products through the grotesque collapse of securitized debt obligations. Defendants' (collectively, "Hometap's") loan is another iteration of such products.

2.    Hometap breaks federal and state lending laws and attempts to avoid their protections by ensnaring homeowners with its complex, confusing, and high-risk loans which Hometap deceptively brands as "Option Purchase Agreements," and affiliated documents, which falsely claim "THIS IS NOT A LOAN."

3.    Broadly, Hometap's product operates like any other loan. In exchange for a cash advance paid to the consumer, Hometap receives a mortgage-secured right to a percentage of the property's value which its contract describes as the "Hometap Share." For example, after deducting fees and costs, a homeowner who receives $100,000 in cash from Hometap sells a percentage of their home equity worth nearly twice as much today and more than twice that amount over the ten-year term. Hometap does not adequately disclose this difference to consumers like Plaintiff, but its investor materials tout the HEI's "downside protection, even during times of declining home values," through a "cushion in each property investment to minimize potential losses."[1]

---

[1] Hometap is subject to an enforcement action by the State of Massachusetts raising similar claims as those raised herein. The quoted language appears in paragraph 75 of the Massachusetts Complaint, which quotes Hometap's representations obtained by the Massachusetts Attorney General. *See Comm. of Mass. v. Hometap Equity Partners, LLC*, Civil Action No. 2584-CV-469-BLS2 (Mass. Sup. Ct. Feb. 19, 2025),

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

4.    Over the course of the ten-year term, the amount owed on the contract increases. During this time, the homeowner pays for all upkeep, repairs, improvements, taxes, insurance, and other costs related to the property, but does not pay down the principal to Hometap. When the Hometap loan comes due, the homeowner is required to pay back significantly more than they received from Hometap in one lump sum. If consumers cannot make that required payment to Hometap, Hometap can foreclose or otherwise force a sale to collect it and thereby force consumers out of their homes without any of the protections required of a lender before foreclosing on a traditional mortgage. Worse, because Hometap's transactions are underwritten without regard to homeowner's income, assets, or future ability to pay the loan—and because Hometap targets homeowners who cannot qualify for or afford a traditional mortgage—a significant subset of homeowners are at risk of being forced out of their homes by the Hometap loan when their ten-year contracts mature.

5.    Hometap markets to individuals with low credit scores who are less likely than the general population to be able to refinance later. Further exacerbating their risk is the structure of the product with its single enormous lump sum payment due after a ten-year cliff (which can be extended to 20 years at Hometap's sole discretion). Moreover, at the time of sale, Hometap will take much of the sale proceeds while the homeowners will have to cover all of the sale costs, making transition to a new home more onerous—and in some cases, impossible.

6.    To disguise that Hometap makes money as a lender and to avoid licensing and substantive controls on its lending, Hometap frames its product as an "option agreement" rather than a loan, that is, in exchange for an upfront payment, Hometap receives an "option" to acquire a percentage interest in the consumer's home, which vests after ten years. This "option" language is mere artifice. It hides Hometap's guaranteed repayment of the entirety of the loan's principal by the borrower plus a

available at https://www.mass.gov/doc/commonwealth-v-hometap-equity-partners-llc/download (hereinafter "Massachusetts Enforcement Action").

2

CLASS ACTION COMPLAINT

significant finance charge disguised as an equity share, all of which Hometap can recoup by forcing sale of the homeowner's home as collateral for its loan, through operation of the mortgage. Hometap's own investor materials make clear that exercising its "option" under the contract means Hometap will "either foreclose on the property or force a sale of the property if the homeowner cannot otherwise settle." *See* Massachusetts Enforcement Action ¶ 144.

7.     No matter how Hometap labels its loan product, the reality is that it provides homeowners with an advance of money for a secured mortgage interest in their home, and then requires repayment with interest within 10 years or less. That is a mortgage loan. Plaintiff brings this suit to protect her family and others similarly situated from financial harm and to vindicate her rights under state and federal law.

## II.    JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, where Plaintiff resides.

## III.    PARTIES

10.     Plaintiff Marlene Crawford is an adult individual and American consumer who resides in the County of San Bernardino, in the State of California.

11.     Defendant Hometap Equity Partners, LLC ("HEP" or "Hometap") is a Delaware Limited Liability Company headquartered in Boston, Massachusetts.

12.     HEP is the primary operating entity, employs Hometap's employees, and negotiates and facilitates its real estate transactions. HEP controls subsidiaries which are the contractual counterparties in transactions entered into by Hometap such as Hometap Investment Partners II, L.P. which entered into the instant contract with Plaintiff.

CLASS ACTION COMPLAINT

13.    Defendant Hometap Investment Partners II, L.P. ("HIP") is a Delaware limited partnership headquartered in Boston, Massachusetts.  HIP is named as the entity in contract with Plaintiff for the 2020 and 2021 contracts.

14.    Neither HEP nor HIP is licensed to make mortgage loans in California.

15.    HEP and HIP have contributed assets to a common undertaking, that is, the transactions at issue.

16.    HEP and HIP expect profit from the undertaking, and both have a right to participate in the profit.

17.    HEP and HIP are engaged in a joint venture, partnership, and/or civil conspiracy.

18.    Alternatively, HEP is the principal of HIP and exercises control over and directs its actions.

19.    HEP and HIP are thus jointly and severally liable for all conduct herein, or in the alternative, HEP is liable for all acts of HIP.

20.    HEP and HIP are collectively referred to as "Hometap" herein.

## IV.    FACTUAL ALLEGATIONS

### A.    Hometap contracts

21.    Hometap contracts are lengthy, convoluted, and extremely difficult, if not impossible, for a lay person to understand.

22.    The documents typically consist of a 33-page "Option Purchase Agreement," "Option Closing Disclosure," "Investment Disclosures," a 14-page Mortgage and Security Instrument, and numerous other documents, with the specific financial term sheet hidden in a schedule in the middle of the documents.

23.    Plaintiff completed two separate transactions: once on November 20, 2020 (the "2020 Contract") and again on July 14, 2021 (the "2021 Contract"). Plaintiff's 2020 Contract documents totaled 66 pages and 2021 Contract documents totaled 72 pages. *See* Exs. A (2020 Contract) & B (2021 Contract).

