**MCGUIREWOODS LLP**
Anthony Q. Le (SBN 300660)
ale@mcguirewoods.com
1800 Century Pk E, Seventh Floor
Los Angeles, CA 90067
Tel: (310) 315-8225
Fax: (310) 315-8210

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARLENE CRAWFORD, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HOMETAP EQUITY PARTNERS, LLC and HOMETAP INVESTMENT PARTNERS II, L.P.,

Defendants.

**Case No. 5:26-cv-03457-KK-AS**

**DEFENDANTS HOMETAP EQUITY PARTNERS, LLC AND HOMETAP INVESTMENT PARTNERS II, L.P.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Date: October 29, 2026

Time: 9:30 a.m.

Judge: Hon. Kenly Kiya Kato

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 29, 2026, at 9:30 a.m., in Courtroom 3 of the United States District Court for the Central District of California, located at 3470 Twelfth Street Riverside, CA, 92501, Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P. (collectively, "Hometap") will and hereby do move the Court for an order compelling Plaintiff Marlene Crawford's claims to arbitration.

This Motion is made on the grounds that Plaintiff entered into Option Purchase Agreements with Hometap that contain binding arbitration provisions, including delegation provisions that require arbitrating threshold questions of arbitrability. This Motion is based upon this Notice of Motion, the incorporated Memorandum of Points and Authorities, the Declaration of Adam Jaskievic and exhibits thereto and upon such other matters as the Court may allow.

This Motion is made following a meet and confer pursuant to L.R. 7-3, which took place on August 12, 2026.

DATED: August 21, 2026 **MCGUIREWOODS LLP**

By: */s/ Anthony Q. Le*
Anthony Q. Le

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*

# TABLE OF CONTENTS

Page


MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 7
INTRODUCTION........................................................................................ 7
BACKGROUND .......................................................................................... 8
I. Crawford enters into Option Purchase Agreements with Hometap ............. 9
II. The Agreements contain arbitration agreements and delegation provisions...................................................................................... 11
III. Despite the arbitration agreements, Crawford sued Hometap ................... 12
LEGAL STANDARD ................................................................................... 12
ARGUMENT.............................................................................................. 13
I. The FAA requires enforcing valid arbitration agreements ........................ 13
II. The arbitrator must decide any threshold issues of arbitrability ................ 14
A. The Agreements contain valid delegation provisions ..................... 14
B. TILA does not dictate who decides arbitrability............................. 15
C. Crawford's allegations of unconscionability provide no basis for avoiding arbitration ........................................................ 17
III. Alternatively, if the Court reaches threshold arbitrability issues, no basis for avoiding arbitration exists.................................................. 17
A. TILA does not cover the Agreements ............................................ 18
1. The Agreements do not extend credit.................................. 18
2. The Agreements are option contracts and investment plans ............................................................................. 21
B. The arbitration agreements are not unconscionable........................ 22
CONCLUSION........................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baskin v. EK Real Est. Servs., NY, LLC*,
No. 21-cv-727, 2022 WL 17742738 (E.D. Tex. Sept. 14, 2022)............... 16, 17

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015).......................................................... 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000).......................................................... 13

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)....................................................................15-17

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)......................................................................... 13

*Fli-Lo Falcon, LLC, v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024)..........................................................13-15

*Foster v. EquityKey Real Estate Investments L.P.*,
No. 17-cv-67, 2017 WL 1862527 (N.D. Cal. May 9, 2017).......................... 21

*Garner v. Inter-State Oil Co.*,
52 Cal. App. 5th 619 (2020)............................................................. 15

*Gilliam v. Levine*,
955 F.3d 1117 (9th Cir. 2020).......................................................... 21

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000)........................................................................... 13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019).........................................................................14-16

*In re Robert L. Helms Constr. & Dev. Co.*,
139 F.3d 702 (9th Cir. 1998)............................................................ 22

*In re Svenhard's Swedish Bakery*,
154 F.4th 1100 (9th Cir. 2025).......................................................... 18

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......... 21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......... 13, 14

*Olsen v. Unison Agreement Corp.*, No. 22-cv-1859, 2023 WL 4492346 (W.D. Wash. June 27, 2023) .......... 16

*Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220 (9th Cir. 2022) .......... 12, 13, 15

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010) .......... 15, 17

*Sitzman v. EK Real Est. Servs. of NY LLC*, No. 21-cv-2666, 2022 WL 17853214 (N.D. Tex. Dec. 21, 2022) .......... 16

*Veneziani v. Unison Agreement Corp.*, No. 22-cv-1789, 2023 WL 4201961 (W.D. Wash. June 27, 2023) .......... 16

