**MCGUIREWOODS LLP**
Anthony Q. Le (SBN 300660)
ale@mcguirewoods.com
1800 Century Pk E, Seventh Floor
Los Angeles, CA 90067
Tel: (310) 315-8225
Fax: (310) 315-8210

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARLENE CRAWFORD, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>HOMETAP EQUITY PARTNERS, LLC and HOMETAP INVESTMENT PARTNERS II, L.P.,<br>Defendants. | **Case No. 5:26-cv-03457-KK-AS**<br>**DECLARATION OF ADAM JASKIEVIC IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY ACTION**<br>Date: October 29, 2026<br>Time: 9:30 a.m.<br>Judge: Hon. Kenly Kiya Kato |

I, Adam Jaskievic, declare as follows:

1. I am employed by Hometap Equity Partners, LLC as the Chief Compliance Officer. I have personal knowledge of the facts contained in this declaration and if called upon to do so, could and would competently testify to the facts in this declaration. I submit this declaration in support of Defendants' Motion to Compel Arbitration and Stay Action.

2. Hometap Investment Partners II, L.P. signed the Option Purchase Agreements attached as Exhibits A and B as the contracting party. Hometap Equity Partners, LLC is the sole member of Hometap Holdings II, LLC, which is the general partner of Hometap Investment Partners II, L.P.

3. I hereinafter refer to Hometap Equity Partners, LLC and Hometap

Investment Partners II, L.P. collectively as "Hometap."

4. As the Chief Compliance Officer, I have access to Hometap's business records relating to option contracts entered into between Hometap and homeowners, including documents obtained from homeowners during and after the contract was entered into, which Hometap maintains for itself and any investors.

5. I am one of the custodians of records for Hometap's business records relating to Marlene Crawford and her contractual relationship with Hometap. The records referred to herein were made and kept in the ordinary course of Hometap's business and were prepared in the normal course of business at or near the time of the events to which they refer or reflect. I have reviewed Hometap's business records relating to Crawford, including the Option Purchase Agreements and the arbitration provisions contained therein, and I am familiar with their contents.

6. On November 20, 2020, Crawford, as owner of the subject property located at 13531 Desert Rue Drive, Victorville, California 92392 (the "Property"), entered into an Option Purchase Agreement with Hometap, whereby Hometap made an initial investment payment of $44,000 to Crawford. In exchange, Crawford granted Hometap an option to purchase an undivided 23.967% interest in the Property if the Property's value appreciated, and an undivided 19.973% interest in the Property if the Property's value depreciated. A true and correct copy of the Option Purchase Agreement is attached hereto as **Exhibit A** and incorporated herein by this reference. A true and correct copy of the associated Option Closing Disclosure is attached hereto as **Exhibit B** and incorporated herein by this reference.

7. On November 20, 2020, Crawford and Hometap entered into a mortgage and security agreement, which secured her performance under the Option Purchase Agreement. The mortgage and security agreement created a valid and enforceable lien against the Property and was recorded concurrently in the San Bernardino County Recorder's Office. A true and correct copy of the mortgage and security agreement is attached hereto as **Exhibit D** and incorporated herein by this reference.

8. On July 14, 2021, Crawford entered into a second Option Purchase Agreement with Hometap, whereby Hometap made an initial investment payment of $57,459 to Crawford. In exchange, Crawford granted Hometap an option to purchase an undivided 26.031% interest in the Property if the Property's value appreciated, and an undivided 21.692% interest in the Property if the Property's value depreciated. A true and correct copy of the Option Purchase Agreement is attached hereto as **Exhibit C** and incorporated herein by this reference.

9. On July 14, 2021, Crawford and Hometap entered into a mortgage and security agreement, which secured Crawford's performance under the Option Purchase Agreement. The mortgage and security agreement created a valid and enforceable lien against the Property and was recorded concurrently in the San Bernardino County Recorder's Office. A true and correct copy of the mortgage and security agreement is attached hereto as **Exhibit E** and incorporated herein by this reference.

10. Section 8.13 of the Option Purchase Agreements (the "Arbitration Agreement") provides in relevant part as follows:

> (a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement**." You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

* * *

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

* * *

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page …. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

Ex. A at 23-24, § 8.13; Ex. C at 23-24, § 8.13.

11. By entering into the Option Purchase Agreements, which contained the Arbitration Agreements, Crawford affirmed her agreement to be bound by the Arbitration Agreements, which expressly state that Crawford agreed to arbitrate "any and all disputes or claims that have arisen or may arise between you and us," including those "arising out of or relating to this Agreement or the other Investment Documents." Ex. A at 23, § 8.13(a); Ex. C at 23, § 8.13(a). In addition, Crawford agreed that "[a]ll issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement." Ex. A at 24, § 8.13(e); Ex. C at 24, § 8.13(e).

12. Crawford and Hometap agreed that, by entering into the Option Purchase Agreements, each "waiv[ed] the right … to participate in a class action." Ex. A at 23, § 8.13(a); Ex. C at 23, § 8.13(a). Crawford and Hometap further agreed that each party "may bring claims against the other only on an individual basis and not as a plaintiff or class member in any purported class or representative action or proceeding." Ex. A at 23, § 8.13(c); Ex. C at 24, § 8.13(c).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 21, 2026 in Lincoln, MA.

By: [signature]

*Adam Jaskievic*

# Exhibit A

Investment No.: CA915030

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

# OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Closing Date**") by and between Hometap Investment Partners II, L.P., a Delaware limited partnership with its principal offices at 800 Boylston Street, 16th Floor , Boston, MA 02199 ("**we**", "**our**", "**us**" and "**Hometap**") and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Option Disclosure (as defined below).

**WHEREAS**, as of the Closing Date, the Owner and Hometap have conducted and completed a closing (the "**Investment Closing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Option Closing Disclosure (the "**Option Disclosure**"), which includes, among other information, the Beginning Home Value, the Investment Amount, the Net Investment Amount, Hometap Percentage, Hometap Share, and Hometap Investment Fee;

**WHEREAS**, as of the Closing Date, Hometap has deposited the Investment Amount, as set forth in the Option Disclosure, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS**, the Option Disclosure sets forth certain closing costs, processing fees, and additional costs and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS**, the Option Disclosure is attached and made a part of this Agreement as Exhibit A; and

**WHEREAS**, in reliance upon the Option Disclosure, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Share. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to receive an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit B, which is attached and made a part of this Agreement (the "**Property**"). The

Property will include only the real property described in Exhibit B, fixtures appurtenant thereto, and as covered by a UCC-1 Financing Statement, as more fully set forth in Section 1.2(a)(v) below.

Section 1.2 Closing. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Closing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents:

(i) this Agreement;

(ii) the Option Disclosure;

(iii) a notarized Memorandum of Option Purchase Agreement summarizing the provisions of this Agreement, substantially in the form set forth in Exhibit C, which is attached and made a part of this Agreement (the "**Memorandum of Option**");

(iv) a notarized Mortgage and Security Instrument substantially in the form set forth in Exhibit D, which is attached and made a part of this Agreement (a "**Mortgage and Security Instrument**");

(v) a complete and satisfactory UCC-1 Financing Statement substantially in the form set forth in Exhibit E, which is attached and made a part of this Agreement (a "**UCC-1**", and together with the Memorandum of Option and Mortgage and Security Instrument, the "**Security Instruments**");

(vi) Right to Cancel, substantially in the form as set forth in Exhibit F, which is attached and made a part of this Agreement; and

(vii) Consent of Spouse/Domestic Partner, as defined below, if applicable, in form and substance satisfactory to Hometap, and substantially in the form as set forth in Exhibit G, which is attached and made a part of this Agreement.

(b) Provided written evidence that Hometap has been added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies and the Settlement Agent is satisfied with the evidence thereof;

(c) Agreed to and acknowledged the Settlement Instructions prepared and provided by the Settlement Agent based upon the Option Disclosure, and which shall set forth the use and disbursement of the Investment Amount (the "**Settlement Instructions**"); and

(d) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Closing, and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Closing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (hereinafter referred to as the "**Effective Date**").

Section 1.4 Disbursement of Funds and Recording of Closing Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner in the Option Disclosure as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Closing Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instruments, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Settlement Instructions with the appropriate Registry of Deeds or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instruments and any related documents.