24. The documents contain multiple cross-references, use dozens of proprietary defined terms, some of which are not found in a glossary, and contain excessively lengthy and confusing sentences and clauses. *See id.*

25. All Hometap's so-called Option Purchase Agreements (referred to herein as the Hometap contract or Hometap product) have the same four core features:

a. Cash Advance: They provide upfront cash to homeowners without requiring documentation or underwriting of income, job, or assets other than the home itself. Hometap refers to this cash as the "Option Investment Amount" or "Investment Amount" rather than what it is, the principal amount of a loan.

b. Equity Devaluation: In exchange for the cash advance, Hometap acquires an interest in a percentage of the homeowner's home equity that well exceeds the percentage of the home value paid to the homeowner via the cash advance.

c. Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate but, Hometap's "capped" return routinely exceeds 20% annual interest, because Hometap does not calculate the figure based on the full value of the Investment Amount. See Massachusetts Enforcement Action ¶¶ 52(c), 63.

d. Ten-Year Balloon: The homeowner is not required to make any installment payments to Hometap during the loan term. Instead, at the end of the ten-year term, the homeowner must make a single, very large payment to Hometap, unless Hometap decides to extend the term up to twenty years. Most homeowners will have to fund this payment by selling their homes.

26. Hometap's form contracts contain the header: "Option Purchase Agreement" and deceptively state "THIS IS NOT A LOAN."

27. Under the contract, Hometap purportedly "pays" (but in reality, loans) a sum of money to the homeowner, called the "Investment Amount."

28. This amount is paid back through a supposed option to purchase a percentage of the home's value in the future, called the "Hometap Percentage."

29. A copy of Plaintiff's Hometap contracts and accompanying schedules and exhibits are attached hereto as Exs. A & B.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

30. Hometap deducts certain fees and costs from the Investment Amount before the consumer receives the Investment Amount.

31. Some of these fees and costs are purportedly paid to third parties for typical mortgage closing services, such as for appraisals, title charges, and recording fees.

32. Hometap does not disclose the identity of the entities that provide each of the services, nor the actual amount paid to that entity.

33. Hometap charges the homeowner more for closing services than the amount it pays to third parties for these services.

34. Upon information and belief, the excess of the amount charged for the so-called "third-party costs" are actually retained by Hometap.

35. In addition, Hometap retains a 3% "Investment Fee."

36. Thus, for example, although Hometap offered a $44,000.00 "Investment Amount" to Plaintiff in the 2020 Contract, Plaintiff actually received $40,664.38. *See* Ex. A at Option Closing Disclosure. Similarly, in 2021, Hometap purported to offer Plaintiff an Investment Amount of $57,459.00 but Plaintiff actually received $53,555.23. *See* Ex. B at Investment Disclosure.

37. Under the terms of the contract, in exchange for the "Investment Amount," Hometap will receive a payment from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage"), although Hometap alleges that Hometap Percentage is capped at an annualized twenty percent ("Hometap Cap").

38. The actual payment of that amount by the homeowner, which will typically be paid through a voluntary or forced sale of the home, is called the "Hometap Share."

39. Under the Hometap contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events. *See* Ex. A at Option Closing Disclosure, Option

6

CLASS ACTION COMPLAINT

Purchase Agreement § 2.5; B at Investment Disclosure, Option Purchase Agreement § 2.5.

40.    sssThe Hometap Share is, functionally, repayment of the original Investment Amount plus a profit.

41.    The profit to Hometap, its return on investment, is a disguised finance charge for the original amount loaned to the homeowner.

42.    Despite what Hometap tells consumers, its products are single-payment mortgage loans with a high rate of effective interest and/or exorbitant finance charges.

**B.    Hometap's product misleads homeowners & puts vulnerable homeowners at risk.**

43.    Hometap advertises its product to cash strapped homeowners as a way to pay off unsecured debt like credit cards and eliminate bills to enable a homeowner to "get closer to financial freedom." Hometap, https://www.hometap.com/ (last visited June 22, 2026) (hereinafter "Hometap Homepage").

44.    Instead, the product places a homeowner in a financial trap, stripping their most valuable financial asset—their home equity—from them at an extremely high rate of return for Hometap.

45.    Indeed, Hometap's product restricts a homeowner's "freedom" by not allowing the homeowner to rent the house, move, take on additional debts without Hometap's approval, or otherwise make personal decisions about the home such as transferring it to a family member. *See* Exs. A & B Option Purchase Agreement § 6.

46.    Hometap presents itself as working for the joint interest of itself and the homeowner.

47.    For instance, Hometap advertises that its product is: "Built for You. We put homeowners at the heart of everything we do. Our products are designed to help you meet your goals, and our team of real humans is here to support you every step of the way." Hometap Homepage.

CLASS ACTION COMPLAINT

48. Hometap further touts "Our homeowner-first approach," *id*., and states that it "invest[s] alongside homeowners," Hometap FAQs, https://www.hometap.com/faqs (last accessed June 23, 2026) (hereinafter "Hometap FAQs").

49. In reality, Hometap's goal is to maximize profit for investors.

50. Hometap also misleads homeowners by touting that they will not have to sell their homes to access their home equity, when in fact the contract requires just that. *See, e.g.*, Hometap Homepage ("Access your home equity without having to sell or stress."); Hometap FAQs (asserting that it "provides homeowners with a fast, simple, and straightforward way to access the equity in their home without taking on monthly payments or having to sell.")

51. Indeed, Hometap advertises specifically to homeowners who cannot afford monthly payments and asserts that their product will help them receive cash without selling. *See* IPE Webinar: Home Equity Investments: An Untapped Asset Class/Hometap, https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (noting that the product appeals to people who "just can't take on . . . more debt"; later explaining that increased homeowner cost-of-living and inability to take on additional traditional debt "translates into an opportunity for capital . . . to earn a really strong relative risk adjusted return") (hereinafter "IPE Webinar").

52. In reality, homeowners will not be able to refinance with a traditional loan at the end of the contract when the payoff has dramatically increased, because payments will be even more unaffordable. Instead, in direct contrast to Hometap's promises, the homeowner will be forced to sell—at considerable gain to Hometap and its investors.

53. Hometap further indicates that the loans require "no monthly payments," Hometap Homepage, without making clear that Hometap requires the homeowner to pay all costs associated with the home, including the first mortgage, taxes, insurance,

8

CLASS ACTION COMPLAINT

homeowners' association fees, and repair and maintenance costs. *See* Exs. A & B Option Purchase Agreement § 6.

54.    And while Hometap repeatedly characterizes the product as "financing" to homeowners and investors, its contract claims that the payment is "not a loan or any other form of financing transaction," *See* Ex. A § 4.9; Ex. B § 4.1(i); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

55.    Prior to entering a Hometap contract, Hometap does not determine whether or not a homeowner can repay the Hometap product based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation.

56.    Hometap's only evaluation prior to entering a Hometap contract pertains to a homeowner's ability to repay the Hometap contract through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

57.    If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property . . . and [thereafter] solicit[] a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers . . . ." Ex. A Option Purchase Agreement at § 7.2(a); Ex. B at § 3.1(b).