**Statutes**

9 U.S.C. § 2 .......... 13

9 U.S.C. § 3 .......... 13, 14, 23

9 U.S.C. § 4 .......... 13, 14

15 U.S.C. § 1602(f) .......... 18

15 U.S.C. § 1602(dd)(5) .......... 18, 21

15 U.S.C. § 1639c(e)(1) .......... 8, 15, 16

H.B. 1150, ch. 568, 443d Gen. Assemb., Reg. Sess. (Md. 2023) .......... 22

S.B. 1257, Pub. Act No. 25-115, Gen. Assemb., Reg. Sess. (Conn. 2025) .......... 22

S.B. 3551, Pub. Act No. 103-1015, 103d Gen. Assemb., Reg. Sess. (Ill. 2024) .......... 22

**Other Authorities**

12 C.F.R. pt. 1026, Supp. I, Subpt. A, cmt. 2(a) .......... 21, 22

Am. Arb. Ass'n, Consumer Arb. Rules and Mediation Procedures R-7(a) (2025) .......... 12

Debt, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) .......... 18

Loan, BLACK'S LAW DICTIONARY (4th ed. 1968) .......... 18

Owe, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) .......... 18

Restatement (Second) of Contracts § 25 (A.L.I. 1981) .......... 21

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P. (collectively, "Hometap") respectfully move this Court for an order: (1) compelling Plaintiff Marlene Crawford to arbitrate her claims on an individual basis, and (2) staying this action pending the arbitration's resolution.

## INTRODUCTION

Crawford entered into Option Purchase Agreements with Hometap that allowed her to access the equity in her home without taking on debt. Under the Agreements, Hometap purchased the right—an option—to later acquire a percentage ownership interest in Crawford's home. In exchange for that option, Hometap paid Crawford tens of thousands of dollars that she is not required to repay. The Agreements require Crawford only to hold the option open and to allow Hometap its share in the home's value should Hometap elect to exercise its option. Any money that Hometap ultimately may receive would depend entirely on the value of its ownership interest, not the money it paid to purchase that option.

Crawford asserts several claims related to the Agreements, including purported violations of federal and state requirements for mortgage loans. Hometap vigorously disputes the merits of those claims. But those merits are not properly before this Court. In entering the Agreements, Crawford agreed that "any and all disputes or claims" between her and Hometap that "have arisen or may arise" would be "resolved exclusively through final and binding arbitration, rather than a court." Decl. Ex. A at 23, § 8.13(a); Decl. Ex. C at 23, § 8.13(a). Under the Federal Arbitration Act (FAA) and California law, that agreement is binding and enforceable. This Court should enforce it by compelling this dispute to arbitration.

Trying to circumvent the arbitration provisions, Crawford argues that the Agreements are residential mortgage loans subject to the Truth in Lending Act (TILA). This Court should reject that effort and compel arbitration. Crawford agreed that "[a]ll issues" in covered disputes, including such "issues relating to the scope,

enforceability, and arbitrability of th[e] Arbitration Agreement" are "for the arbitrator to decide." Decl. Ex. A at 23-24, § 8.13(e); Decl. Ex. C at 24, § 8.13(e). Such a commonplace delegation provision is enforceable under the FAA absent a valid challenge to the delegation provision itself. And Crawford presents no such challenge here. TILA's bar on arbitration only prohibits arbitrating the merits of a dispute concerning a residential mortgage loan; it does not prohibit arbitrating the threshold question whether an agreement is a residential mortgage loan to which TILA applies.

Even if this Court looked past the delegation provisions, Crawford's contentions are unpersuasive. TILA does not preclude arbitration because the Agreements are not "residential mortgage loan[s]." 15 U.S.C. § 1639c(e)(1). A "loan" necessarily involves a creditor extending credit and a debtor incurring debt—an obligation to repay the amount of credit received. The Agreements do not impose any obligation to repay any amount. What Crawford calls the principal of her supposed loans is just the price Hometap paid for its option, which Crawford has no obligation to repay; if Hometap receives any proceeds down the line, they will not be loan repayments, but a reflection of Hometap's ownership interest in the property.

This Court should compel Crawford's claims to individual arbitration under the FAA and stay this action pending the resolution of arbitration.

## BACKGROUND

Hometap offers home equity option contracts that enable homeowners to harness the equity in their homes without incurring debt. For many homeowners, that equity is a significant financial asset that is typically difficult to access. Conventional avenues include selling the home or taking on home equity loans that require repaying the principal amount plus interest. Hometap provides an alternative. Through its contracts, a homeowner can access her home's equity by receiving an upfront payment in exchange for granting Hometap an option to later acquire an ownership interest in the property.