Section 1.5 Option Term. The term of the Option (the "**Option Term**") shall commence on the Effective Date and shall continue until the earlier of (a) our receipt of the full amount of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement) or (b) 11:59 p.m., Eastern Time, on the 10th anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Term one or more times by up to a total of an additional 10 years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Term prior to the Expiration Date or the conclusion of any Extension Term (as defined below). Any Extension Notice shall include the term for which Hometap intends to extend the Option Term (such period being the "**Extension Term**", and the Option Term and any Extension Term, collectively being the "**Term**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Term.

## SECTION 2
## THE HOMETAP SHARE

Section 2.1 Calculation of the Value of the Hometap Share. The "**Hometap Share**" shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Option Disclosure, by (b) the greater of the value of the Property (i) as set forth as the sale price of the Property in the terms and conditions of Permitted Sale (defined below in Section 2.2(a)) or (ii) as determined by the Appraisal Process (defined below in Section 2.2(c) and Section 2.2(d) (such value of the Property being hereinafter referred to as the "**Ending Home Value**"); *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount, as calculated in accordance with the formula set forth on Exhibit II, which is attached and made a part of this Agreement.

Section 2.2 Permitted Sale and Appraisal.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a sale or transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the sale or transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided*, *however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) where the sale price of the Property is less than 90% of the fair market value as determined by an Appraisal, as further defined in Section 2.2(e);

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title (as defined below), or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being referred to as "**Permitted Encumbrances**"), and (B) loans or other obligations (such items being "**Senior Liens**"), or any other liens on the Property to secure the payment of any loans or the performance of any obligations owed to any creditor or third-party vendor.

(b) Physical Appraisals. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice.

(iv) Owner shall be responsible for payment of Appraisal costs.

(c) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal, and (b) the Ending Home Value will then

be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(d) Alternative Appraisal. Notwithstanding the requirements of Section 2.2(b) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.2(c) above.

(e) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.2(b) or an Alternative Appraisal as defined in Section 2.2(d).

Section 2.3 Hometap Right to Exercise Option and Receive Payment of Hometap Share. Unless and until you elect and complete an Owner Repurchase, as defined and provided for below in Section 2.4(a)(ii), Hometap shall have the right to exercise the Option and seek payment from you of the Hometap Share (a "**Hometap Option Exercise**") upon any of the following events or occurrences:

(a) any Permitted Sale, or other sale, exchange, transfer, conveyance or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"); *provided, however* that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.6;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction as provided below in Section 6.1(c)(ii) and Section 6.1(c)(iii); or

(e) upon condemnation of the Property, as provided below in Section 6.1(g).

Section 2.4 Owner Repurchase or Hometap Option Exercise upon a Transfer.

(a) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Owner Notice of Binding Offer. Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer, and in any event, no less than thirty (30) days prior to the proposed closing date for such Transfer. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located, and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Transfer, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase (as defined below) prior to, or simultaneous with, the closing of the Transfer.

(ii) Owner Repurchase. Upon any proposed Transfer of the Property, the Owner shall have the right (an "**Owner Repurchase Right**") to repurchase the Option (an "**Owner Repurchase**") from Hometap by paying the Hometap Share in accordance with the terms and conditions of this Agreement. If you do not elect to exercise your Owner Repurchase Right, Hometap shall have the right to complete a Hometap Option Exercise, as set forth below in Section 2.4(a)(iii).

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice in which you do not elect to exercise your Owner Repurchase Right, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice, Hometap shall have the right to complete a Hometap Option Exercise by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports and any other materials and information relating to the proposed Transfer that become available. Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transaction.

For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day which is a federal legal holiday in the United States or any day on which banking institutions in the state in which the Property is located are authorized or required by law or other governmental action to be closed.

(b) Appraisal Process upon Owner Repurchase or Hometap Option Exercise. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase Right, or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal. Each party agrees to comply with the Appraisal Process, and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(c) Ending Home Value.

(i) The Ending Home Value in connection with a Hometap Option Exercise or Owner Repurchase upon a Transfer shall be the sale price of the Property; *provided, however*, that such sale price is at least 90% of the Ending Home Value as determined by the Appraisal Process.

(ii) The Ending Home Value in connection with a Hometap Option Exercise or Owner Repurchase in any other circumstance hereunder shall be determined by the Appraisal Process. Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(d) Closing of Transfer of Property and Hometap Option Exercise or Owner Repurchase upon a Transfer.

(i) Transfer Closing. Any Transfer shall be completed through a closing process (the "**Transfer Closing**") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide

written notice (the "**Transfer Closing Notice**") to Hometap promptly, and in any event no later than thirty (30) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include, among other information, the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, instructions for the payment of the Hometap Share, and release of the Security Instruments upon Hometap's receipt of the Hometap Share. Hometap shall have the right to (A) review, and provide input on any such settlement instructions, and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(ii) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to affect the Owner Repurchase or the Hometap Option Exercise.

(iii) Payment Allocations. At any Transfer Closing, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any and all other closing costs, including those expenses set forth in Section 2.4.(d)(v) below.

(iv) Termination and Release by Hometap at Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share, we will submit the filings necessary to terminate and release the Security Instruments.

(v) Closing Costs. Owner shall pay all costs in connection with a Transfer Closing (or Repurchase Settlement or Termination Settlement as set forth below), including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("**Closing Costs**") and all sales commissions ("**Sales Commissions**"). Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner, and not from any amounts that are owed to Hometap; provided, however, that Owner shall pay Hometap directly for any Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.5 Owner Repurchase.

(a) You may elect to complete an Owner Repurchase at any time during the Term, regardless of whether or not a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Upon our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. The Ending Home Value will be the value of the Property as determined by the Appraisal Process. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value, and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(b) Hometap retains the right to reject any tender by you of the Hometap Share where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, or is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation. Upon our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), the Option shall be terminated, and, we will have no further right to exercise the Option, or have any further interest whatsoever in the Property. After our receipt of the Hometap Share, we will

terminate and release the Security Instruments and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instruments. Owner will be responsible for all Closing Costs as set forth in Section 2.4(d)(v) above.

Section 2.6 Owner Repurchase or Hometap Option Exercise as of the Expiration Date.

(a) In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "**Expiration Settlement**"), each implemented by delivering written notice to the other party (an "**Expiration Settlement Notice**") prior to the Expiration Date.

(b) Appraisal and Confirmation of Title upon Hometap Option Exercise as of the Expiration Date. Following our delivery to you or receipt from you of an Expiration Settlement Notice, we may:

(i) Commence an Appraisal Process, at your cost. You agree to comply with the Appraisal Process, and cooperate in good faith with any third-party vendors so that the Appraisal Process may be completed in a timely and effective manner.

(ii) Request from you, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances, subject only to the Permitted Encumbrances, to be provided in the form either of a policy of title insurance issued to, or for the benefit of, Hometap or our assignee at the time that this Agreement is entered into (or at such other times as may be required by us under this Agreement) and insuring our or our assignee's rights under the Investment Documents; or of a written title report, abstract of title or other title search documentation reflecting, to our satisfaction, confirmation of its good and marketable title to our ownership interest in the Property (such confirmation being referred to as "**Confirmation of Title**").

(iii) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Term as provided in this Agreement.

(c) In the event of an Option Exercise as of Expiration Date, you may (i) pay to us the Hometap Share based on the Ending Home Value as determined by the Appraisal Process, or (ii) agree to have Hometap take joint ownership of the Property with you, the legal form of which will be decided by Hometap (and which legal form of ownership may be in trust with you and us as beneficiaries), and seek to Transfer the entire Property, including your interest, to one or more third parties under the rights provided by this Agreement and the Mortgage and Security Instrument. In such circumstances, you will retain physical possession and the exclusive right to occupy the Property prior to a Transfer (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession in order to preserve and maintain the Property).

(d) Closing of an Expiration Settlement.

(i) Within ten (10) Business Days of the later of the completion of the Appraisal Process or our receipt of Confirmation of Title, we will send you written notice of a proposed closing (an "**Expiration Closing**") of an Expiration Settlement. The parties will use commercially reasonable efforts to complete the Expiration Closing on the Expiration Date.

(ii) Closing Deliveries for Expiration Closing. On or prior to the Expiration Closing, you agree to deliver to Hometap, either directly or through a Settlement Agent, as the case may be: (A) a Grant Deed; (B) Closing Costs, if any; (C) any documents or other instruments that may be required by the Settlement Agent; and (D) affidavits, certificates or notices required by us or law, in form reasonably satisfactory to us.

(e) Transfer Following a Hometap Option Exercise as of the Expiration Date.

(i) Initiation of Transfer by Owner. If you intend to initiate a Transfer following our Expiration Exercise Notice, then such Transfer shall meet the conditions for a Permitted Sale, as described above in Section 2.2(a).