58.    Hometap does this after years of requiring and relying on homeowners to invest in their own homes and ensure that the value of the home increases, ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

59. Hometap is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt.

60. Hometap's product further exploits homeowners through a number of unlawful provisions designed to limit the ability of homeowners to vindicate their rights in court, including:

    a. The contract includes a mandatory arbitration clause. Exs. A & B Option Purchase Agreement § 8.13. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1).

    b. The contract also seeks to strip Plaintiff of her right to remedies, including actual, statutory, punitive, and consequential damages. Exs. A & B § 8.1. No matter how much harm the company causes Plaintiff or how many laws it violates, the contract provides that "IN NO EVENT WILL [Hometap's] AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT." *Id.*

    c. The contract also seeks to immunize Hometap by allowing asserting that it is not responsible for the acts of its employees, contractors, agents, or others, except in limited circumstances. Ex. A § 8.8.

    d. The contract's indemnification clause also purports to put Plaintiff on the hook for Hometap's legal expenses for a wide range of claims, independent of the outcome of the litigation. Ex. A § 8.1.

61. These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights—including seeking to protect themselves from Hometap's predatory and unlawful attempts to take their homes and strip them of their home equity.

**C.    Hometap's product is a mortgage loan.**

62. Hometap falsely claims that it is entirely exempt from any federal and state lending laws and licensure requirements because (it claims) its product is not a mortgage loan.

63. Rather than providing appropriate disclosures to homeowners, including the true cost of the loan and the fact that Hometap has structured the transaction to

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

ensure that it will be paid back at a profit, Hometap disguises the finance charge in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates or depreciates.

64.    But no matter how Hometap labels its product, it is still a mortgage loan, because Hometap provides homeowners with an advance of money, receives security through a mortgage on their home, and defers repayment until the end of the contract, to occur within 10 years. In other words, homeowners have the obligation to repay Hometap, by the very terms of the product. Those features create a mortgage loan.

65.    Hometap ensures that, in practice, it will obtain repayment of its initial advance payment (plus a substantial finance charge) because all of the conditions for the conclusion of the contract require Plaintiff to pay Hometap.

66.    In this case, under the 2020 Contract, Hometap paid Plaintiff roughly 13% of the value of her home at the time of that contract, and Hometap will receive up to 23.967% of the home's end-of-contract value in 2030 (capped at 20% annual compound interest). *See* Ex. A at Option Closing Disclosure. Under the 2021 Contract, Hometap paid Plaintiff roughly 14.5% of the home's value at the time of that contract, and Hometap will receive up to 26.031% of its end-of-contract value in 2031. *See* Ex. B at Investment Disclosure.

67.    Thus, even without any home appreciation, Hometap is guaranteed a profit.

68.    Upon information and belief, Hometap will not issue one of its products unless it anticipates significant appreciation of the home. As a result, not only does the percentage of the home's value that Hometap will be paid increase, but the real dollar figures (the denominator by which the payout is calculated) also increases.

69.    In reality, Hometap anticipates that its products will reach the 20% APR cap almost all of the time. As a result, the product functions exactly like a traditional loan: the homeowner takes out a debt and then repays it, with 20% interest.

CLASS ACTION COMPLAINT

70. While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

71. Hometap's contract contains a number of features to further ensure that nothing will decrease the value of the home or jeopardize its future payment:

a. Hometap requires homeowners to pay for all the taxes, insurance, and repairs on the home. Exs. A & B Option Purchase Agreement §§ 6.2(e); 7.1(i); 7.1(f). Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. Exs. A & B § 7.2(b).

b. Hometap limits the homeowner's ability to rent out the home or leave the property. See Ex. A & B § 6.1(b); *see also* IPE Webinar at 30:02 (explaining that investors will see profit because the homeowner will pay for upkeep of the property and ensure that its value increases, unlike a renter).

c. Hometap caps the amount of any additional home secured debt that the homeowner can take on. Ex. A § 6.1(h); B § 6.1(i).

d. Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can, in its sole discretion, calculate the value of the "Hometap Share" based on appraisal instead of the sale price. *See* Ex. A § 2.1-2.3; Ex. B §§ 2.1-2.3. Hometap can also effectively delay the sale by requiring sworn documentation from both the owner and buyer.

e. The contract's 10-year maturity date ensures that it will not take a loss: Hometap CEO Jeffrey Glass has explained that there "only three time periods in American history where over a 10-year period the average home in America has had any level of realized decline" and that even then, the amount of decline has been minimal. IPE Webinar at 23:02.

f. Hometap's (but not the homeowner's) option to extend the contract up to an additional 10 years also allows it to ensure that it will be paid back, with a profit. *See* Exs. A& B § 1.5.

12

CLASS ACTION COMPLAINT

72. Hometap's statements to investors confirm it will be paid back at a profit. For instance:

a. Hometap states that it has a "Proven track record" including "8+ years delivering strong, risk-adjusted returns," and "in both rising and declining home value environments." Hometap Investment Homepage, https://invest.hometap.com/ (last accessed June 23, 2026); *see also id.* (touting that "investors reap the benefits of U.S. home price appreciation without the complexities that historically come with large-scale residential real estate investing," and further explaining that a "combination of data science, technology, thorough underwriting creates high quality assets"—that is, a high rate of return); IPE Webinar at 1:16 (explaining that Hometap has a "very big focus on technology and data science . . . for ensuring that we're creating a really strong portfolio for capital").

b. Hometap explains that it "structure[s] these [products] in a way that we're able to create meaningful downside protection for capital" and that it recognizes that "we have to deliver appropriate risk-adjusted returns for investors who care about downside protection and Sharpe ratios." IPE Webinar at 12:40.

c. Hometap further explains that despite the ten-year contractual period, Hometap knows that it will "always see a percentage of the portfolio turn each year and that provides the cash flow back to investors" because of refinances and sales. IPE Webinar at 37:18.

73. In addition, while the Hometap product does have the characteristics of a mortgage loan, its product does not have the characteristics of an option, including:

a. Unlike with a typical option contract, the contract terms demonstrate that Hometap does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to so that Hometap is paid back financially, primarily either through forced or voluntary sale.

b. As described above, the product shifts all risk and costs onto consumers and is designed to ensure that Hometap will always benefit from exercising the option, unlike a true option contract.

c. The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home, which is not a feature of a typical option contract and reflects Hometap's true intention that consumers pay back Hometap at a profit. Exs. A & B § 2.4.

13

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

d. A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home and various contractual terms creating obligations on the homeowner throughout the life of the contract gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

e. A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Hometap has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise payment" at the end of the ten-year term is, at most, a nominal 1% of the cash amount loaned to the consumer. *See* Ex. B § 3.1(e).

f. Hometap's statements to consumers about how to "settle" the contract demonstrate that it only contemplates being paid back and does not contemplate any scenario in which it will not exercise the option.