Unlike a loan, Hometap's contract imposes no obligation to repay the initial payment and charges no interest. Instead, if exercised, the option allows Hometap only to share in any appreciation or depreciation of the home. Any proceeds Hometap may receive depend entirely on the home's value when the option is exercised or repurchased—that is, on the ownership interest that Hometap contracted for the option to acquire.

**I. Crawford enters into Option Purchase Agreements with Hometap.**

Crawford decided to enter into two Option Purchase Agreements with Hometap to access some of her home equity, in exchange for potential equity-sharing with Hometap down the line. In 2020, Hometap entered into an Agreement with Crawford for her property in Victorville, California. Compl. ¶ 23, ECF No. 1; *see* Decl. Ex. A. When the parties signed the Agreement, the property's value was $305,973. Decl. Ex. B at 1. Under the Agreement, Crawford "agree[d] to sell to Hometap an exclusive and irrevocable option … to receive an undivided percentage interest … of fee simple title ownership" in her home. Decl. Ex. A at 1, § 1.1. To purchase this option, Hometap paid Crawford an "Investment Amount" of $44,000. *Id.* at 3, § 1.4(a); Decl. Ex. B at 1. After fees and costs, including a paydown of Crawford's existing mortgage, Crawford received a net amount of $40,664.38. Decl. Ex. B at 1-2; Compl. ¶ 102. The parties secured performance of the Agreement by entering and recording a mortgage. *See* Decl. Ex. D at 1.

Crawford entered into a second Agreement in 2021 for the same property. Compl. ¶ 23; *see* Decl. Ex. C. The property's value at the time was $367,889. Decl. Ex. C (Schedule A) at 1. Hometap paid an Investment Amount of $57,459. *Id.* After fees and costs, including an additional paydown of her existing mortgage, Crawford received $53,555.23. *Id.* at 1-2. Hometap likewise secured the Agreement's performance through a mortgage. *See* Decl. Ex. E at 1.

Under each Agreement, the value of Hometap's option depends on the property's value on the future date of any option exercise or repurchase. Hometap's

percentage ownership interest under Crawford's 2020 Agreement—called the "Hometap Percentage"—is 23.967% if the value of the home has appreciated when Hometap exercises the option (if it chooses to do so). Decl. Ex. B at 1. If the home's value has depreciated, however, the Hometap Percentage is only 19.973%. *Id.* Crawford's 2021 Agreement works similarly. The Hometap Percentage under that contract is 26.031% if the property appreciates and 21.692% if the property depreciates. Decl. Ex. C (Schedule A) at 1.

As option contracts, both Agreements give Hometap the "right," but not the obligation, "to exercise the Option." Decl. Ex. A at 5, § 2.3; Decl. Ex. C at 6, § 2.5. Hometap can exercise its option as of the Agreements' expiration date, which (unless extended) falls ten years after the effective date. Decl. Ex. A at 3, § 1.5; Decl. Ex. C at 3-4, § 1.5. If Hometap exercises the option, it receives its "Hometap Share" of the home's value. The "Hometap Share" is calculated by multiplying the property's value by the applicable Hometap Percentage. Decl. Ex. A at 3, § 2.1; Decl. Ex. C at 4, § 2.2. A contractual ceiling (the "Hometap Cap") limits the value of Hometap's ownership interest to a maximum 20% annualized return on the Investment Amount. Decl. Ex. A at 3, § 2.1; Decl. Ex. C at 4, § 2.2. Meanwhile, the homeowner retains her remaining share of the home's value, plus the initial option payment.

The option's exercise is neither required nor guaranteed: Hometap may elect not to exercise the option, and if Hometap does not, and the homeowner does not repurchase it, the option simply terminates. Just as Crawford would retain the initial Investment Amount if the option were exercised, she would also retain it if the option were not exercised.

Numerous contractual provisions reinforce the parties' shared understanding that the Agreements are not loans. The Agreements open with a bold, capitalized declaration: "**THIS IS NOT A LOAN.**" Decl. Ex. A at 1; Decl. Ex. C at 1. They further explain, "**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION**

**TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME**." Decl. Ex. A at 1; Decl. Ex. C at 1. Under the heading "Not a Loan," the Agreements provide that "the payment of the Investment Amount by Hometap is not a loan." Decl. Ex. A at 11, § 4.9; Decl. Ex. C at 12, § 4.1(i). Crawford further agreed that "[u]nder no circumstances will the Investment Amount accrue interest, and if Hometap's Option expires then [she] will not be obligated to return or repay the Investment Amount." Decl. Ex. A at 11, § 4.9; Decl. Ex. C at 12, § 4.1(i). The Agreements also specify that Hometap is not a "lender" and that "[t]he Option is intended to be and will be treated for all purposes … as an economic interest and not as a loan." Decl. Ex. A at 21, § 8.4; Decl. Ex. C at 21, § 8.4.