(ii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer after our Hometap Option Exercise as of the Expiration Date, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to affect a Transfer of your interest in the Property to the Third-Party Buyer.

(iii) Ending Home Value and Payment of the Hometap Share. In any Transfer following our Expiration Exercise Notice, the Ending Home Value will be the sale price of the Property. At the closing for the Transfer under this Section 2.6(e)(iii), the sale proceeds will be allocated and paid in the manner described above in Section 2.4(d)(iii), and we will be paid (A) any Closing Costs that we paid as further detailed in Section 2.4(d)(v), and (B) any other amounts paid by us related to the preparation, marketing or sale of the Property.

## SECTION 3
## NON-EXERCISE; OTHER TERMINATION OF OPTION

Section 3.1 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(a)(i), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date, and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of the sale of the Property are paid to us in the full amount specified below in Section 6.1(c)(iii);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(c)(iii); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.2 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.1, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, and deliver to you a termination and release of the Memorandum of Option and a reconveyance of the Security Instruments (including the filing of a termination statement to terminate the UCC-1) and deliver any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

The truth, accuracy and completeness of the representations and warranties set forth in this Section 4 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any closing of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

Section 4.1 Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

Section 4.2 Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement, and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

Section 4.3 Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

Section 4.4 No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property; (b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

Section 4.5 No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property, or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

Section 4.6 Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws or regulations relating to the Property or perform any activities upon, or use or occupy the Property, or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws or regulations.

Section 4.7 Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information, including without limitation, the Option Disclosure, supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied, and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Closing Date.

Section 4.8 New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations or liens.

Section 4.9 Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap or futures contract. Under no circumstances will the Investment Amount accrue interest, and if Hometap's Option expires then you will not be obligated to return or repay the Investment Amount.

Section 4.10 Conflict; Enforceability. (a) the execution, delivery and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease or other agreement or instrument to which you are a party or by which the Property may be bound, and (b) the Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any closing of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

Section 5.1 Authority. Hometap is a duly established and organized Delaware limited partnership, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance

Section 5.2 Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**SECTION 6**
**COVENANTS**

Section 6.1 Owner Covenants. During the Term, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage, and any and all other mortgages, loans and obligations that is senior to the lien established by the Security Instruments, the covenants running with the land under this Agreement, and the Hometap Interest, of which (A) we have actual written notice under a title report, title search or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that is acknowledged in writing by us before or upon our execution of this Agreement (an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults, or potential or pending defaults thereunder, and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans.

(b) Owner Occupied; Right of Occupancy. During the Term the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your right of sole occupancy is not transferable by you except as part of a Property Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Insurance.

(i) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise

direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expenses, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Borrower, Borrower's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all closings conducted under this Agreement, or as Hometap may reasonably request from time to time.

(ii) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(iii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Loan and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Loan, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Loan, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(d) Physical Appraisals.

(i) Owner Cooperation. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(ii) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

(e) Renovation.

(i) Owner shall be entitled, in his, her, their or its sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), so long as any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, and only upon receipt of any approvals from any local, municipal, or state authority. If the Owner undertakes a single Renovation project with documented cost in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (i) a summary describing the Renovation, (ii) photographs of the Property prior to and following the Renovation, (iii) copies of all contracts, invoices, permits and other documentation associated with such Renovation, (iv) all material terms and information describing the Renovation, and (v) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with a Permitted Sale or Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation (a "**Renovation Adjustment**"). In connection with a potential Renovation Adjustment at the time of a Permitted Sale or Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share: provided, however, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced documented the Renovation Notice.

(f) Service Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Term (such fees being referred to as "**Service Fees**"), which may include, without limitation: (i) fees for processing any requests for subordination; (ii) fees for processing any requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instruments or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and Escrow companies, charges related to recording of documents, and attorneys' fees).

(g) Condemnation. If the Property is condemned in whole or in part during the Term, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(c)(iii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(c)(iii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(h) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Without Hometap's prior written consent, Owner may not at any time increase, or permit the increase of, the total balance of loans or other property interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's

remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, "**Owner Equity**" shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value equal to or higher than Beginning Home Value), and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the "**Current Property Value**"). For purposes of the foregoing, "**Minimum Owner Equity**" shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens (the "**Required Documentation**").

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to Hometap's interest in the Property, and/or Hometap is being asked to subordinate its interest in the Property, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new third Physical Appraisal or Alternative Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all Required Documentation, and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether or not to consent to such Approved Subsequent Loan; provided, however, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's Rights, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Option Term if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.5. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(i) Obligation to Provide Information to and Cooperate with Hometap. During the Term you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with Notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Hometap Share, or Hometap's Rights, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property, or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Ownership. Pursuant to this Agreement, until the consummation of an Owner Repurchase, a Hometap Option Exercise, or Expiration, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition, (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 8.1, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property;

*provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, you pay any amounts we reasonably require.

(c) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Subsequent Approved Loans, or any other loans or obligations to any third parties created, established or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under this Agreement or any of the other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement, including without limitation the Option Disclosure (each an "**Investment Document**", and together the "**Investment Documents**"), including any action or failure to act resulting in, or which can reasonably be expected to result in a violation of Hometap's Rights or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's Rights or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any Notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4, is, or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or the appointment or election of a receiver, conservator, trustee, custodian or similar official for an Owner or any substantial part of Owner's property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) any lien that attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default. If Owner fails to cure the default within thirty (30) days following delivery of the Notice of Right to Cure, Hometap may declare a default and exercise any of the following rights or remedies, or other rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. We will have the right in our sole discretion, by delivering to you a written notice (a "**Default Notice**") (i) to complete a Hometap Option Exercise, (ii) take joint ownership of the Property with you, (iii) to solicit and to Transfer the entire Property, including your interest, to one or more Third-Party Buyers, and receive the Hometap Share in connection with such Transfer, or (iv) pay any amounts ("**Hometap Cure Payments**") to any third parties to cure and remedy an actual or impending Event of Default. We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, taxes and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries. Upon delivery of the Default Notice, Hometap shall be permitted to start a Hometap Option Exercise. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an Event of Default or otherwise protect Hometap's interest in the Property, Hometap shall have the right, but not the obligation, to take such actions or complete such payments. Hometap shall provide Owner with five (5) Business Days written notice prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default.

Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure and Sale Under State Laws. We will be entitled to exercise our rights under the Mortgage and Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Property Transfer following a Hometap Option Exercise after Default.

(i) Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property). While any Event of Default continues, we may order one or more Appraisals.

(ii) Any Transfer initiated following a Hometap Option Exercise after an Event of Default must be conducted in accordance with Section 2.3(d), as applicable, and the Ending Home Value will be the sale price of the Property; *provided, however*, that such sale price is at least 90% of the Ending Home Value as determined by the Appraisal Process.

(e) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(c)(i), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be deemed exempt, on a dollar for dollar basis, from the Hometap Cap. If this occurs, we may exercise a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 7.2(d). The proceeds of any sale pursuant to this Section 7.2(e), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(c)(iii).

(f) Owner Repurchase After Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.3 above; *provided that* the closing of the Owner Repurchase must (i) occur (A) within twenty (20) days of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the closing of the Owner Repurchase is not completed within the prescribed periods in this Section 7.2(f) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 7.2(d).

(g) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity or otherwise, we will be entitled to seek specific performance of the covenants, agreements and rights contained in each of the Investment Documents, or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Term.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instruments and any power of sale granted under the Security Instruments require specification of an amount in default or liquidated bid amount or we elect to exercise the power of sale and foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of Liquidated Damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax and insurance related obligations on the Property, including late fees, reinstatement fees and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative and not exclusive, to the extent not prohibited by law. Every right, power and remedy granted to us in the Investment Documents will be in addition to all those rights, powers and remedies available to us at law, equity or otherwise, and each such right, power and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law, and the decision not to exercise of any such right, power or remedy will not be deemed a waiver of the right to exercise any right, power or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1 Indemnification by Owner and Maximum Liability. You agree to defend, indemnify and hold us harmless from and against any claims, causes of action, proceedings, judgements, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements and other obligations of every kind arising out of or relating to: (a) a breach of any of your representations, warranties, covenants or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 Asset Administration. From time to time during the Term, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 Covenants to Run with Land. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record a Memorandum of Option reflecting this fact in the public records.