74. Hometap's documents also confirm that the product is a mortgage loan:

a. Hometap has obtained and recorded a mortgage on Plaintiff's home to secure its loan. Ex. A Mortgage and Security Agreement; Ex. B Mortgage and Security Agreement.

b. Hometap's documents, in some places, do refer to the product as a "loan." *See* Ex. A Option Purchase Agreement § 6.2(h)(ii); Ex. B § 6.1(i)(ii) (referring to any additional indebtedness as a "Subsequent Loan").

c. Certain of Hometap's documents for the transaction refer to Plaintiff as "borrowers." *See, e.g.*, Ex. A § 6.1(c)(i) ("As such, coverage shall cover Hometap but may not protect Borrower, Borrower's equity in the Property…")

d. Hometap also refers to the product as "financing." Hometap Homepage (referencing "a fresh take on financing"); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

75. The product contains also various costs that are identical to those incurred with a loan.

---

14

CLASS ACTION COMPLAINT

76. In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus a profit—at a benefit to investors and a huge loss to homeowners.

77. As Hometap's own documents and statements recognize, its product is a mortgage loan.

**D.      Hometap's predatory business practices contribute to its rapid expansion.**

78. Hometap is a rapidly growing company, and it now boasts that it has over 14,000 customers across the U.S. Hometap, Home Equity Investments: The Tipping Point for Alternative Financing at 16 (back cover) (2025), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing

79. Getting homeowners to sign these mortgage loans is just the first step in Hometap's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

80. In late 2025, Hometap entered its fifth substantial securitization, backed by $300 million in Hometap contracts, "reinforcing both its position as a leader in the asset class and its ability to deliver consistent access to capital for investors." Hometap Closes $300M Securitization of Hometap-originated Home Equity Investments, Citybiz (Sept. 8, 2025), https://www.citybiz.co/article/741421/hometap-closes-300m-securitization-of-hometap-originated-home-equity-investments/.

81. As of that date, Hometap's contracts equate to over $2 billion and impact more than 20,000 homeowners. *Id.*

**E.      Federal and state laws protect homeowners like Plaintiff from Hometap's loan.**

82. Congress and the California legislature have both passed laws to protect homeowners like Plaintiff from complex and confusing financial products that can cause people to lose their homes.

CLASS ACTION COMPLAINT

83. While the Truth in Lending Act, 15 U.S.C. §1602 *et seq.* ("TILA"), protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

84. For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. *Id.* at § 1639c(a)(1).

85. Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* at § 1639b(b)(1)(A).

86. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* at § 1639c(e)(1).

87. In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." *Id*. § 1602(bb). These include pre-loan counseling and additional disclosures. *Id.* § 1639(a), (h), (u).

88. California requires disclosures and protections for mortgages generally, *see generally* Cal. Bus. & Prof. Code §§ 10240-10241. California also provides broad protections for consumer contracts, *see, e.g.,* Cal. Civ. Code §§ 1799.200-1799.207; 1799.209; Cal. Bus. & Prof. Code § 17200.

89. California also requires that only licensed mortgage lenders can offer these products. Cal. Fin. Code § 50002(a)

**F.     Plaintiff's experience is typical.**

90. In the late 1990s, Plaintiff purchased a home for herself and her family in Victorville, CA 92392.  She chose the home because it was in a desirable and safe location and hoped to raise her family there, intending to keep the home so that she could one day leave it to her children.

CLASS ACTION COMPLAINT

91. By 2020, Plaintiff was in financial distress. She was not working, was relying in part on government stimulus payments and support from her adult children, and was carrying bills she could not keep up with.

92. Plaintiff began looking for ways to address her financial situation but could not qualify for conventional financing. It was against this backdrop that Plaintiff turned to Hometap.

### i. November 20, 2020 Contract

93. In or around October 2020, Plaintiff contacted Hometap by telephone to inquire about its product, and at Hometap's request, provided certain information about her home.

94. Plaintiff communicated with a Hometap Investment Manager, Devlin Keogh by telephone. Keogh asked Plaintiff how much equity she had in her home and how much money she needed. When Plaintiff provided those figures, Keogh represented that the funds would be easy to obtain and that her request would be no problem. The ease of the process struck Plaintiff who had expected obtaining money be far more difficult.

95. At no point did Keogh represent that qualification turned on Plaintiff's income, employment or creditworthiness. To the contrary, Plaintiff was not required to document any income, and, to her knowledge, Hometap did not run a credit check on her. Qualification appeared to depend entirely on the equity in her home.

96. Keogh presented the product as a fast and simple way to draw cash from her home equity to pay her bills and other expenses, including a car payment, at a time when she was not working and could not qualify for other financing. Plaintiff was led to believe the transaction was a straightforward, low-risk way to access the cash she needed.

97. Keogh told Plaintiff she could expect to receive around $44,000, the amount Plaintiff had requested based on what she needed to pay her bills. Plaintiff was informed that she qualified for more than this amount. The home was initially

CLASS ACTION COMPLAINT

appraised at $305,973, making the requested amount roughly 13% of the home's appraised value.

98. Plaintiff never met in person with Keogh or anyone else from Hometap. On November 20, 2020, a settlement agent from the title company came to her home and had her sign the 2020 Contract documents in her garage. The agent handed Plaintiff a stack of documents, did not sit down, did not explain any of the documents to her. Instead, the agent simply pointed to where Plaintiff should sign, flipping through and turning the pages over quickly as Plaintiff signed. Plaintiff felt rushed throughout, and the entire process went by very fast. Plaintiff signed without any meaningful opportunity to read, understand, or negotiate the terms.

99. The Closing Package of the 2020 Contract stated that the required signatories for the contract were Homeowner, here Plaintiff, and Hometap Investment Partners II, L.P.

100. Hometap required Plaintiff to grant it a mortgage on her home, which secured her obligations under the contract on penalty of foreclosure (the "Mortgage and Security Instrument"). Ex. A Option Purchase Agreement § 1.2(a)(iv).

101. Plaintiff did not have any opportunity to negotiate the terms of the contract. Under Hometap's contract, the company was to give Plaintiff a stated amount of $44,000.00.

102. Plaintiff only received $40,664.38 of the loan amount due to the following deductions:

    a. investment fee of $1,320.00

    b. appraisal costs of $299.00

    c. title charges of $595.00

    d. "memorandum" costs of $120.00

    e. "mortgage" costs of $231.00

    f. payoff payments to Bank of America of $737.62.

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

g. "UCC financing statement" costs of $33.00

103. These fees exceed the actual cost for the services provided. For instance, the typical cost of recording a mortgage in San Bernardino County is under $100.

104. At the end of the contract, Plaintiff would be forced to pay Hometap 19.973% of the home's value at that time if the property value went down, or 23.967% of her home's value if the home's value increased.