## II. The Agreements contain arbitration agreements and delegation provisions.

The Agreements require the parties to arbitrate any claims relating to them. These provisions are placed under the all-capitalized and underlined heading "DISPUTE RESOLUTION BY BINDING ARBITRATION." Decl. Ex. A at 22, § 8.13; Decl. Ex. C at 23, § 8.13. That section opens with the conspicuous directive to "PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS." Decl. Ex. A at 22, § 8.13; Decl. Ex. C at 23, § 8.13. In this section, Hometap ("we" and "us") and Crawford ("you") agreed that:

> [A]ny and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify.

Decl. Ex. A at 23, § 8.13; Decl. Ex. C at 23, § 8.13. The arbitration provisions acknowledge that "[t]he Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement." Decl. Ex. A at 23, § 8.13; Decl. Ex. C at 23, § 8.13. Crawford also agreed to arbitrate her claims on an individual and non-class basis. Decl. Ex. A at 23, § 8.13(a), (c); Decl. Ex. C at 23-24, § 8.13(a), (c).

The parties stipulated that "[a]rbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the 'AAA') rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the 'AAA Rules'), as modified by this Arbitration Agreement." Decl. Ex. A at 23-24, § 8.13(e) (emphasis removed); Decl. Ex. C at 24, § 8.13(e) (emphasis removed). Rule 7(a) of the AAA Consumer Arbitration Rules states that "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim." Am. Arb. Ass'n, Consumer Arb. Rules and Mediation Procedures R-7(a) (2025).

The parties also agreed in the body of the Agreements that "[a]ll issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement." Decl. Ex. A at 23-24, § 8.13(e); Decl. Ex. C at 24, § 8.13(e).

Each Agreement further gave Crawford a right to cancel the transaction, without cost, within three business days of signing—an opt-out right that she did not exercise. Decl. Ex. A at 2-3, § 1.3; Decl. Ex. C at 3, § 1.3.

## III. Despite the arbitration agreements, Crawford sued Hometap.

On June 23, 2026, Crawford filed this putative class action in the Central District of California, claiming that the Agreements are mortgage loans. *See* Compl. The Complaint asserts seven counts against Hometap, alleging violations of the Truth in Lending Act, the California Unfair Competition Law, and related state lending and consumer-protection laws, as well as unconscionability. *See id.* ¶¶ 142-209.

## <u>LEGAL STANDARD</u>

Once the party seeking to compel arbitration "prove[s] by a preponderance of the evidence that the parties formed an agreement to arbitrate," the party seeking to avoid arbitration bears the burden of showing that an arbitration agreement is invalid or should not be enforced. *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir.

2022); *see Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000); *Fli-Lo Falcon, LLC, v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024). If no factual dispute regarding formation of the arbitration agreement exists, all that is left is for this Court to engage in the limited analysis of whether the dispute is arbitrable by "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

## ARGUMENT

This Court should compel Crawford to arbitrate and should stay this action pending arbitration. The FAA requires courts to enforce valid arbitration agreements according to their terms. Here, the Agreements require arbitration on all issues, including any threshold arbitrability questions such as TILA's application. But even if the Court were to address arbitrability itself, the Agreements fall outside TILA's arbitration bar because they do not extend "credit," and no other basis for avoiding arbitration exists. The FAA thus requires this Court to enforce the arbitration agreements by compelling arbitration, *see* 9 U.S.C. § 4, and staying this litigation, *see id.* § 3.

### I. The FAA requires enforcing valid arbitration agreements.

The FAA reflects Congress's determination that courts must "enforce arbitration agreements according to their terms." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). The statute provides that a written arbitration provision in "a contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In keeping with the FAA's "liberal federal policy favoring arbitration agreements," "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Where, as here, a party resists a valid and applicable arbitration agreement, the FAA requires this Court to compel arbitration, 9 U.S.C. § 4, and to stay the litigation pending the arbitration's resolution, *id.* § 3.