Section 8.4 Relationship. We are not a partner, joint venturer, trustee, lender or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 Ongoing Credit Checks. By entering into this Agreement, you are providing written instructions, consent and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Term from one or more consumer reporting agencies, such as TransUnion, Experian or Equifax.

Section 8.6 Multiple Owners. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any Notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the contact information set forth below in Section 8.16; and (e) we may treat any Notice received from any one Owner as Notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is the Trustee of a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) Notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the contact information set forth below in Section 8.16; and (h) we may treat any Notice received from any one Trustee as Notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any person without prior Notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer or transaction, we may disclose any documents

and information in our possession relating to Owner and the Property. Upon such assignment, sale or transfer, our assignee, buyer or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale or transfer of the Option, and the other Investment Documents. You agree to cooperate with such assignee, buyer or transferee, including by executing any documents deemed appropriate by assignee, buyer or transferee to insure or protect such Person's interest in the Property.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement and the Memorandum of Option; (iii) executes a recordable addendum to the Security Instruments in a from provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us ("**Exempted Owner Assignment**"). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section 8.9(b) are met (an "**Exempted Owner Property Transfer**"). An Exempted Owner Property Transfer will not be considered a Property Sale and will not trigger our right to exercise the Hometap Interest.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to repay any Hometap Cure Payments and Service Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention or prohibition until such stay, injunction, prevention or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement**." You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The Notice of Dispute sent to us should be sent by certified mail, with a copy sent to legal@hometap.com (the "**Notice Address**"). The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's

Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer_arbitration. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator, will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Term, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address provided above. By rejecting any

future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to affect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement, and of the other Investment Documents, will be severable from every other provision for the purpose of determining the legal enforceability of any provision, and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse. To the extent that enforcement of any provision, or exercise of any right, under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address. Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any notice required by the Security Instruments is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

**HOMETAP:**

HOMETAP INVESTMENT PARTNERS II, L.P.
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department
Email: homeowners@hometap.com

**OWNER:**

See signature page.

Section 8.17 Entire Agreement; Amendment. The exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instruments, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you are married or in a civil union or registered domestic partnership on the date of this Agreement and your spouse or domestic partner, as applicable, is not named on the title to the Property, Hometap may require your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of Exhibit G ("**Consent of Spouse/Domestic Partner**"). If you should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF A RIGHT TO RECEIVE AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Instrument and any amounts

due under this Agreement and to all renewals, extensions and modifications of the Mortgage and Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Instrument and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Instrument, and all renewals, extensions and modifications of the Mortgage and Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Effective Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ______________________

Name: Noah Spaulding

Title: Chief Legal Officer; Authorized Signatory

Date: 11/21/20

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of November, 20 20, before me, the undersigned notary public, personally appeared Noah Spaulding, proved to me through satisfactory evidence of identification, which was his valid U.S. Passport, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

______________________
Notary Public Signature

My commission expires ______

DANIEL MILLER BURNETT
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Effective Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 11/20/2020

By: ______________________
Chris Crawford

Date: ______________________

Notice Address:

13531 Desert Rue Dr. Victorville, CA 92392

**Acknowledgment Certificate**

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California
County of San Bernardino

On November 20, 2020 before me, Anna M Taylor, Notary Public personally appeared, Marlene S. Crawford who proved to me on the basis of satisfactory evidence to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(~~ies~~), and that by ~~his~~/her/~~their~~ signature(s) on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument voluntarily for its stated purpose.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: [signature]

ANNA M. TAYLOR
Commission No. 2218711
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires NOVEMBER 15, 2021

*[Signature Page to Option Purchase Agreement]*

# Exhibit B

# HOMETAP

## Option Closing Disclosure

*This form outlines the final terms of the Option Purchase Agreement and closing costs.*

| Closing Information | | Transaction Information | |
|---|---|---|---|
| **Date Issued** | 11/20/2020 | **Homeowner(s)** | Marlene S. Crawford |
| **Effective Date** | 11/30/2020 | | |
| **Settlement Agent** | SPRUCE | **Homeowner Address** | 13531 Desert Rue Dr, Victorville, CA 92392 |
| **Title File #** | 114360030115 | | |
| **Property** | 13531 Desert Rue Dr. Victorville, CA 92392 | **Investor** | Hometap Investment Partners II, L.P. |
| | | **Investment Information** | |
| | | **Occupancy Type** | Primary Residence |
| **Rescission Date** | 11/28/2020 | **Option Term** | 10 Years |
| | | **Option Unique ID** | CA915030 |

| **Option Terms** | | *These terms are final and will not change after closing* |
|---|---|---|
| ***THIS IS NOT A LOAN - THERE ARE NO MONTHLY PAYMENTS*** | | |
| **Option Investment Amount** | $44,000.00 | *The amount Hometap will pay you to acquire the specified percentage interest in the Property* |
| **Beginning Home Value** | $305,973 | *Value determined by either automated valuation models or traditional appraisals* |
| **Hometap Option Percentage (If Ending Home value ≥ Beginning Home Value)** | 23.967% | *Hometap will acquire upon exercise or settlement of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value* |
| **Hometap Option Percentage (If Ending Home Value < Beginning Home Value)** | 19.973% | *The percentage of the Ending Home value that Hometap will acquire upon exercise or settlement of the Option when the Ending Home Value is less than the Beginning Home Value* |
| **Acknowledged Pre-Existing Liens** | $72,672 | *The current sum of debt obligations secured by a lien on your property* |
| **Hometap Share** | Lower of Hometap Option Percentage OR Hometap Cap | *See Page 3 - Example: Impact of Hometap Cap* |

| **Closing Cash Flow Summary** | | *See Calculating Closing Cash Flow on page 2 for details* |
|---|---|---|
| **Closing Costs Paid by Homeowner** | $2,598.00 | *Includes*$2,214.00 *in Option Agreement Costs +* $384.00 *in Other Costs* |
| **Cash to Homeowner at Closing** | $40,664.38 | *After Closing Costs and Debt Payoffs are paid, this is the amount you will receive from Hometap* |

**Option Agreement Costs**

| | |
|---|---|
| **A. Investment Costs** | $1,320.00 |
| Investment Fee to Hometap Investment Partners II, L.P. | $1,320.00 |
| **B. Third Party Services Costs** | $894.00 |
| Appraisal | $299.00 |
| Title Charges | $595.00 |
| **C. Total Option Agreement Costs** | $2,214.00 |
| Option Agreement Cost Subtotals (A + B) | |

**Other Costs**

| | |
|---|---|
| **D. Taxes and Other Government Fees** | $384.00 |
| Memorandum | $120.00 |
| Mortgage | $231.00 |
| UCC Financing Statement | $33.00 |

**Total Closing Costs**

| | |
|---|---|
| E. Total Closing Costs (C + D) | $2,598.00 |

**Payoffs & Payments**

| To | Amount |
|---|---|
| Payoff to Bank of America | $737.62 |
| F. Total Payoffs & Payments | $737.62 |

**Calculating Closing Cash Flow**

| | |
|---|---|
| Option Investment Amount | $44,000.00 |
| Total Closing Costs (E) | $2,598.00 |
| Total Payoffs & Payments (F) | $737.62 |
| **CASH DUE TO HOMEOWNER** | $40,664.38 |

## Additional Information

### Option Agreement Details

THE SALE OF THE OPTION TO HOMETAP CAN HAVE SIGNIFICANT FINANCIAL AND TAX CONSEQUENCES. YOU ACKNOWLEDGE THAT HOMETAP HAS URGED YOU TO SEEK TAX, LEGAL, AND FINANCIAL ADVICE TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF ENTERING INTO THE OPTION AGREEMENT, AND THAT YOU HAVE HAD AN OPPORTUNITY TO DO SO.

Please refer to your Option Agreement and Security Instrument for more information about:

- What happens if you fail to sell your home or buy back the Option before the end of the Term;
- What is an event of default under the Option Agreement;
- Situations in which Hometap can force a sale of the Property;
- Your other obligations under the Option Agreement.

### Appraisal

Hometap may require a physical appraisal to be performed by a third party appraiser, in order to determine the property's current value. If an appraisal was performed as part of your investment, Hometap will provide a copy prior to investment closing. If you have not received it, please contact Hometap.

### Homeowner's Insurance

You are required to maintain homeowner's insurance on the Property in accordance with Section 6.1 of the Option Purchase agreement, including flood insurance if applicable. Your insurance policy must name Hometap Investment Partners II, L.P. as a loss payee / mortgagee.