105. The contract purports to subject this amount to a 20% annual rate of return cap.

106. Pursuant to the contract's terms, the contract ends at the first of the following events:

a. Plaintiff selling her home in a sale on terms permitted by Hometap

b. Plaintiff defaults on property taxes, insurance, or homeowner's association dues on the property, or otherwise defaults on the contract terms;

c. The property is destroyed or condemned;

d. Plaintiff otherwise pays off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e. Plaintiff passes away; or

f. Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

107. Additionally, Plaintiff is required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home.

108. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

109. Plaintiff is also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

19

CLASS ACTION COMPLAINT

110. Plaintiff cannot repay that amount of money without either selling her home or sinking deeper into debt they cannot afford.

111. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Plaintiff must either buy out Hometap for thousands of dollars that she doesn't have, or the company will force the sale of her home. Ex. A Option Purchase Agreement, §§ 2.7, 3.1.

112. Plaintiff did not understand that Hometap could force her to sell her home in 10 years and only took out the loan to save her home. If they had understood the consequences, they never would have signed the contract.

113. Being forced out of her home would be a personal and financial disaster for Plaintiff having to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from her home.

### ii.    July 14, 2021 Contract

114. By July 2021, Plaintiff's bills remained high, and she still had not been able to obtain assistance elsewhere. Needing additional funds, she contacted Hometap a second time and asked whether she could receive more money.

115. As with the first transaction, Plaintiff communicated with Hometap Investment Manager Devlin Keogh, who was not required to document her income, and qualification again appeared to turn on her available home equity rather than her income, employment, or credit.

116. To Plaintiff's recollection, Plaintiff requested additional funds, around $54,000. Keogh told her they would give her the maximum amount that she qualified for, which was $57,459.00 and net proceeds of $53,555.23.

117. At no point did Keogh represent that qualification turned on Plaintiff's income, employment or creditworthiness. To the contrary, Plaintiff was not required to document any income, and, to her knowledge, Hometap did not run a credit check on her. Qualification appeared to depend entirely on the equity in her home. Plaintiff

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

was led to believe the transaction was a straightforward, low-risk way to access the cash she needed.

118.  The home was initially appraised at $367,889.00.

119. The Closing Package of the 2021 Contract stated that the required signatories for the contract were Homeowner, here Plaintiff, and Hometap Investment Partners II, L.P.

120. Hometap required Plaintiff to grant it a mortgage on her home, which secured their obligations under the contract on penalty of foreclosure (the "Mortgage and Security Instrument"). Ex. B Option Purchase Agreement § 1.2(a)(iv).

121. Plaintiff did not have any opportunity to negotiate the terms of the contract. Under Hometap's contract, the company was to give Plaintiff a "loan amount" of $57,459.00.

122.  This loan amount was roughly equivalent to 14.5% of the appraised value of the home.

123.  Plaintiff only received $53,555.23 of the loan amount due to the following deductions:

>     a.  investment fee of $1,723.77
>
>     b.  appraisal costs of $299.00
>
>     c.  title charges of $595.00
>
>     d.  "memorandum" costs of $117.00
>
>     e.   "mortgage" costs of $228.00
>
>     f.  payoff payments to Bank of America of $833.00
>
>     g.   "UCC financing statement" costs of $108.00

124.  These fees exceed the amount of the actual cost for the services provided. For instance, the typical cost of recording a mortgage in San Bernardino County is under $100.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

125. At the end of the contract, Plaintiff would be forced to pay Hometap 21.692% of the home's value at that time if the property value went down, or 26.031% of their home's value if the home's value increased.

126. The contract purports to subject this amount to a 20% annual rate of return cap.

127. Pursuant to the contract's terms, the contract ends at the first of the following events:

    a.  Plaintiff selling her home in a sale on terms permitted by Hometap

    b.  Plaintiff defaults on property taxes, insurance, or homeowner's association dues on the property, or otherwise default on the contract terms;

    c.  The property is destroyed or condemned;

    d.  Plaintiff otherwise pays off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

    e.  Plaintiff passes away; or

    f.  Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

128. Additionally, Plaintiff is required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home.

129. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

130. Plaintiff is also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

131. Plaintiff cannot repay that amount of money without either selling her home or sinking deeper into debt she cannot afford.

132. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Plaintiff must either buy out Hometap for hundreds of

22

CLASS ACTION COMPLAINT

thousands of dollars that she doesn't have, or the company will force the sale of her home. Ex. B §§ 2.7, 3.1.

133. Plaintiff did not understand that Hometap could force her to sell their home in 10 years and only took out the loan to save their home. If she had understood the consequences, she never would have signed the contract.

134. Being forced out of her home would be a personal and financial disaster for Plaintiff having to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from her home.

## V. CLASS ACTION ALLEGATIONS

135. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed classes defined as follows:

> **TILA Lookback Class:** All persons who have entered into an Option Purchase Agreement with Hometap more than three (3) years before the filing of this action.

> **California Class:** All persons who have entered into an Option Purchase Agreement with Hometap at a time when they were residents of California and/or where the property was located in California.

136. Plaintiff reserves the right to amend the definitions of the classes above based on discovery or legal developments.

137. **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements in the State of California and Nationwide.

138. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class, and predominate over the questions affecting only individual members. The common legal and factual questions include, among others:

    a. Whether Hometap's Option Purchase Agreements are mortgage loans;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

23

CLASS ACTION COMPLAINT

b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

c. Whether Hometap's Option Purchase Agreements violate federal and state consumer protection laws;

d. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to rescission of their agreements, as well as statutory, actual and punitive damages;

e. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

f. Whether Hometap acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

139. **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of the claims of each Class member. Plaintiff has the same claims for statutory, actual and punitive damages that they seek for absent class members.

140. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Class. Her interests are aligned with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.

141. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all

24

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the class.

## VI.   CAUSES OF ACTION

### COUNT 1

### Truth-in Lending Act, 15 U.S.C. §1602 *et seq*.

### Against All Defendants

142.  Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

143.  The contracts at issue from Hometap involved an extension of consumer credit as described by TILA, 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

144.  The contracts at issue are "residential mortgage loans" as defined by 15 U.S.C. § 1602(dd)(5).

145.  The contracts are for the extension of credit and require the payment of a finance charge, as those terms are defined in 15 U.S.C. §§ 1602(f) and 1605 and 12 C.F.R. § 1026.4; specifically, the difference between the Investment Amount and the Hometap Share includes a finance charge.

146.  The credit was offered to a consumer for personal, family, or household purposes.

147.  The contracts are secured by Plaintiff's dwelling.

148.  Hometap is named as the payee on the face of the contract and regularly makes this type of contract pursuant to the requirements of TILA, rendering it a creditor subject to TILA.