**II. The arbitrator must decide any threshold issues of arbitrability.**

When entering into the Agreements at the center of this dispute, Crawford agreed to arbitrate "any and all disputes or claims that have arisen or may arise between" her and Hometap. Decl. Ex. A at 23, § 8.13(a); Decl. Ex. C at 23, § 8.13(a). Although Crawford insists those arbitration agreements are unenforceable under TILA, the Agreements delegate such threshold issues of arbitrability to the arbitrator.

**A. The Agreements contain valid delegation provisions.**

The Agreements' arbitration provisions commit threshold arbitrability issues to the arbitrator. Specifically, the Agreements provide that "[a]ll issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement." Decl. Ex. A at 23-24, § 8.13(e); Decl. Ex. C at 24, § 8.13(e). The Agreements also incorporate the "AAA Rules," which themselves delegate threshold arbitrability questions to the arbitrator. Decl. Ex. A at 23-24, § 8.13(e) (emphasis removed); Decl. Ex. C at 24, § 8.13(e) (emphasis removed). Both together and independently, these provisions are "clear and unmistakable evidence" that the parties "agreed to arbitrate arbitrability." *Fli-Lo Falcon*, 97 F.4th at 1199 (quotation omitted); *see Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that the "incorporation of the AAA rules constitutes 'clear and unmistakable' evidence that the parties intended to delegate the arbitrability question to an arbitrator"); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).

The delegation provisions extend to any dispute "arising out of or relating to" the Agreements. Decl. Ex. A at 23, § 8.13(a); Decl. Ex. C at 23, § 8.13(a). That broad reach plainly encompasses Crawford's claims, all of which concern the

Agreements. *See* Compl. ¶¶ 142-209. As a result, this Court's role is limited to confirming the valid formation of the arbitration agreements before compelling arbitration. *Fli-Lo Falcon*, 97 F.4th at 1194.

It can do so easily. State-law principles of contract formation govern, and California law applies. *See Reichert*, 56 F.4th at 1227; Decl. Ex. A at 22, § 8.12; Decl. Ex. C at 23, § 8.12. Under California law, contract formation requires mutual assent and consideration. *See Reichert*, 56 F.4th at 1227. Those elements are readily satisfied here. Both parties signed the Agreements. *See* Decl. Ex. A at 28-29; Decl. Ex. C at 28-29. Crawford acknowledges that she "signed" and thus "entered into" the Agreements, which contain the arbitration agreement and the delegation provisions. Compl. ¶¶ 12, 98. The mutual agreement to arbitrate, and the exchange of the investment amount for the option, constitute consideration. *See Garner v. Inter-State Oil Co.*, 52 Cal. App. 5th 619, 625 (2020).

Absent any meritorious challenges to the validity of the delegation provisions, these provisions control and require delegating threshold arbitrability questions to an arbitrator. *See Henry Schein*, 586 U.S. at 67-68. Challenges that target the Agreements broadly—such as allegations that the Agreements are unconscionable—are for the arbitrator to decide under the delegation provisions, unless those challenges also apply to the delegation provisions in particular. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71-72 (2010). Crawford has not advanced any meritorious challenge to the delegation provisions.

**B. TILA does not dictate who decides arbitrability.**

Crawford contends that TILA negates the arbitration agreements that she executed. *See* Compl. ¶ 60(a). TILA provides that "[n]o residential mortgage loan … may include terms which require arbitration … as the method for resolving any controversy or settling any claims arising out of the transaction." 15 U.S.C. § 1639c(e)(1). Crawford asserts that the Agreements are "residential

mortgage loans" to which this prohibition applies. But that contention is not properly before this Court. The delegation provisions route that threshold arbitrability question to an arbitrator. *See* Decl. Ex. A at 23, § 8.13(a); Decl. Ex C at 23, § 8.13(a).

Arbitration disputes can involve "three layers": "(1) merits, (2) arbitrability, and (3) who decides arbitrability." *Coinbase*, 602 U.S. at 149. The first layer concerns liability; the second whether liability must be arbitrated; and the third who decides whether liability must be arbitrated. *See id.* at 148-49. TILA speaks only to the second-order question of whether the merits of a dispute can be arbitrated. It makes unarbitrable only "resolving any controversy" or "settling any claims"—i.e., the merits. 15 U.S.C. § 1639c(e)(1). It does not bar arbitration of whether a given transaction qualifies as a residential mortgage loan in the first place—and thus does not speak to the third-order question of who decides arbitrability.