### Mortgage, Taxes and Other Payments

You are responsible for paying all applicable secured loan payments, property taxes, Homeowners Association (HOA) fees, maintenance fees, mortgage insurance, and any other payments required in connection with the ownership and maintenance of your Property.

### Security Interest

You are granting a security interest in:
13531 Desert Rue Dr. Victorville. CA 92392

***You may lose this Property if you do not satisfy the obligations of the Option Agreement***

### Contact Information

| | Investor | Settlement Agent |
|---|---|---|
| **Name** | Hometap Investment Partners II, L.P. | |
| **Address** | 800 Boylston St,16th Floor,Boston, MA 02199 | |
| **Contact** | Devlin Keogh | |
| **Email** | homeowners@hometap.com | |
| **Phone** | 617-675-9764 | |

## EXAMPLE: IMPACT OF HOMETAP CAP

### Calculation of Hometap Share

Homeowner is obligated to pay Hometap the **lesser** of the calculated Hometap Percentage and Hometap Cap, as demonstrated in the Example Scenario below

### Example Scenario

| | |
|---|---|
| Beginning Home Value | $500,000.00 |
| Investment Amount (at time of Investment) | $50,000.00 |
| Hometap Percentage, when | |
| Ending Home Value ≥ $500,000.00 | 16.70% |
| Ending Home Value ≤ $500.000.00 | 13.90% |
| After 1 year, Homeowner sells the Property for: | $550,000.00 |

### Calculation of Hometap Percentage

Since the Ending Home Value was ≥ $500,000 (Sold for $550,000), the 16.70% Hometap Percentage would be triggered. This would result in a Hometap Share of **$91,850**, subject to the Hometap Cap calculated below.

### Calculation of Hometap Cap

The Hometap Share is capped at an annualized twenty percent (20%) rate of return. In this example, where settlement occurs on the one-year anniversary of when Hometap invested, that means that the Hometap Cap would be **$60,000**.

### Result to Homeowner

Since the Hometap Cap (**$60,000**) is lower than the Hometap Percentage (**$91,850**), the **Homeowner would be obligated to pay Hometap $60,000.**

# Exhibit C

Investment No.: CA485134

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

## OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners II, L.P., a Delaware limited partnership with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS,** Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS,** the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS,** Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Instrument, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS,** as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS,** as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS,** the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS,** the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto, as covered by a UCC-1 Financing Statement, as more fully set forth in Section 1.2(a)(v) below.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement;

(ii) the Investment Term Sheet;

(iii) a notarized Memorandum of Option Purchase Agreement summarizing the provisions of this Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Memorandum of Option**");

(iv) a notarized Mortgage and Security Instrument substantially in the form set forth in Exhibit C, which is attached and made a part of this Agreement (the "**Mortgage and Security Instrument**");

(v) a complete and satisfactory UCC-1 Financing Statement substantially in the form set forth in Exhibit D, which is attached and made a part of this Agreement (the "**UCC-1**", and together with the Memorandum of Option and Mortgage and Security Instrument, the "**Security Instruments**");

(vi) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit E, which is attached and made a part of this Agreement; and

(vii) a Consent of Spouse/Domestic Partner, as defined below, if applicable, in form and substance satisfactory to Hometap, and substantially in the form as set forth in Exhibit F, which is attached and made a part of this Agreement.

(b) Provided (i) written evidence that Hometap has been added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property and the Settlement Agent is satisfied

with the evidence thereof or (ii) written authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property;

(c) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(d) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d) For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instruments, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Settlement Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instruments and any related documents.

Section 1.5 Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however,* that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the

Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The "**Ending Home Value**" shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instruments and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instruments. Owner will be responsible for all Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided*, *however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d); or

(e) upon condemnation of the Property, as provided below in Section 6.1(h).

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations (such items being "**Senior Liens**"), or any other liens on the Property to secure the payment of any loans or the performance of any obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available.

Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the **"Transfer Closing"**) that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the **"Transfer Closing Notice"**) to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instruments.

(iv) Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes (**"Closing Costs"**) and all sales commissions (**"Sales Commissions"**). Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an **"Expiration Settlement"**), each implemented by

delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise ("**Exercise Closing**"). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instruments upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Exercise Option by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount ("**Exercise Payment**"). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a termination and release of the Memorandum of Option, a reconveyance of the Security Instruments (including the filing of a termination statement to terminate the UCC-1), and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property;

(b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

**SECTION 5**
**HOMETAP REPRESENTATIONS AND WARRANTIES**

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited partnership, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**SECTION 6**
**COVENANTS**

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instruments, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing any requests for subordination; (ii) fees for processing any requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instruments or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Without Hometap's prior written consent, Owner may not at any time increase, or permit the increase of, the total balance of loans or other property

interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, "**Owner Equity**" shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the "**Current Property Value**"). For purposes of the foregoing, "**Minimum Owner Equity**" shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default (**"Event of Default"**):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default and exercise any of the rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. We will have the right in our sole discretion, by delivering to you a written notice (a "**Default Notice**"), to (i) complete a Hometap Option Exercise in compliance with Section 3.1 or (ii) pay any amounts ("**Hometap Cure Payments**") to any third parties to cure and remedy an actual or impending Event of Default. We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Upon delivery of the Default Notice, Hometap shall be permitted to start a Hometap Option Exercise. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure and Sale Under State Laws. We will be entitled to exercise our rights under the Mortgage and Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(c), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be

deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e) Owner Repurchase After Event of Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.4 above; *provided that* the Repurchase Settlement must (i) occur (A) within twenty (20) days of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instruments and any power of sale granted under the Security Instruments require specification of an amount in default or liquidated bid amount or we elect to exercise the power of sale and foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law,

and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1 Indemnification by Owner and Maximum Liability. You agree to defend, indemnify, and hold us harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to: (a) a breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 Asset Administration. From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 Covenants to Run with Land. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Memorandum of Option reflecting this fact in the public records.

Section 8.4 Relationship. We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 Ongoing Credit Checks. By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Term from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6 Multiple Owners. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the Notice Address, as defined below in Section 8.16; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement and the Memorandum of Option; (iii) executes a recordable addendum to the Security Instruments in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us ("**Exempted Owner Assignment**"). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section

8.9(b) are met (an "**Exempted Owner Property Transfer**"). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however,* to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement**." You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the

arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator, will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instruments is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

| **HOMETAP**: | **OWNER**: |
| --- | --- |
| HOMETAP INVESTMENT PARTNERS II, L.P.<br>800 Boylston Street, 16th Floor<br>Boston, MA 02199<br>Attention: Legal Department<br>Email: homeowners@hometap.com | See signature page. |

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instruments, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you are married or in a civil union or registered domestic partnership on the date of this Agreement and your spouse or domestic partner, as applicable, is not named on the title to the Property, Hometap may require your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of Exhibit F ("**Consent of Spouse/Domestic Partner**"). If you should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or

domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner to Hometap at the Notice Address.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Instrument and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Instrument and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Instrument, and all renewals, extensions and modifications of the Mortgage and Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ____________________

Name: Adam Jaskievic

Title: VP, Operations & Authorized Signatory

Date: 7/14/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 14th day of July, 20 21, before me, the undersigned notary public, Adam Jaskievic (name of document signer) personally appeared, proved to me through satisfactory evidence of identification, which were MA Driver's License, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

____________________
Notary Public Signature

My commission expires

JEFFREY M. HORNE
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 31, 2028

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 7/14/2021

By: ______________________________

Date: ______________________________

Notice Address:

13531 Desert Rue Drive, Victorville, CA 92392

**Acknowledgment Certificate**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San bernardino

On 07 | 14 | 2021 before me, Ciji Chimere McClenney notary public

personally appeared Marlene S. Crawford, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: [signature] (Seal)

CIJI CHIMERE MCCLENNEY
Commission No. 2284820
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires APRIL 11, 2023

**Acknowledgment Certificate**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San bernardino

On 07/14/2021 before me, Ciji Chimere McClenney, notary public
personally appeared Marlene S. Crawford, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: ______________________ (Seal)

CIJI CHIMERE MCCLENNEY
Commission No. 2284820
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires APRIL 11, 2023
NCC1

**List of Schedules and Exhibits**

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Memorandum of Option
Exhibit C – Mortgage and Security Instrument
Exhibit D – UCC-1 Financing Statement
Exhibit E – Notice of Right to Cancel
Exhibit F – Consent of Spouse/Domestic Partner

# EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain real property situated in the County of San Bernardino, State of California, described as follows;
Lot 58 of Tract 13760-0, in the City of Victorville, County of San Bernardino, State of California, as per Map Recorded in Book 222,
Page(s) 74 through 76, inclusive of Miscellaneous Maps, in the Office of the County Recorder of Said County

Parcel ID / APN: 3095-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

## Schedule A: Hometap Investment Term Sheet

This document and the Option Purchase Agreement define key terms of the Option and Hometap's investment in the Property ("**Investment Terms**"). Capitalized terms are further defined in the Option Purchase Agreement.