149.  Hometap violated TILA including but not limited to by:

   a.  Entering into the contracts with Plaintiff while being unlicensed to originate mortgage loans in California, 15 U.S.C. §1639b(b)(1)(A);

   b.  failing to make a reasonable and good faith determination that Plaintiff had the ability to repay the loans, 15 U.S.C. § 1639c(a);

c. failing to provide Plaintiff with any of the disclosures required by TILA for residential mortgage loans, including those required by 15 U.S.C. §§ 1638(a), 1639(a); 12 C.F.R. §§ 1026.19, .23, .31, .37, and .38;

d. including a mandatory arbitration clause in the contract, 15 U.S.C. § 1639c(e); and

e. in the alternative, failing to comply with TILA's reverse mortgage protections, including failing to provide the required disclosures, despite that the loan (alternatively) is a reverse mortgage as defined by statute, 15 U.S.C. §§ 1602(cc), 1648, 12 C.F.R. § 1026.33.

150. Plaintiff hereby rescinds and requests that the Court enforce the rescission of her transactions with Hometap, pursuant to 15 U.S.C. § 1635.

151. Plaintiff suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiff's interest in the property.

152. As a result of the violations of TILA, pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiff, on behalf of herself and the Nationwide TILA Class, seeks: a declaration that Plaintiff and the Nationwide TILA Class have the right to rescind their loans, pursuant to 28 U.S.C. § 2201; rescission of the transactions, including a declaration that Plaintiff and the Class are not liable for any finance charges or other charges imposed by Defendant; termination of any security interest in Plaintiff's property created under the transaction; return of any money or property given by the Plaintiff to anyone, including the Defendants, in connection with this transaction; actual damages; an amount equal to the sum of all finance charges and fees paid; an award of reasonable attorney's fees and costs; and all other appropriate relief to the class as permitted by statute or law.

153. Although 15 U.S.C. § 1640(e) ordinarily requires that an action for damages be commenced within one year from the date of the violation, the limitations period is subject to equitable tolling in appropriate circumstances. Tolling is warranted where, among other circumstances, the defendant's own conduct prevented the plaintiff from discovering the violation or from timely asserting her rights.

154. Defendants' Option Purchase Agreement was drafted and deployed in such a manner calculated to dissuade consumers like Plaintiff from recognizing or pursuing her federal rights under TILA. In particular, the Option Purchase Agreement explicitly states that the product is not a loan and hides its true characterization by claiming Defendants are providing an equity investment. The Agreement also contains a mandatory arbitration and class action waiver.

155. This action was filed within one year of Plaintiff's discovery of the violations. The limitations period of § 1640(e) is therefore tolled, and Plaintiff's claims are timely. To hold otherwise would reward Defendants who concealed their violations long enough to time-bar their victims' remedy.

## COUNT 2

### Unlawful Business Practices

### Cal. Bus. & Prof. Code § 17200

156. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

157. The California Unfair Competition Law ("UCL") prohibits acts of unfair competition, including business practices that are unlawful. Cal. Bus. & Prof. Code §§ 17200 *et seq*.

158. A business practice that violates any other provision of law, be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, is an unlawful business practice under the UCL.

159. Defendants' conduct violates the California Constitution's prohibition on usury, Article XV, Section 1.

160. Defendants' conduct is unconscionable and prohibited by common law and statute, see Cal. Civ. Code §§ 1670.5, 22302.

161. Defendants' conduct violates California's Financial Code and related statutes, including by the following conduct:

a. Defendants' products are residential mortgage loans, Cal. Fin. Code §§ 50002(a), 50003(p); Defendants acted as a mortgage loan originator, Cal. Fin. Code § 22013; Cal. Bus. & Prof. Code § 10166.01, while not being so licensed as required by California law, Cal. Fin. Code §§ 22109.4, 22109.6, 22100(f), 22755; Cal. Bus. & Prof. Code §§ 10166.01, 10166.02;

b. Defendants' product is a consumer loan, Cal. Fin. Code § 22203, but Hometap was not and is not a licensed lender and therefore is unlawfully "engaged in the business of making consumer loans." Cal. Fin. Code §§ 22009, 22100(a)

c. Defendants violated Cal. Fin. Code § 22161 by (1) making materially false or misleading statements or representations to a borrower about the terms or conditions of the loan, as described herein, including but not limited to that the product was not a loan, that the borrower might not have to pay the loan back, that the loan had no interest, and that Hometap and the homeowner shared equally in the risks and rewards of the product, § 22161(a)(1); (2) making statements and representations in advertising about the rates, terms, and conditions of its loan that were false, misleading, deceptive, or omitted material information, including information revealed the true cost and risks of the transaction, § 22161(a)(3); (3) knowingly misrepresenting, circumventing, or concealing material aspects or information regarding the transaction as described herein, § 22161(a)(6); and (4) engaging in dishonest dealings, § 22161(a)(7);

d. Defendants failed to provide full and clear disclosure of interest rates, charges, and loan costs, in violation of Cal. Fin. Code § 22164;

e. Defendants' contract is unconscionable under Cal. Fin. Code § 22302;

f. Defendants violated Cal. Fin. Code § 22332 by failing to accurately disclose the amount of the loan and the interest rate on the loan;

g. Defendants violated Cal. Fin. Code § 22755 by engaging in unlawful conduct as a mortgage originator, including but not limited to the following conduct alleged herein and below: (1) directly or indirectly employing any scheme, device, or artifice to defraud or mislead borrowers; (2) engaging in unfair and deceptive practices; (3) failing to disclose financing terms; (4) failing to make disclosures required by law; (5) failing to comply with other requirements of the Financial Code; and (6) making false or deceptive statement or representations as to rates and financing terms, and engaging in bait-and-switch advertising.

162. Each of Defendants' violations of California's Financial Code was willful. The loan is therefore void under Cal. Fin. Code § 22750(b). Defendants have

unlawfully collected or received principal, charges, or recompense in connection with its transactions.

163. In the alternative, if these violations were not willful, all interest on Defendant's loans is uncollectable. Cal. Fin. Code § 22752(a). Hometap has unlawfully collected or received interest in connection with its transactions.

164. Defendants' conduct also violates California's laws on reverse mortgages:

    a. The product is a reverse mortgage under California law. Cal. Civ. Code § 1923. Its product is a nonrecourse loan secured by real property. Hometap provides a cash advance to a borrower based on the equity or the value of the borrower's owner-occupied principal residence. The loan requires no payment of principal or interest until the entire loan becomes due or payable. However, in violation of California reverse mortgage laws, Defendants are not a lender licensed or chartered pursuant to the laws of California or the United States.

    b. Defendants fail to comply with the requirements for reverse mortgages, including but not limited to prepayment penalty prohibitions, disclosure requirements, and independent counseling obligations. §§ 1923.2, 1923.5, 1923.6.