A contrary view would be untenably circular. It would reason that an arbitrator cannot decide the second-order arbitrability question because that question must be resolved against arbitrability. Under that logic, the merits of the arbitrability dispute dictate who resolves arbitrability in the first instance. That gets the necessary order of analysis backwards. Courts must enforce valid delegation provisions according to their terms before reaching arbitrability questions. *See Henry Schein*, 586 U.S. at 65, 68 (holding that a court may not "short-circuit the process" by resolving the arbitrability question itself based on the perceived strength of the claim for arbitration). Multiple federal courts have reached this conclusion in the TILA context, correctly holding that TILA does not dictate "who is empowered to decide arbitrability in the first instance." *Veneziani v. Unison Agreement Corp.*, No. 22-cv-1789, 2023 WL 4201961, at *2 (W.D. Wash. June 27, 2023); *Olsen v. Unison Agreement Corp.*, No. 22-cv-1859, 2023 WL 4492346, at *2 (W.D. Wash. June 27, 2023); *Baskin v. EK Real Est. Servs., NY, LLC*, No. 21-cv-727, 2022 WL 17742738, at *10 (E.D. Tex. Sept. 14, 2022); *see also Sitzman v. EK Real Est. Servs. of NY LLC*, No. 21-cv-2666, 2022 WL 17853214, at *7-8 (N.D. Tex. Dec. 21, 2022) (holding

that the TILA argument "do[es] not attack … the validity of the delegation clause"). Because TILA does not address who decides arbitrability, the Agreements' delegation provisions govern that question. *See Coinbase*, 602 U.S. at 152 ("[A]bsent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration."); *Baskin*, 2022 WL 17742738, at *10 ("[N]othing in the TILA provision[] invoked here … bars the delegation of questions of arbitrability."). Those provisions should be enforced.

### C. Crawford's allegations of unconscionability provide no basis for avoiding arbitration.

Crawford's unconscionability allegations likewise do not preclude enforcing the delegation provisions. *See* Compl. ¶¶ 200-04. Although Crawford's Complaint contains a series of (incorrect) allegations about how the Agreements are unconscionable, none of those allegations challenge the delegation provisions "specifically," as they must to render those provisions invalid. *Rent-A-Ctr.*, 561 U.S. at 71-72. Because Crawford does not specifically challenge the arbitration agreement as unconscionable—let alone raise such a challenge to the delegation provisions—any unconscionability issue belongs to the arbitrator.

## III. Alternatively, if the Court reaches threshold arbitrability issues, no basis for avoiding arbitration exists.

The Court's analysis can begin and end with the delegation provisions. But even if the Court were to assess arbitrability, there is still no basis to avoid arbitration. The arbitration agreements sweep broadly, requiring arbitration of "any and all disputes or claims … whether arising out of or relating to this Agreement or the other Investment Documents … or any aspect of the relationship or transactions between" the parties. Decl. Ex. A at 23, § 8.13(a); Decl. Ex. C at 23, § 8.13(a). Crawford's claims, which are based on the Agreements, plainly fall within this scope. Neither TILA nor any unconscionability argument Crawford might assert warrants nullifying the agreements she entered.

**A. TILA does not cover the Agreements.**

TILA poses no obstacle to enforcing the arbitration agreements, because the broader Agreements are not "residential mortgage loans." Under TILA, a "residential mortgage loan" is (1) a "consumer credit transaction" that is (2) "secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602(dd)(5). Although the parties secured Hometap's rights under the Agreements through mortgages, the Agreements do not extend "credit" and thus do not reflect a "consumer credit transaction." The Agreements are not residential mortgage loans, but option contracts and investment plans that fall outside TILA's bounds.

**1. The Agreements do not extend credit.**

Under TILA, a "residential mortgage loan" is a "consumer credit transaction," and "credit" is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id.* § 1602(f), (dd)(5). Because TILA does not define the word "debt," courts look to dictionaries to determine the "ordinary, contemporary, and common meaning" of that term. *In re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1104 (9th Cir. 2025). In ordinary usage, a "debt" is something "owed"—i.e., a transaction that creates an obligation to repay. Debt, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976); Owe, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976).

This meaning of "credit" or "debt" accords with the plain meaning of the word "loan" as used in TILA: a "loan" allows a debtor to defer payment of a sum received, but that sum is always eventually due to be repaid (typically with interest). *See* Loan, BLACK'S LAW DICTIONARY (4th ed. 1968) ("[A]dvance of money with an absolute promise to repay"; "contract whereby one delivers money to another who agrees to return equivalent sum"; "payment of money by one to another to be repaid some future day"; "[t]ransaction wherein one party transfers to the other a sum of money

which that other agrees to repay absolutely."). A loan therefore, by definition, requires a contractual repayment obligation: the borrower receives funds and commits to returning them, often with interest.