Homeowner(s): Marlene S. Crawford
Property Address: 13531 Desert Rue Dr, Victorville, CA 92392
Option ID: CA485134
Effective Date: 07/19/2021

**Section I: Predetermined Investment Terms**
Hometap and Owner agree to the Investment Terms defined below. These terms have the value assigned to them as shown below, and such values shall not change during the Option Period.

| Predetermined Investment Terms | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Amount | *Gross amount that Hometap will pay you to acquire an Option in the Property* | $57,459.00 |
| Net Investment Amount | *Net amount that you will receive after Investment Fees and Costs (see Section II below) have been deducted from the Investment Amount* | $53,555.23 |
| Beginning Home Value | *Property's value at the time of Investment Signing, determined by Appraisal* | $367,889.00 |
| Hometap Percentage (if Ending Home Value ≥ Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value; used to determine Option's value* | 26.031% |
| Hometap Percentage (if Ending Home Value < Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is less than the Beginning Home Value; used to determine Option's value* | 21.692% |
| Acknowledged Pre-Existing Liens | *Current sum of debt obligations secured by a lien on the Property*<br><br>*Bank of America, $70,697.99* | $70,697.99 |

**Section II: Investment Fees and Costs**
Hometap and Owner agree to the Investment Fees and Costs defined below. The Investment Fees and Costs have the value assigned to them as shown below, which shall be deducted from the Investment Amount to determine the Net Investment Amount. The Net Investment Amount shall be paid to the Owner, as further provided in the Option Purchase Agreement.

| Investment Fees and Costs<br>Deducted from Investment Amount | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Fee | *3% investment fee charged by Hometap* | $1,723.77 |
| Third-Party Costs | *Costs incurred for third-party processing and services related to finalizing the Investment and signing the Investment Documents*<br>*Appraisal, $299.00*<br>*Title Charges, $595.00* | $894.00 |
| Government Taxes and Fees | *Taxes and fees assessed by government entities related to finalizing the Investment and signing the Investment Documents*<br>*Memorandum,$117.00*<br>*UCC,$108.00*<br>*Mortgage,$228.00* | $453.00 |
| Payoffs | *Amounts paid at time of Signing to third-party lien holders, on Owner's behalf, to pay down the total amount of debt against the Property*<br>*Bank of America, N.A., $833.00* | $833.00 |
| Total Investment Fees and Costs | *Total of amounts listed in this table, to be deducted from the Investment Amount to determine the Net Investment Amount* | $3,903.77 |

**Section III: Investment Terms Valued at Time of Option Exercise or Repurchase**
Hometap and Owner agree to the Investment Terms defined below. The value of the Investment Terms in this Section III cannot be determined until the Owner repurchases or Hometap exercises the Option. Hometap and Owner agree that the value of the Investment Terms in this Section III shall be determined or calculated as stated herein and as further provided in the Option Purchase Agreement. Sample calculations of the Investment Terms in this Section III have been provided to Owner in the Investment Disclosures.

| **Investment Terms Valued at Time of Option Exercise or Repurchase** | |
|---|---|
| **Term** | **Definition** |
| Ending Home Value | *Property's value at the time of Option exercise or repurchase, determined by Appraisal or Permitted Sale* |
| Hometap Cap | *Maximum 20% annualized rate of return on the Investment Amount, prorated for a partial year, as applied to the Hometap Share* |
| Hometap Share | *Value of Hometap's Option, calculated by multiplying the Ending Home Value by the Hometap Percentage; the maximum value of the Hometap Share is the Hometap Cap* |

I acknowledge and agree that the Investment Terms defined in this Schedule A shall apply to the Option, as further described in the Option Purchase Agreement.

Marlene S. Crawford 7/14/2021

Marlene S. Crawford

Date

Date

# Exhibit D

Electronically Recorded in Official Records County of San Bernardino
Bob Dutton
Assessor-Recorder-County Clerk

***After Recording Return To:***

Hometap Equity Partners, LLC
800 Boylston Street
16th Floor
Boston, MA 02199

**DOC# 2021-0101481**

| | | | |
|---|---|---|---|
| 03/04/2021 | | Titles: 2 | Pages: 11 |
| 02:00 PM | | | |
| SAN | | Fees | $58.00 |
| | | Taxes | $0.00 |
| I1113 | | CA SB2 Fee | $150.00 |
| | | Total | $208.00 |

***Recording Requested By:***
*Hometap Investment Partners II, L.P.*
Investment No.: CA915030

___________________[Space Above This Line For Recording Data] _________________

Parcel ID No.: 3095-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

**Investment Amount:** $44,000.00

## MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 11/30 2020 ("**Effective Date**"), by and between Marlene S. Crawford , having an address of 13531 Desert Rue Dr. Victorville. CA 92392 (collectively, the "**Homeowner/Mortgagor**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap/Mortgagee**"). Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Purchase Agreement by and between Homeowner and Hometap (the "**Option Agreement**"). The Option Agreement, Memorandum of the Option Purchase Agreement and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement**."

This Mortgage and Security Agreement was prepared by Noah Spaulding, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.

1. Grant.

HOMEOWNER HEREBY IRREVOCABLY grants, transfers and assigns to Hometap, and its successors and assigns, a security interest, with power of sale, for the benefit of Hometap, and its successors and assigns, in and to the property located at
13531 Desert Rue Dr. Victorville. CA 92392
and further described on Exhibit A attached hereto (the "**Property**"), together with all improvements, replacements and additions now or hereafter erected on the Property, and all easements, appurtenances

and fixtures now or hereafter a part of the Property, all rents, issues, profits and proceeds, including insurance and condemnation proceeds, from the Property.

2. Secured Obligations.

Homeowner makes the grant, transfer and assignment set forth in Section 1 to secure the following:

(a) Homeowner's performance of each of its obligations in the Hometap Homeowner Agreement;

(b) Hometap's Rights under the Hometap Homeowner Agreement;

(c) Homeowner's payment obligations in the Hometap Homeowner Agreement, including:

(i) Payment of the Hometap Share owed to Hometap;

(ii) Payment of all Service Fees owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the Liquidated Damages pursuant to Section 7.4 of the Option Agreement;

(vi) Any expenditures made by Hometap pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel (collectively "**Legal Fees**")) incurred by Hometap in the enforcement and collection of the obligations listed above and the protection of Hometap's related rights, whether such costs, fees and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court, and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations**."

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a security agreement under the California Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the California Commercial Code. Homeowner grants to Hometap a security interest in those items to secure the performance and payment of the Obligations.

(a) Homeowner agrees that Hometap may file this Security Instrument, or a copy of it, and a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of the Secretary of State of California, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 9-501(a)(1) and 9-502(c) of the California Commercial Code, and any similar or successor provisions.

(c) Hometap may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

(d) Homeowner will pay all costs, fees and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees and expenses of any record searches for financing statements that Hometap may require.

(e) Upon an Event of Default, Hometap will have the remedies of a secured party under the California Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Hometap may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Hometap's remedies under the California Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Homeowner absolutely and unconditionally assigns to Hometap all of Homeowner's right, title and interest in and to all current and future leases, subleases and licenses relating to the use, occupancy or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds and earnings now or hereafter payable with respect to the ownership, use or occupancy of the Property (collectively the "**Rents**"); it being intended by Homeowner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Homeowner gives to and confers upon Hometap the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Homeowner's failure to perform any Obligation timely, or a breach of any agreement of Homeowner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Homeowner's failure to perform any Obligation timely, or a breach of any agreement of Homeowner in this Security Instrument, Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Hometap may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues and profits and the application of the Rents, issues and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Homeowner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent or occupancy of the Property.

5. Covenants of Homeowner Regarding the Property. Homeowner agrees as follows:

(a) To appear in and defend any action, suit or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Hometap; and to pay all costs, fees and expenses of Hometap (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate or bankruptcy court, in any action, suit or proceeding in which Hometap may appear, and in any action, suit or proceeding brought by Hometap to foreclose this Security Instrument or to collect the Obligations or to protect Hometap's Rights or other rights under this Security Instrument; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property; and all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

(i) If Homeowner fails to make any payment or to do any act as provided in this Security Instrument, Hometap may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Hometap will not require notice to, or demand on, Homeowner and will not release Homeowner from any obligation under this Security Instrument.