165. Defendants' conduct violates California's laws on real property loans, including but not limited to by charging a fee for an appraisal but failing to provide Plaintiff and class members a copy of that appraisal at or before closing. Cal. Bus. & Prof. Code § 10241.3.

166. Each of these violations of other statutes is an unlawful business practice under the Unfair Competition Law.

167. These violations have caused and continue to cause harm to Plaintiff and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Defendants. These harms are caused by Defendants' unlawful conduct. For example, Defendants do not meet the requirements for licensing as lender, such that it could never have offered these contracts to Plaintiff or the class. Additionally, even if Defendants had been properly licensed, it could not have engaged in harmful and

unlawful conduct towards Plaintiff and the class. For example, the reporting requirements imposed on licensed lenders and mortgage originators would have required Defendants to regularly disclose to California regulators lending and marketing practices that are not in compliance with state law. *See, e.g.,* Cal. Bus. & Prof. Code § 10166.07; Cal. Fin. Code § 22159; Cal. Code Regs. Tit. 10, § 1430 *et seq.* Had Defendants failed to make disclosures, it could then have faced penalties and further enforcement. On information and belief, this reporting requirement or reporting would have prevented Hometap from engaging or continuing to engage in these practices.

168. Plaintiff and the class seek equitable relief, rescission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

169. Plaintiff seeks public injunctive relief on behalf of herself and the general public. Specifically, she seeks a declaration that Defendants' Option Purchase Agreement is unlawful and an order prohibiting Hometap from offering the unlawful Defendants' Option Purchase Agreements to Californians. This relief applies to all persons who own or may in the future own residential property in California.

170. Plaintiff also seeks an injunction prohibiting Hometap from enforcing the unlawful terms of the Defendants' Option Purchase Agreements against all persons who own residential property in California.

## COUNT 3

### Unfair Business Practices

### Cal. Bus. & Prof. Code § 17200

### Against All Defendants

171. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

172. The Unfair Competition Law prohibits unfair business practices and provides a cause of action for these violations. Cal. Bus. & Prof. Code § 17200.

30

CLASS ACTION COMPLAINT

173. Defendants' contracts are unfair under both the balancing test and the tethering test. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).

174. Hometap's contracts are immoral, unethical, oppressive or unscrupulous and cause injury to consumers that outweighs the utility of Hometap's conduct, including but not limited to the following ways:

a. Homeowners provide highly disproportionate returns to Hometap in comparison to the advances they receive;

b. Even though Defendants receive a disproportionate payout from the value of the home, it requires that homeowners like Plaintiff bear all costs in order to protect and increase Defendants' profits, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

c. These products can destroy intergenerational transmission of wealth, especially for working-class families;

d. Homeowners can lose their homes, which are often their financial anchor and largest asset, or get virtually nothing for homes they have spent decades working hard to pay off;

e. Defendants offer these products without sufficient independent counseling about their lengthy contracts, which contain complex and convoluted terms that are difficult for ordinary homeowners to understand;

f. Defendants include these highly one-sided terms in order to increase its profits and returns to its own investors; and

g. There are other viable methods for homeowners to access equity in their homes that do not involve these predatory features and are far less dangerous to homeowners, including but not limited to the California Dream for All program and Home Equity Lines of Credit.

175. Plaintiff and the class could not have reasonably avoided these unfair terms because Defendants' contract is misleading, complex, confusing, and presented as a contract of adhesion on a take-it-or-leave-it basis.

176. Plaintiff and the class cannot reasonably avoid their future payment obligations to Defendants, since each outcome of the contract requires payment to

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

CLASS ACTION COMPLAINT

Defendants. The only scenario in which Defendants will not "exercise" its purported option to require payment is one in which the housing market experiences a catastrophic collapse, which is not an outcome in the control of Plaintiff or the class.

177. Defendants' contracts are also in violation of legislatively declared policy, including but not limited to the policy reflected in laws limiting interest rates in consumer loans; requiring significant disclosures and independent counseling when homeowners are using their homes as security; and disproportionate returns on shared-appreciation products. Cal. Civ. Code §§ 1917.006(a), 1917.006(a)(1), 1917.006(c), 1923.2(k), 1923.

178. These violations have caused and continue to cause harm to Plaintiff and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Defendants.

179. Plaintiff and the class seek equitable relief, recission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

180. Plaintiff seeks public injunctive relief on behalf of herself and the general public. Specifically, she seeks a declaration that Defendants' Option Purchase Agreement is unfair, an order prohibiting Defendants from offering the unfair the Option Purchase Agreement to Californians. This relief applies to all persons who own or may in the future own residential property in California.

181. Plaintiff also seeks an injunction prohibiting Hometap from enforcing the unfair terms of the Option Purchase Agreement against all persons who own residential property in California.

/ / /

/ / /

# COUNT 4

## Deceptive Business Practices/Omissions

## Cal. Bus. & Prof. Code § 17200

## Against All Defendants

182.  Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

183. The Unfair Competition Law prohibits deceptive and misleading practices. Cal. Bus. & Prof. Code § 17200.

184.  Defendants' contract documents contain several statements that are likely to deceive members of the public.

185.  The contracts Defendants provided to Plaintiff and the class repeatedly state that it will pay the homeowner an Investment Amount that is a specific percentage of the home value that is typically thousands of dollars.  This is likely to deceive reasonable consumers into believing that they would be receiving this sum of money from Defendants. However, as explained above, the actual percentage is far less than expected due to a number of fees tacked on by Defendants. This payment is therefore illusory. This deceptive statement is material, since a reasonable consumer would attach significant importance to whether they would receive certain payments from entering into the contract with Defendants.

186.  Defendants' contract also misleadingly omits the true cost of its loan. This is a material omission, since the amount a homeowner will have to pay Defendants will be very important to their decision of whether to enter into this contract.

187.  Defendants' contracts also misleadingly omitted the fact that Defendants are not licensed to engage in lending, mortgage lending, or mortgage origination through its purported equity sharing agreements. A reasonable consumer is likely to be deceived by this omission, since they would not suspect that Defendants' products are illegal, unlicensed loans. This omission is also material, since a reasonable

consumer would attach importance to the fact that the company placing a mortgage on her home and lending her money is doing so illegally.

188. Upon information and belief, Defendants' representations regarding the fees assessed for the origination of the contract are false and/or misleading, in that Defendants' profits from certain fees while indicating that they are bona fide fees reflecting the costs of the transaction.

189. These violations have caused and continue to cause harm to Plaintiff and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Defendants.

190. Plaintiff and the class seek equitable relief, recission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

191. Plaintiff seeks public injunctive relief on behalf of herself and the general public. Specifically, she seeks a declaration that Defendants' Option Agreement and advertisements of the agreement are deceptive, and an order prohibiting Defendants from offering the Option Agreements to Californians in a deceptive manner. This relief applies to all persons who own or may in the future own residential property in California.