The Agreements do not extend "credit" and thus do not qualify as a "loan" under TILA. They impose no contractual repayment obligation, much less one that accrues interest. In exchange for paying Crawford the Investment Amount, Hometap received the option to later obtain a share of the home's value. At no point did Hometap obligate Crawford to repay the Investment Amount, with or without interest. Until Hometap exercises its option or the Agreements terminate, Crawford's sole obligation is to keep open the continuing offer to sell Hometap an ownership interest in the property.

Even upon exercise, Crawford's only further duty at that point would be to allow Hometap to share in the home's value according to its ownership stake—not to return the amount that Hometap previously paid. Crawford retains the Investment Amount (and her own share of the home's value) throughout. Because Hometap purchased a right to acquire an ownership interest in each property, what, if anything, Hometap would receive from that interest depends entirely on the property's value at the time of exercise. Decl. Ex. A at 4, § 2.2; Decl. Ex. C at 4, § 2.2.

Crawford ignores this reality. She characterizes the Investment Amount as an "advance" and the "principal amount of a loan," and contends that Hometap structured the Agreements to guarantee repayment. Compl. ¶ 25(a)-(b). Crawford's theory that the Agreements extend credit rests on the premise that, even though she will never directly repay Hometap the Investment Amount, Hometap will invariably recoup a sum equal to or greater than the Investment Amount when it exercises the option. That view is wrong. Hometap is not entitled to recover the specific Investment Amount under the Agreements. Nor do the contracts ensure *any* recovery.

Indeed, there are multiple scenarios in which Hometap would receive less than the Investment Amount, or even nothing at all. For one, Hometap may not "elect" to exercise the option before it lapses. Decl. Ex. A at 9, § 3.1(a)-(b); Decl. Ex. C at 10, § 3.2(a)-(b). In that case, the Agreements make clear that Hometap's decision not to exercise the option has no effect on the funds it already paid to Crawford: the "Investment Amount will be retained by [Crawford]." Decl. Ex. A at 10, § 3.2(b); Decl. Ex. C at 11, § 3.3(b). And: "[u]nder no circumstances will the Investment Amount accrue interest"; if the "Option expires, then [Crawford] will not be obligated to return or repay the Investment Amount." Decl. Ex. A at 11, § 4.9; Decl. Ex. C at 12, § 4.1(i).

Other scenarios illustrate that Hometap may not recover even the Investment Amount's equivalent (while Crawford will always retain that sum). Because Hometap purchased a right to acquire an ownership interest in the property, what if anything Hometap would receive from that interest depends entirely on the property's value at the time of Crawford's repurchase or Hometap's exercise of the option. Decl. Ex. A at 3, § 2.1; Decl. Ex. C at 4, § 2.2. If the property value declines, Hometap could end up receiving less than the Investment Amount.

That reality also aligns with Hometap's business model. As Crawford acknowledges, Hometap bundles and securitizes its contracts for sale to investors. Compl. ¶ 79. That bundling reflects the risk that Hometap bears on each individual transaction. The possibility that any given property may depreciate explains why Hometap aggregates transactions, so that gains on some may offset losses on others. No single transaction in the bundle—including Hometap's contracts with Crawford—constitutes a loan, because none requires or guarantees repayment. Hometap's model depends not on contractual repayment assurances in any individual Agreement, but on the expectation that its ownership interests will appreciate overall. Because the Agreements create no obligation to repay any sum to Hometap, TILA

does not treat them as "credit transaction[s]" or "residential mortgage loan[s]." 15 U.S.C. § 1602(dd)(5).

The only federal court to have examined a comparable home equity option contract under TILA has concluded that these features distinguish such contracts from residential mortgage loans. In *Foster v. EquityKey Real Estate Investments L.P.*, the court held that EquityKey's option agreement did not extend "credit" because the contract contained no "guarantee that the payment received by [the homeowner] need ever be returned." No. 17-cv-67, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017). If EquityKey "elect[ed] not to exercise its option," the homeowner would "not owe it any money." *Id.* The agreement was not a loan because the homeowner "did not agree to 'repay absolutely' the option premium payment." *Id.* The same reasoning applies with equal force here.

Because the Agreements did not create "debt," they did not extend "credit" and are not "residential mortgage loan[s]" for which TILA precludes arbitration.

**2. The Agreements are option contracts and investment plans.**

Rather than loans, the Agreements have the defining characteristics of option contracts and investment plans—categories of contracts that TILA does not govern. The Consumer Financial Protection Bureau's official staff commentary recognizes that both option contracts and investment plans fall outside the definition of "credit." *See* 12 C.F.R. pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(vii), (viii). That commentary warrants "due respect" in interpreting TILA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024); *see Gilliam v. Levine*, 955 F.3d 1117, 1121 (9th Cir. 2020) ("Courts defer to the CFPB's Official Staff Commentary to Regulation Z.").

An option contract extends a "continuing offer" and limits the optionor's "power to revoke [that] offer." Restatement (Second) of Contracts § 25 & cmt. a (A.L.I. 1981). Although optionors (here, Crawford) must hold the offer open for the duration of the option period, the optionee (Hometap) retains discretion over whether

to exercise the option. That discretion is the hallmark of an option. *See In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d 702, 705-06 (9th Cir. 1998). The Agreements fit this description precisely: Hometap paid for the right to an ownership stake and has discretion over whether to exercise that right. And the Agreements' express terms confirm that they are option contracts, not loans. Their conspicuous, unambiguous "**NOT A LOAN**" declarations reflect the parties' objective intent and understanding of the contract's structure and function. Decl. Ex. A at 1; Decl. Ex. C at 1; *see also* Decl. Ex. A at 11, § 4.9; Decl. Ex. C at 12, § 4.1(i).

The Agreements also function as investment plans. Because Hometap's potential proceeds are tied to the property's future value, Hometap's initial payment operates as an investment in which Hometap "risk[ed] the loss of the capital advanced." 12 C.F.R. pt. 1026, Supp. I, Subpt. A, cmt. 2(a)(14)(1)(viii). As described above, Hometap assumed the risk that the value of its ownership interest would fall below its initial outlay. *See supra* p. 20.

Reflecting that equity-sharing arrangements like what Hometap offers fall outside existing consumer credit laws and TILA, multiple States have enacted statutes specifically covering such "shared appreciation agreements." *See, e.g.*, S.B. 3551, Pub. Act No. 103-1015, 103d Gen. Assemb., Reg. Sess. (Ill. 2024); H.B. 1150, ch. 568, 443d Gen. Assemb., Reg. Sess. (Md. 2023); S.B. 1257, Pub. Act No. 25-115, Gen. Assemb., Reg. Sess. (Conn. 2025). These legislative efforts underscore that Hometap's contract occupies distinct legal ground from the traditional lending TILA covers.

Because the Agreements are properly characterized as option contracts and investment plans—not as credit transactions and loans—TILA and its arbitration bar do not apply.

**B. The arbitration agreements are not unconscionable.**

Finally, Crawford's allegations of unconscionability are irrelevant to arbitrability. As with the delegation provisions, Crawford points to nothing about

the agreements to arbitrate the merits that are unconscionable. Even if the broader Agreements were somehow unconscionable, Crawford does not articulate how that alleged deficiency would extend to the arbitration agreements, which are clear, standard, and fair contractual terms. No basis for finding unconscionability exists.

* * *

Crawford voluntarily entered into Agreements that require arbitration of all issues, including any threshold issues of arbitrability and enforceability. Crawford provides no basis for this Court to look past that agreement: she does not specifically challenge the delegation provisions, and TILA does nothing to overcome the parties' agreement to delegate. But even if the Court were to reach the merits of Crawford's arbitrability arguments, those arguments fail—the Agreements are not "residential mortgage loans" because they extend no credit and create no debt. This dispute belongs in arbitration.

## CONCLUSION

For these reasons, Hometap requests that this Court (1) compel Crawford to submit her claims to individual, binding arbitration, and (2) stay this action pending the outcome of arbitration under 9 U.S.C. § 3.

DATED: August 21, 2026

**MCGUIREWOODS LLP**

By: */s/ Anthony Q. Le*
Anthony Q. Le

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II. L.P.*

**Local Rule 11-6.1 Certification**

The undersigned, counsel of record for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P., certifies that this Memorandum of Points and Authorities contains 5,477 words, which complies with the word limit of L.R. 11-6.1. Pursuant to L.R. 11-6.1, this word count includes headings, footnotes, and quotations but excludes the caption, the table of contents, the table of authorities, the signature block, and exhibits.

By: * /s/ Anthony Q. Le*
Anthony Q. Le

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*

# CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I caused the foregoing document entitled **DEFENDANTS HOMETAP EQUITY PARTNERS, LLC AND HOMETAP INVESTMENT PARTNERS II, L.P.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** to be filed electronically with the Clerk of the Court for the United States District Court, Central District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

Dated: August 21, 2026

By: */s/ Anthony Q. Le*
Anthony Q. Le

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*