(iii) Hometap will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Hometap under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Hometap appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Hometap related to this Security Instrument; and to pay interest on any of such amounts demanded by Hometap at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Homeowner irrevocably appoints Hometap as Homeowner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Hometap may, in Hometap's name or in the name of Homeowner, prepare, execute and file or record financing statements, continuation statements, applications for registration and similar documents to create, perfect or preserve any of Hometap's security interests and rights in or to any of the Property. Upon an Event of Default, Homeowner's failure to perform any Obligation timely, or a breach of any agreement of Homeowner in this Security Instrument, Hometap may take any other action that may be required or desired of Homeowner, including the ability to advertise and solicit the Property for sale,

encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; provided, however, that Hometap as agent and attorney-in-fact will be accountable only for such funds as are actually received by Hometap.

7. Default and Foreclosure. Upon an Event of Default, Hometap may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Homeowner of a written declaration of default. If any Event of Default has occurred and is continuing, Hometap may take any or all of the following actions, at the same or at different times:

(a) Possession. Hometap may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the rents, income, issues and profits; and apply the same to satisfy any Obligation. Hometap is granted full power and authority to do any act or thing which Homeowner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Hometap, then this Security Instrument will at the option of Hometap become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Hometap may have a receiver of the rents (including an Asset Administrator), income, issues and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Homeowner or any other person who may be legally or equitably liable for the Obligations, and Homeowner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Homeowner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Hometap the amount of rent requested by Hometap in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Hometap may apply on account of the unsatisfied Obligations owed to Hometap after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Hometap that were paid by Homeowner to Hometap or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Homeowner.

(e) Remedies at Law or Equity. Hometap may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Statutory Power of Sale. To the extent permitted by applicable law:

Hometap will have the power to sell the Property at a non-judicial foreclosure sale. In connection with the sale, Hometap may declare all performance and Obligations immediately due by delivery to Homeowner of a written declaration of default. Hometap will give notice of default to Homeowner prior to acceleration following an Event of Default. The notice will specify: (i) the default; (ii) the action required to cure the Event of Default; (iii) a date by which the Event of Default must be cured; and (iv) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument and sale of the Property. The notice will further inform Homeowner of any right to cure after acceleration and the

right to bring a court action to assert the non-existence of an Event of Default or any other defense of Homeowner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Hometap at its option may require immediate performance in full of all Obligations without further demand and may invoke the power of sale and any other available remedies not prohibited by applicable law. Hometap will be entitled to collect all costs, fees and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

If Hometap invokes the power of sale, Hometap will execute a written notice of Hometap's election to cause the Property to be sold as may be prescribed by applicable law. Hometap will cause this notice to be recorded in each county in which any part of the Property is located. Hometap will mail copies of any notice required by applicable law to Homeowner and to the other persons required by applicable law. Hometap will give public notice of sale to the persons and in the manner as may be prescribed by applicable law.

After the time required by applicable law, Hometap may sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Hometap determines. Hometap may postpone the sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

Hometap will deliver to the purchaser its deed conveying the property sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts will be conclusive proof of their truthfulness. Any person, including Homeowner or Hometap, may purchase at the sale.

After deducting all costs, fees and expenses (including Legal Fees), including cost of evidence of title in connection with the sale, Hometap will apply the proceeds of the sale to payment of: first, to all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by applicable law in effect on the Effective Date of this Security Instrument; second, to other sums then secured by this Security Instrument and senior to Hometap's interest, third the Hometap Share to Hometap, and fourth, the remainder, if any, to the person or persons legally entitled to it.

Notice provided to Homeowner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

Exercise of Hometap's remedies under this Security Agreement will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Hometap does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Hometap's Powers. At any time and from time to time, without liability and without notice, upon written request of Homeowner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations Hometap may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Subordination. This Security Instrument is subordinate to and junior to the Memorandum of Option Purchase Agreement which affects the Property and is executed by Homeowner as "Owner" as of the same date as this Security Instrument.

11. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The term "**Hometap**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument. Absent Hometap's prior written consent, which consent may be withheld in Hometap's sole discretion, Homeowner may not assign or otherwise transfer this Security Instrument.

12. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

13. Joint and Several Liability. If more than one person signs this Security Instrument as Homeowner, the obligations of each signatory will be joint and several.

14. Multiple Owners. If there are multiple Homeowners of the Property:

(a) this Security Instrument must be signed by each Homeowner;

(b) all rights and powers specified for Homeowner in this Security Instrument must be approved and exercised unanimously by each Homeowner;

(c) each Homeowner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Homeowner will be deemed adequately given if given by or to any Homeowner using the contact information set forth in this Security Instrument; and

(e) Hometap may treat any notice received from any Homeowner as notice from all Homeowners.

15. Incorporation by Reference. Schedule A to this Security Instrument is incorporated by this reference.

16. Extent of Lien. The lien granted under this Security Instrument will encumber Homeowner's entire interest in the Property, notwithstanding the fact that the Hometap Homeowner Agreement relates to only a fractional interest in the Property.

17. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Hometap otherwise consents in writing, the fee estate of Homeowner in the Property or any part of the Property (including the estate of Hometap after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Hometap or in any other person.

18. Release. Following payment of all amounts secured by this Security Instrument, Hometap will discharge this Security Instrument. Homeowner will pay any recordation costs. Hometap may charge Homeowner a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

19. Subordination of Homestead and Waivers. If Homeowner has acquired before the Effective Date or acquires on or after the Effective Date an estate of homestead in the Property, Homeowner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Hometap under the Hometap Homeowner Agreement and all renewals, extensions and modifications of the Hometap Homeowner Agreement, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Homeowner waives and relinquishes all rights of curtesy and dower in the Property.

20. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

| **Hometap/Mortgagee:** | **Homeowner/Mortgagor:** |
|---|---|
| Hometap Investment Partners II, L.P.<br>800 Boylston Street, 16th Floor<br>Boston, MA 02199<br>Attention: Legal Department | Marlene S. Crawford<br>13531 Desert Rue Dr, Victorville, CA 92392 |

*[Signature Pages Follow]*

**HOMEOWNER DECLARES THAT HOMEOWNER HAS READ THIS MORTGAGE & SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE EFFECTIVE DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage & Security Agreement under seal as of the Effective Date.

**MORTGAGORS:**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 11/20/2020

By: ______________________________
Chris Crawford

Date: ______________________________

**The undersigned Homeowner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Homeowner at the Homeowner's address set forth in Section 21 above.**

**MORTGAGORS:**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 11/20/2020

By: ______________________________
Chris Crawford

Date: ______________________________

**Acknowledgment Certificate**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Bernardino )

On November 20, 2020 before me, Anna M Taylor, Notary Public
(insert name and title of officer)

personally appeared Marlene S. Crawford,

who proved to me on the basis of satisfactory evidence to be the person(~~s~~) whose name(~~s~~) is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity(~~ies~~), and that by ~~his~~/her/~~their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(~~s~~) acted, executed the instrument and did so voluntarily for its stated purpose.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: [signature]

NCC1
ANNA M. TAYLOR
Commission No. 2218711
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires NOVEMBER 15, 2021
NCC1

# EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain real property situated in the County of San Bernardino, State of California, described as follows:

Lot 58 of Tract 13760-2, in the City of Victorville, County of San Bernardino, State of California, as per Map recorded in Book 222, page(s) 74 through 76, inclusive of Miscellaneous Maps, in the Office of the County Recorder of said County.

Parcel ID No.: 3095-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

# Exhibit E

Electronically
Recorded in Official Records
San Bernardino County

Bob Dutton
Assessor-Recorder-County Clerk

*After Recording Return To:*
Hometap Equity Partners LLC
800 Boylston Street
16th Floor
Boston, MA 02199

DOC# 2021-0363741

08/12/2021
01:33 PM
SAN

I5190

Titles: 2 Pages: 12

| | |
|---|---|
| Fees | $61.00 |
| Taxes | $0.00 |
| CA SB2 Fee | $150.00 |
| Total | $211.00 |

***Recording Requested By:***
*Hometap Investment Partners II, L.P.*
Investment No.: CA485134

________________[Space Above This Line For Recording Data] ________________

**Investment Amount: $57,459.00**

## MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 07/14/2021 ("**Signing Date**"), by and between Marlene S. Crawford (the "**Owner/Mortgagor**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap/Mortgagee**"). Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Purchase Agreement by and between Owner and Hometap (the "**Option Agreement**") of even date. The Option Agreement, Memorandum of the Option Purchase Agreement, and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement**."

This Mortgage and Security Agreement was prepared by Adam Jaskievic, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.

1. Grant.

OWNER HEREBY IRREVOCABLY grants, transfers, and assigns to Hometap, and its successors and assigns, a security interest, with power of sale, for the benefit of Hometap, and its successors and assigns, in and to the property located at 13531 Desert Rue Dr, Victorville, CA 92392 and further described on Exhibit A attached hereto (the "**Property**"), together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

2. Secured Obligations.

Owner makes the grant, transfer, and assignment set forth in Section 1 to secure the following:

(a) Owner's performance of each of its obligations in the Hometap Homeowner Agreement;

(b) Hometap's rights under the Hometap Homeowner Agreement;

(c) Homeowner's payment obligations in the Hometap Homeowner Agreement, including:

(i) Payment of the Hometap Share owed to Hometap pursuant to the terms of the Option Agreement;

(ii) Payment of all Option Fees owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the liquidated damages pursuant to Section 7.4 of the Option Agreement;

(vi) Reimbursement of any expenditures made by Hometap pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel) (collectively, "**Legal Fees**") incurred by Hometap in the enforcement and collection of the obligations listed above and the protection of Hometap's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a security agreement under the California Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the California Commercial Code. Owner grants to Hometap a security interest in those items to secure the performance and payment of the Obligations.

(a) Owner agrees that Hometap may file this Security Instrument, or a copy of it, and a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of

the Secretary of the State of California, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 9-501(a)(1) and 9-502(c) of the California Commercial Code, and any similar or successor provisions.

(c) Hometap may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d) Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Hometap may require.

(e) Upon an Event of Default, Hometap will have the remedies of a secured party under the California Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Hometap may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Hometap's remedies under the California Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Owner absolutely and unconditionally assigns to Hometap all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Owner gives to and confers upon Hometap the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Hometap may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5. Covenants of Owner Regarding the Property. Owner agrees as follows:

(a) To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Hometap; and to pay all costs, fees, and expenses of Hometap (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Hometap may appear, and in any action, suit, or proceeding brought by Hometap to foreclose this Security Instrument or to collect the Obligations or to protect Hometap's rights under this Security Instrument or the Hometap Homeowner Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i) If Owner fails to make any payment or to do any act as provided in this Security Instrument, Hometap may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Hometap will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii) Hometap will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Hometap under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Hometap appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Hometap related to this Security Instrument and to pay interest on any of such amounts demanded by Hometap at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Owner irrevocably appoints Hometap as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Hometap may, in Hometap's name or in the name of Homeowner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Hometap's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Hometap as agent and attorney-in-fact will be accountable only for such funds as are actually received by Hometap.

7. Default and Foreclosure. Upon an Event of Default, Hometap may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner

of a written declaration of default. If any Event of Default has occurred and is continuing, Hometap may take any or all of the following actions, at the same or at different times:

(a) Possession. Hometap may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Hometap is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Hometap, then this Security Instrument will, at the option of Hometap, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Hometap may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Hometap the amount of rent requested by Hometap in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Hometap may apply on account of the unsatisfied Obligations owed to Hometap after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Hometap that were paid by Owner to Hometap or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e) Remedies at Law or Equity. Hometap may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Statutory Power of Sale. To the extent permitted by applicable law:

(i) Hometap will have the power to sell the Property at a nonjudicial foreclosure sale. In connection with the sale, Hometap may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default. Hometap will give notice of default to Owner prior to acceleration following an Event of Default. The notice will specify: (A) the default; (B) the action required to cure the Event of Default; (C) a date by which the Event of Default must be cured; and (D) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument and sale of the Property. The notice will further inform Owner of any right to cure after acceleration and the right to bring a court action to assert the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Hometap at its option may require immediate performance in full of all Obligations without further demand and may invoke the power of sale and any other available remedies not prohibited by applicable law. Hometap will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

(ii) If Hometap invokes the power of sale, Hometap will execute a written notice of Hometap's election to cause the Property to be sold as may be prescribed by applicable law. Hometap will cause this notice to be recorded in each county in which any part of the Property is located. Hometap will mail copies of any notice required by applicable law to Owner and to the other persons required by applicable law. Hometap will give public notice of sale to the persons and in the manner as may be prescribed by applicable law.

(iii) After the time required by applicable law, Hometap may sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Hometap determines. Hometap may postpone the sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.

(iv) Hometap will deliver to the purchaser its deed conveying the property sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts will be conclusive proof of their truthfulness. Any person, including Owner or Hometap, may purchase at the sale.

(v) After deducting all costs, fees, and expenses (including Legal Fees), including cost of evidence of title in connection with the sale, Hometap will apply the proceeds of the sale to payment of: first, to all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by applicable law in effect on the Signing Date of this Security Instrument; second, to other sums then secured by this Security Instrument and senior to Hometap's interest; third, the Hometap Share to Hometap; and fourth, the remainder, if any, to the person or persons legally entitled to it.

(vi) Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(vii) Exercise of Hometap's remedies under this Security Instrument will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Hometap does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Hometap's Powers. At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations Hometap may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Subordination. This Security Instrument is subordinate to and junior to the Memorandum of Option Purchase Agreement which affects the Property and is executed by Owner as "Owner" as of the same date as this Security Instrument.

11. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The term "**Hometap**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security

Instrument. Absent Hometap's prior written consent, which consent may be withheld in Hometap's sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

12. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

13. Joint and Several Liability. If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

14. Multiple Owners. If there are multiple Owners of the Property:

(a) this Security Instrument must be signed by each Owner;

(b) all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c) each Owner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e) Hometap may treat any notice received from any Owner as notice from all Owners.

15. Incorporation by Reference. Exhibit A to this Security Instrument is incorporated by this reference.

16. Extent of Lien. The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Hometap Homeowner Agreement relates to only a fractional interest in the Property.

17. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Hometap otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Hometap after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Hometap or in any other person.

18. Release. Following payment of all amounts secured by this Security Instrument, Hometap will discharge this Security Instrument. Owner will pay any recordation costs. Hometap may charge Owner a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

19. Subordination of Homestead and Waivers. If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Hometap under the Hometap Homeowner Agreement and all renewals, extensions, and

modifications of the Hometap Homeowner Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument. Owner waives and relinquishes all rights of curtesy and dower in the Property.

20. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Mortgagee:**

Hometap Investment Partners II, L.P.
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department

**Owner/Mortgagor:**

Marlene S. Crawford

13531 Desert Rue Drive
Victorville, CA 92392

*[Signature Pages Follow]*

**OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 7/14/2021

By: ______________________

Date: ______________________

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 20 above.**

**MORTGAGORS:**

By: Marlene S. Crawford
Marlene S. Crawford

Date: 7/14/2021

By: ______________________

Date: ______________________

**Acknowledgment Certificate**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San bernardino

On 07/14/2021 before me, Ciji Chimere McClenney, notary public

personally appeared Marlene S. Crawford, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: ______________________ (Seal)

CIJI CHIMERE MCCLENNEY
Commission No. 2284820
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires APRIL 11, 2023
NCC1 NCC1

**Acknowledgment Certificate**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Bernardino

On 07/14/2021 before me, Ciji Chimere McClenney, notary public

personally appeared Marlene S. Crawford, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: ______________________ (Seal)

CIJI CHIMERE MCCLENNEY
Commission No. 2284820
NOTARY PUBLIC-CALIFORNIA
SAN BERNARDINO COUNTY
My Comm. Expires APRIL 11, 2023
NCC1 NCC1

**EXHIBIT A**

**LEGAL DESCRIPTION**

Real property described as follows:

All that certain real property situated in the County of San Bernardino, State of California, described as follows;
Lot 58 of Tract 13760-0, in the City of Victorville, County of San Bernardino, State of California, as per Map Recorded in Book 222,
Page(s) 74 through 76, inclusive of Miscellaneous Maps, in the Office of the County Recorder of Said County

Parcel ID / APN: 3095-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

# CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I caused the foregoing document entitled **DECLARATION OF ADAM JASKIEVIC** to be filed electronically with the Clerk of the Court for the United States District Court, Central District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

Dated: August 21, 2026

By: */s/ Anthony Q. Le*
Anthony Q. Le

*Attorney for Defendants Hometap Equity Partners, LLC and Hometap Investment Partners II, L.P.*