192. Plaintiff also seeks an injunction prohibiting Hometap from enforcing the terms of the Option Agreement against all persons who own residential property in California because Defendants obtained the purported agreements by deceptive means.

**COUNT 5**

**Usury**

**California Constitution, Article XV § 1**

**Against All Defendants**

193. Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

34

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.　|　22525 Pacific Coast Highway　|　Malibu, CA 90265

194.  The California Constitution, Article XV, Section 1 prohibits the charging of interest on a loan above 10%.

195.  Defendants' product is a loan.

196.  The effective Annual Percentage Rate on Defendants' product far exceeds 10%. If a triggering event were to happen today, Plaintiff's contract contains an effective simple interest rate of at or over 20% on both contracts.

197.  Defendants are consciously and voluntarily requiring and taking more than the legal rate of interest. Since Defendants structure their contracts to require return rates that will far exceed 10%, Hometap willfully intended to enter into usurious transactions.

198.  As such, Defendants have violated the California Constitution, Article XV, Section 1.

199.  Plaintiff and the class are entitled to relief, including Hometap's forfeiture of all interest on its contract and penalties. *See* Cal. Civ. Code § 1916-3.

## COUNT 6

### Unconscionability

### Cal. Civ. Code § 1670.5 and/or Common Law

### Against All Defendants

200.  Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

201.  As described above and set forth herein, the agreement is substantively and procedurally unconscionable, including but not limited to the following:

    a.  Defendants are a large financial company engaged in the business of soliciting homeowners and placing them in agreements like the one entered by Ms. Crawford;

    b.  Defendants and Plaintiff, and other similarly situated consumers, occupied and occupy significantly unequal bargaining positions, including in Hometap has complex methods of market and financial analysis whereas consumers do not;

CLASS ACTION COMPLAINT

c. Defendants drafted all documents, amounting to nearly 100 pages in the funding package, and presented them as contracts of adhesion;

d. Defendants provided no meaningful explanation of the true costs of the contracts;

e. Defendants failed to provide accurate disclosures related to the transaction and cost of credit as required by law, and instead provided purported disclosures that were misleading, misstated the risks and costs of the transaction, and were confusing;

f. Defendants drafted the documents to be confusing and embedded the terms in fine print, some of which could only be located on the website, others of which were never disclosed, and the contracts themselves are written in small print, are extremely lengthy, contain legalese, repeatedly cross reference other documents, and include extremely difficult to understand terms;

g. Defendants drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that consumers like Plaintiff would not and could not understand the full nature and consequences of the transaction

h. Upon information and belief, Defendants have artificially decreased the purported "original value" of consumers' homes to increase Defendants' future profits, which will be based on a valuation of the house that won't be artificially decreased;

i. Defendants drafted the contract to limit the ability of homeowners to pay off the obligation before three years elapsed, thereby further guaranteeing Defendants' high rate of return and the homeowner's increased loss;

j. Defendants required that homeowners, such as Plaintiff, transfer wealth from themselves to Plaintiff by requiring the homeowners to bear all costs in order to protect and increase Defendants' profit, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

k. The terms of the transaction further benefit Defendants at the cost of consumers like Plaintiff because the majority of Defendants' purported "purchase price" that it pays homeowners is only paid out of funds from the sale of the home that the homeowner would receive without having entered the contract, such that it is illusory;

l. The actual cost of the transaction to Plaintiff and similarly situated consumers is extremely high; and

CLASS ACTION COMPLAINT

m. The terms of the transaction are substantially one-sided in favor of Defendants, which drafted the documents and their terms, and guarantee a substantial rate of return to Defendants at very limited cost or risk, while placing an outsized burden of the costs and risks on Plaintiff, and similarly situated consumers, as described above.

202.  As described herein, the transactions are procedurally unconscionable, in that Defendants uses its unequal bargaining power with respect to their targeted borrowers to allow them to insert oppressive terms that would come as a surprise to borrowers, once discovered.

203.  As described herein, the transactions are substantively unconscionable, in that Defendants traps borrowers in contracts that yield overly harsh and one-sided results in Defendants' favor.

204.  Because the contract was unconscionable, Plaintiff is thus entitled to and respectfully requests, for herself and all others similarly situated, all available relief, including that the court declare that the contract cannot be enforced under Cal. Civ. Code § 1670.5 and/or declare that the contract is void pursuant to the common law contract defense of unconscionability.

## COUNT 7

### Declaratory Judgment

### Declaratory Judgment Act Cal Civ. Code § 1060

### Against All Defendants

205.  Plaintiff incorporates by reference each allegation set forth above as if set forth at length herein.

206.  Plaintiff is a "person interested under a written instrument … or under a contract or who desires a declaration of his or her rights or duties with respect to another." Cal. Civ. Code § 1060.

207.  These contracts and written instruments impose ongoing and future obligations upon Plaintiff, and also encumber Plaintiff's property.

208.  Plaintiff seeks a declaration of the validity of her contracts with Defendants, as well as her rights and duties under those contracts. Specifically,

37

CLASS ACTION COMPLAINT

Plaintiff seeks a declaration that her contracts with Defendants are void, voidable, invalid, or otherwise unenforceable in whole or in part.

209. Plaintiff seeks declarations including:

   a. Defendants' contracts are void under Cal. Fin. Code § 22750(b);

   b. That the contracts are unconscionable and unenforceable under Cal. Civ. Code § 1670.5 and/or common law; or

   c. In the alternative, that all interest under the contracts is uncollectable under Cal. Fin. Code § 22752(a).

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against the defendants as follows:

   A. An Order certifying the Classes above;

   B. An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

   C. An Order awarding monetary damages, including but not limited to any statutory, actual, punitive and treble damages, in an amount to be determined by the Court or jury;

   D. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

   E. An Order awarding Plaintiff reasonable costs and expenses of suit, including attorneys' fees;

   F. Such further relief as the Court may deem just and proper.

   G. An order declaring the Defendants jointly and severally liable;

   H. An order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to declaring void, rescinding, terminating, voiding, or reformulating the contracts;

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

I. An order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

J. An order awarding treble damages;

K. An order awarding punitive damages in an amount to be determined by the Court or jury;

L. An order awarding interest at the maximum allowable legal rate on the foregoing sums;

M. An order awarding reasonable attorneys' fees, costs, and expenses, including under Cal. Civ. Pro. § 1021.5; and

N. Such further relief as this Court may deem just and proper.

## VIII. JURY DEMAND

210. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury as to all issues in the above matter.

Dated: June 23, 2026

**CLARKSON LAW FIRM, P.C.**

*/s/ Kristen Simplicio*
Kristen Simplicio
Chimaraoke Iko

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT