**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (SBN 263291)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Ave. NW, Suite 500
Washington, DC 20036
Tel: (202) 998-2299

**CLARKSON LAW FIRM, P.C.**
Chimaraoke Iko (SBN 367771)
*riko@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis (admitted *pro hac vice*)
*jfrancis@consumerlawfirm.com*
Lauren KW Brennan (admitted *pro hac vice*)
*lbrennan@consumerlawfirm.com*
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel: (215) 735-8600
Fax: (215) 940-8000

**ROBERT P. COCCO, P.C.**
Robert P. Cocco (*pro hac vice* forthcoming)
*bob.cocco@phillyconsumerlaw.com*
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
Tel: (215) 351-0200
Fax: (215) 827-5403

*Attorneys for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARLENE CRAWFORD and MICHAEL SAUNDERS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HOMETAP EQUITY PARTNERS, LLC and HOMETAP INVESTMENT PARTNERS II, L.P.,

Defendants.

Case No. 5:26-cv-03457-KK-AS

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. Truth-in Lending Act (15 U.S.C. §1602 *et seq.*)
2. Unlawful Business Practices (Cal. Bus. & Prof. Code § 17200)
3. Unfair Business Practices (Cal. Bus. & Prof. Code § 17200)
4. Deceptive Business Practices ( Cal. Bus. & Prof. Code § 17200)
5. Usury (California Constitution, Article XV § 1)
6. Unconscionability (Cal. Civ. Code § 1670.5)
7. Declaratory Relief (Cal. Code Civ. Proc. § 1060)

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION ........ 1
II. JURISDICTION AND VENUE ........ 3
III. PARTIES ........ 3
IV. FACTUAL ALLEGATIONS ........ 4
A. Hometap contracts ........ 4
B. Hometap's product misleads homeowners & puts vulnerable homeowners at risk. ........ 7
C. Hometap's product is a mortgage loan. ........ 11
D. Hometap's predatory business practices contribute to its rapid expansion. ........ 15
E. Federal and state laws protect homeowners like Plaintiffs from Hometap's loan. ........ 16
F. Plaintiffs' facts are typical ........ 17
1. Plaintiff Marlene Crawford ........ 17
i. November 20, 2020 Contract ........ 18
ii. July 14, 2021 Contract ........ 21
2. Plaintiff Michael Saunders ........ 24
V. CLASS ACTION ALLEGATIONS ........ 29
VI. CAUSES OF ACTION ........ 31
COUNT 1 ........ 31
COUNT 2 ........ 33
COUNT 3 ........ 37
COUNT 4 ........ 39
COUNT 5 ........ 41
COUNT 6 ........ 42
COUNT 7 ........ 44


Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

VII. PRAYER FOR RELIEF ........................................................................ 44
VIII. JURY DEMAND.................................................................................... 45

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

On behalf of themselves and all others similarly situated, Plaintiffs Marlene Crawford and Michael Saunders (together, "Plaintiffs"), by and through their attorneys, respectfully allege as follows:

## I. INTRODUCTION

1. Every few years, a new group of private-money interests finds a predatory and abusive mortgage loan product that they peddle to financially struggling homeowners, all the while believing that they have created something so original and unique that they can skirt traditional federal and state lending laws. The foreclosure crisis of 2008 displayed the danger of such products through the grotesque collapse of securitized debt obligations. Defendants' (collectively, "Hometap's") loan is another iteration of such products.

2. Hometap breaks federal and state lending laws and attempts to avoid their protections by ensnaring homeowners with its complex, confusing, and high-risk loans which Hometap deceptively brands as "Option Purchase Agreements," and affiliated documents, which falsely claim "THIS IS NOT A LOAN."

3. Broadly, Hometap's product operates like any other loan. In exchange for a cash advance paid to the consumer, Hometap receives a mortgage-secured right to a percentage of the property's value which its contract describes as the "Hometap Share." For example, after deducting fees and costs, a homeowner who receives $100,000 in cash from Hometap sells a percentage of their home equity worth nearly twice as much today and more than twice that amount over the ten-year term. Hometap does not adequately disclose this difference to consumers like Plaintiffs, but its investor materials tout the HEI's "downside protection, even during times of declining home values," through a "cushion in each property investment to minimize potential losses."[1]

---

[1] Hometap is subject to an enforcement action by the State of Massachusetts raising similar claims as those raised herein. The quoted language appears in paragraph 75 of the Massachusetts Complaint, which quotes Hometap's representations obtained by

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

4. Over the course of the ten-year term, the amount owed on the contract increases. During this time, the homeowner pays for all upkeep, repairs, improvements, taxes, insurance, and other costs related to the property, but does not pay down the principal to Hometap. When the Hometap loan comes due, the homeowner is required to pay back significantly more than they received from Hometap in one lump sum. If consumers cannot make that required payment to Hometap, Hometap can foreclose or otherwise force a sale to collect it and thereby force consumers out of their homes without any of the protections required of a lender before foreclosing on a traditional mortgage. Worse, because Hometap's transactions are underwritten without regard to homeowner's income, assets, or future ability to pay the loan—and because Hometap targets homeowners who cannot qualify for or afford a traditional mortgage—a significant subset of homeowners are at risk of being forced out of their homes by the Hometap loan when their ten-year contracts mature.

5. Hometap markets to individuals with low credit scores who are less likely than the general population to be able to refinance later. Further exacerbating their risk is the structure of the product with its single enormous lump sum payment due after a ten-year cliff (which can be extended to 20 years at Hometap's sole discretion). Moreover, at the time of sale, Hometap will take much of the sale proceeds while the homeowners will have to cover all of the sale costs, making transition to a new home more onerous—and in some cases, impossible.

6. To disguise that Hometap makes money as a lender and to avoid licensing and substantive controls on its lending, Hometap frames its product as an "option agreement" rather than a loan, that is, in exchange for an upfront payment, Hometap receives an "option" to acquire a percentage interest in the consumer's home, which vests after ten years. This "option" language is mere artifice. It hides Hometap's

---

the Massachusetts Attorney General. *See Comm. of Mass. v. Hometap Equity Partners, LLC*, Civil Action No. 2584-CV-469-BLS2 (Mass. Super. Ct. Feb. 19, 2025), available at https://www.mass.gov/doc/commonwealth-v-hometap-equity-partners-llc/download (hereinafter "Massachusetts Enforcement Action").

guaranteed repayment of the entirety of the loan's principal by the borrower plus a significant finance charge disguised as an equity share, all of which Hometap can recoup by forcing sale of the homeowner's home as collateral for its loan, through operation of the mortgage. Hometap's own investor materials make clear that exercising its "option" under the contract means Hometap will "either foreclose on the property or force a sale of the property if the homeowner cannot otherwise settle." *See* Massachusetts Enforcement Action ¶ 144.

7. No matter how Hometap labels its loan product, the reality is that it provides homeowners with an advance of money for a secured mortgage interest in their home, and then requires repayment with interest within 10 years or less. That is a mortgage loan. Plaintiffs bring this suit to protect their respective families and others similarly situated from financial harm and to vindicate their rights under state and federal law.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

9. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) the proposed class consists of more than 100 members; (b) there is minimal diversity; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, where Plaintiffs reside and where the properties that are the subject of the contracts are located.

## III. PARTIES

11. Plaintiff Marlene Crawford is an adult individual and American consumer who resides in the County of San Bernardino, in the State of California.

12. Plaintiff Michael Saunders is an adult individual and American consumer who resides in the County of Los Angeles, in the State of California.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

13. Defendant Hometap Equity Partners, LLC ("HEP" or "Hometap") is a Delaware Limited Liability Company headquartered in Boston, Massachusetts.

14. HEP is the primary operating entity, employs Hometap's employees, and negotiates and facilitates its real estate transactions. HEP controls subsidiaries which are the contractual counterparties in transactions entered into by Hometap such as Hometap Investment Partners II, L.P. which entered into the instant contracts with Plaintiff Crawford.

15. Defendant HEP is named as the entity in contract with Plaintiff Saunders.

16. Defendant Hometap Investment Partners II, L.P. ("HIP") is a Delaware limited partnership headquartered in Boston, Massachusetts. HIP is named as the entity in contract with Plaintiff Crawford for the 2020 and 2021 contracts

17. Neither HEP nor HIP is licensed to make mortgage loans in California.

18. HEP and HIP have contributed assets to a common undertaking, that is, the transactions at issue.

19. HEP and HIP expect profit from the undertaking, and both have a right to participate in the profit.

20. HEP and HIP are engaged in a joint venture, partnership, and/or civil conspiracy.

21. Alternatively, HEP is the principal of HIP and exercises control over and directs its actions.

22. HEP and HIP are thus jointly and severally liable for all conduct herein, or in the alternative, HEP is liable for all acts of HIP.

23. HEP and HIP are collectively referred to as "Hometap" herein.

## IV. FACTUAL ALLEGATIONS

### A. Hometap contracts

24. Hometap contracts are lengthy, convoluted, and extremely difficult, if not impossible, for a lay person to understand.

25. The documents typically consist of a 33-page "Option Purchase Agreement," "Option Closing Disclosure," "Investment Disclosures," a Mortgage and Security Instrument or similar security instrument, and numerous other documents, with the specific financial term sheet hidden in a schedule in the middle of the documents.

26. The documents contain multiple cross-references, use dozens of proprietary defined terms, some of which are not found in a glossary, and contain excessively lengthy and confusing sentences and clauses. *See, e.g.* Ex. A (the "2020 Crawford Contract"); Ex. B (the "2021 Crawford Contract"); Ex. C (the "Saunders Contract").

27. All Hometap's so-called Option Purchase Agreements (referred to herein as the Hometap contract or Hometap product) have the same four core features:

a. Cash Advance: They provide upfront cash to homeowners without a reasonable and good-faith determination that a homeowner can repay from income, job, or assets other than the home itself. Hometap refers to this cash as the "Option Investment Amount" or "Investment Amount" rather than what it is, the principal amount of a loan.

b. Equity Devaluation: In exchange for the cash advance, Hometap acquires an interest in a percentage of the homeowner's home equity that well exceeds the percentage of the home value paid to the homeowner via the cash advance.

c. Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate but Hometap's "capped" return routinely exceeds 20% annual interest, because Hometap does not calculate the figure based on the full value of the Investment Amount. *See* Massachusetts Enforcement Action ¶¶ 52(c), 63.

d. Ten-Year Balloon: The homeowner is not required to make any installment payments to Hometap during the loan term. Instead, at the end of the ten-year term, the homeowner must make a single, very large payment to Hometap, unless Hometap decides to extend the term up to twenty years. Most homeowners will have to fund this payment by selling their homes.



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

28. Hometap's form contracts contain the header: "Option Purchase Agreement" and deceptively state "THIS IS NOT A LOAN."

29. Under the contract, Hometap purportedly "pays" (but in reality, loans) a sum of money to the homeowner, called the "Investment Amount."

30. This amount is paid back through a supposed option to purchase a percentage of the home's value in the future, called the "Hometap Percentage."

31. A copy of Ms. Crawford's Hometap contracts and accompanying schedules and exhibits are attached hereto as Exs. A & B. A copy of Mr. Saunders's Hometap contract and accompanying schedules and exhibits is attached hereto as Ex. C.

32. Hometap deducts certain fees and costs from the Investment Amount before the consumer receives the Investment Amount.

33. Some of these fees and costs are purportedly paid to third parties for typical mortgage closing services, such as for appraisals, title charges, and recording fees.

34. Hometap does not disclose the identity of the entities that provide each of the services, nor the actual amount paid to that entity.

35. Hometap charges the homeowner more for closing services than the amount it pays to third parties for these services.

36. Upon information and belief, the excess of the amount charged for the so-called "third-party costs" are actually retained by Hometap.

37. In addition, Hometap retains at least 3%, and in some transactions 4.5% or more, "Investment Fee."

38. Thus, for example, although Hometap offered a $44,000.00 "Investment Amount" to Plaintiff Crawford in the 2020 Contract, she actually received $40,664.38. *See* Ex. A at Option Closing Disclosure. Similarly, in 2021, Hometap purported to offer Plaintiff Crawford an Investment Amount of $57,459.00 but Plaintiff Crawford actually received $53,555.23. *See* Ex. B at Investment Disclosure.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

39. Likewise, although Hometap offered a $111,000.00 "Investment Amount" to Plaintiff Saunders, he actually received only $98,499.87. *See* Ex. C at Schedule A, Hometap Investment Term Sheet.

40. Under the terms of the contract, in exchange for the "Investment Amount," Hometap will receive a payment from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage"), although Hometap alleges that Hometap Percentage is capped at an annualized twenty percent ("Hometap Cap").

41. The actual payment of that amount by the homeowner, which will typically be paid through a voluntary or forced sale of the home, is called the "Hometap Share."

42. Under the Hometap contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events. *See* Ex. A at Option Closing Disclosure, Option Purchase Agreement § 2.5; Ex. B at Investment Disclosure, Option Purchase Agreement § 2.5; Ex. C at Option Purchase Agreement § 1.5.

43. The Hometap Share is, functionally, repayment of the original Investment Amount plus a profit.

44. The profit to Hometap, its return on investment, is a disguised finance charge for the original amount loaned to the homeowner.

45. Despite what Hometap tells consumers, its products are single-payment mortgage loans with a high rate of effective interest and/or exorbitant finance charges.

**B. Hometap's product misleads homeowners & puts vulnerable homeowners at risk.**

46. Hometap advertises its product to cash strapped homeowners as a way to pay off unsecured debt like credit cards and eliminate bills to enable a homeowner to "get closer to financial freedom." Hometap, https://www.hometap.com/ (last accessed Sept. 30, 2026) (hereinafter "Hometap Homepage").

47. Instead, the product places a homeowner in a financial trap, stripping their most valuable financial asset—their home equity—from them at an extremely high rate of return for Hometap.

48. Indeed, Hometap's product restricts a homeowner's "freedom" by not allowing the homeowner to rent the house, move, take on additional debts without Hometap's approval, or otherwise make personal decisions about the home such as transferring it to a family member. *See* Exs. A-C Option Purchase Agreement § 6.

49. Hometap presents itself as working for the joint interest of itself and the homeowner.

50. For instance, Hometap advertises that its product is: "Built for You. We put homeowners at the heart of everything we do. Our products are designed to help you meet your goals, and our team of real humans is here to support you every step of the way." Hometap Homepage.

51. Hometap further touts "Our homeowner-first approach," *id*., and states that it "invest[s] alongside homeowners," Hometap FAQs, https://www.hometap.com/faqs (last accessed June 23, 2026) (hereinafter "Hometap FAQs").

52. In reality, Hometap's goal is to maximize profit for investors.

53. Hometap also misleads homeowners by touting that they will not have to sell their homes to access their home equity, when in fact the contract requires just that. *See, e.g.*, Hometap Homepage ("Access your home equity without having to sell or stress."); Hometap FAQs (asserting that it "provides homeowners with a fast, simple, and straightforward way to access the equity in their home without taking on monthly payments or having to sell.")

54. Indeed, Hometap advertises specifically to homeowners who cannot afford monthly payments and asserts that their product will help them receive cash without selling. *See* IPE Webinar: Home Equity Investments: An Untapped Asset Class/Hometap, https://www.youtube.com/watch?v=NabDHTVlp3Y&t=1s (noting

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

that the product appeals to people who "just can't take on . . . more debt"; later explaining that increased homeowner cost-of-living and inability to take on additional traditional debt "translates into an opportunity for capital . . . to earn a really strong relative risk adjusted return") (hereinafter "IPE Webinar").

55. In reality, homeowners will not be able to refinance with a traditional loan at the end of the contract when the payoff has dramatically increased, because payments will be even more unaffordable. Instead, in direct contrast to Hometap's promises, the homeowner will be forced to sell—at considerable gain to Hometap and its investors.

56. Hometap further indicates that the loans require "no monthly payments," Hometap Homepage, without making clear that Hometap requires the homeowner to pay all costs associated with the home, including the first mortgage, taxes, insurance, homeowners' association fees, and repair and maintenance costs. *See* Exs. A-C Option Purchase Agreement § 6.

57. And while Hometap repeatedly characterizes the product as "financing" to homeowners and investors, its contract claims that the payment is "not a loan or any other form of financing transaction," *See* Ex. A § 4.9; Exs. B & C § 4.1(i); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing (last accessed Sept. 30, 2026).

58. Prior to entering a Hometap contract, Hometap does not make a reasonable and good-faith determination that a homeowner has the ability to repay based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

59. Hometap's only evaluation prior to entering a Hometap contract pertains to a homeowner's ability to repay the Hometap contract through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

60. If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property . . . and [thereafter] solicit[] a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers . . . ." Ex. A Option Purchase Agreement § 7.2(a); Exs. B & C at § 3.1(b).

61. Hometap does this after years of requiring and relying on homeowners to invest in their own homes and ensure that the value of the home increases, ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

62. Hometap is aware of the serious harms that its product can cause, including forcing people to sell their homes or sink even further into debt.

63. Hometap's product further exploits homeowners through a number of unlawful provisions designed to limit the ability of homeowners to vindicate their rights in court, including:

a. The contracts include a mandatory arbitration clause. Exs. A-C Option Purchase Agreement § 8.13. Yet federal law prohibits arbitration clauses in residential mortgages, precisely because it is so important that homeowners can get before a court to save their home. 15 U.S.C. § 1639c(e)(1).

b. The contract also seeks to strip Plaintiffs of their right to remedies, including actual, statutory, punitive, and consequential damages. Exs. A-C § 8.1. No matter how much harm the company causes Plaintiffs or how many laws it violates, the contract provides that "IN NO EVENT WILL [Hometap's] AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT." *Id.*

c. The contract also seeks to immunize Hometap by allowing asserting that it is not responsible for the acts of its employees, contractors, agents, or others, except in limited circumstances. Exs. A-C § 8.8.

d. The contract's indemnification clause also purports to put Plaintiffs on the hook for Hometap's legal expenses for a wide range of claims, independent of the outcome of the litigation. Exs. A-C § 8.1.

64. These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights—including seeking to protect themselves from Hometap's predatory and unlawful attempts to take their homes and strip them of their home equity.

**C. Hometap's product is a mortgage loan.**

65. Hometap falsely claims that it is entirely exempt from any federal and state lending laws and licensure requirements because (it claims) its product is not a mortgage loan.

66. Rather than providing appropriate disclosures to homeowners, including the true cost of the loan and the fact that Hometap has structured the transaction to ensure that it will be paid back at a profit, Hometap disguises the finance charge in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates or depreciates.

67. But no matter how Hometap labels its product, it is still a mortgage loan, because Hometap provides homeowners with an advance of money, receives security through a mortgage on their home, and defers repayment until the end of the contract, to occur within 10 years. In other words, homeowners have the obligation to repay Hometap, by the very terms of the product. Those features create a mortgage loan.

68. Hometap ensures that, in practice, it will obtain repayment of its initial advance payment (plus a substantial finance charge) because all of the conditions for the conclusion of the contract require Plaintiffs to pay Hometap.

69. In this case, under Ms. Crawford's 2020 Contract, Hometap paid her roughly 13% of the value of her home at the time of that contract, and Hometap will receive up to 23.967% of the home's end-of-contract value in 2030 (capped at 20% annual compound interest). *See* Ex. A at Option Closing Disclosure. Under the 2021 Contract, Hometap paid Ms. Crawford roughly 14.5% of the home's value at the time

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

of that contract, and Hometap will receive up to 26.031% of its end-of-contract value in 2031. *See* Ex. B at Investment Disclosure.

70. Under Mr. Saunders's Contract, Hometap paid him roughly 8.95 % of the value of his home at the time of that contract, and Hometap will receive up to 20.182% of the home's end-of-contract value in 2036 (capped at 20% annual compound interest). *See* Ex. C, Schedule A Hometap Investment Term Sheet.

71. Thus, even without any home appreciation, Hometap is guaranteed a profit.

72. Upon information and belief, Hometap will not issue one of its products unless it anticipates significant appreciation of the home. As a result, not only does the percentage of the home's value that Hometap will be paid increase, but the real dollar figures (the denominator by which the payout is calculated) also increases.

73. In reality, Hometap anticipates that its products will reach the 20% APR cap almost all of the time. As a result, the product functions exactly like a traditional loan: the homeowner takes out a debt and then repays it, with 20% interest.

74. While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

75. Hometap's contract contains a number of features to further ensure that nothing will decrease the value of the home or jeopardize its future payment:

a. Hometap requires homeowners to pay for all the taxes, insurance, and repairs on the home. Exs. A-C Option Purchase Agreement §§ 6.2(e); 7.1(f); 7.1(i). Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. Exs. A-C § 7.2(b).

b. Hometap limits the homeowner's ability to rent out the home or leave the property. See Exs. A-C § 6.1(b); *see also* IPE Webinar at 30:02



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

(explaining that investors will see profit because the homeowner will pay for upkeep of the property and ensure that its value increases, unlike a renter).

c. Hometap caps the amount of any additional home secured debt that the homeowner can take on. Ex. A § 6.1(h); Exs. B & C § 6.1(i).

d. Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can, in its sole discretion, calculate the value of the "Hometap Share" based on appraisal instead of the sale price. *See* Exs. A-C §§ 2.1-2.3. Hometap can also effectively delay the sale by requiring sworn documentation from both the owner and buyer.

e. The contract's 10-year maturity date ensures that it will not take a loss: Hometap CEO Jeffrey Glass has explained that there "only three time periods in American history where over a 10-year period the average home in America has had any level of realized decline" and that even then, the amount of decline has been minimal. IPE Webinar at 23:02.

f. Hometap's (but not the homeowner's) option to extend the contract up to an additional 10 years also allows it to ensure that it will be paid back, with a profit. *See* Exs. A-C § 1.5.

76. Hometap's statements to investors confirm it will be paid back at a profit. For instance:

a. Hometap states that it has a "Proven track record" including "8+ years delivering strong, risk-adjusted returns," and "in both rising and declining home value environments." Hometap Investment Homepage, https://invest.hometap.com/ (last accessed Sept. 30, 2026); *see also id*. (touting that "investors reap the benefits of U.S. home price appreciation without the complexities that historically come with large-scale residential real estate investing," and further explaining that a "combination of data science, technology, thorough underwriting creates high quality assets"—that is, a high rate of return); IPE Webinar at 1:16 (explaining that Hometap has a "very big focus on technology and data science . . . for ensuring that we're creating a really strong portfolio for capital").

b. Hometap explains that it "structure[s] these [products] in a way that we're able to create meaningful downside protection for capital" and that it recognizes that "we have to deliver appropriate risk-adjusted returns for investors who care about downside protection and Sharpe ratios." IPE Webinar at 12:40.

c. Hometap further explains that despite the ten-year contractual period, Hometap knows that it will "always see a percentage of the portfolio turn each year and that provides the cash flow back to investors" because of refinances and sales. IPE Webinar at 37:18.

77. In addition, while the Hometap product does have the characteristics of a mortgage loan, its product does not have the characteristics of an option, including:

a. Unlike with a typical option contract, the contract terms demonstrate that Hometap does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to so that Hometap is paid back financially, primarily either through forced or voluntary sale.

b. As described above, the product shifts all risk and costs onto consumers and is designed to ensure that Hometap will always benefit from exercising the option, unlike a true option contract.

c. The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home, which is not a feature of a typical option contract and reflects Hometap's true intention that consumers pay back Hometap at a profit. Exs. A-C § 2.4.

d. A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home and various contractual terms creating obligations on the homeowner throughout the life of the contract gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

e. A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Hometap has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise payment" at the end of the ten-year term is, at most, a nominal 1% of the cash amount loaned to the consumer. *See* Exs. B & C § 3.1(e).

f. Hometap's statements to consumers about how to "settle" the contract demonstrate that it only contemplates being paid back and does not contemplate any scenario in which it will not exercise the option.

78. Hometap's documents also confirm that the product is a mortgage loan:

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

a. Certain of Hometap's documents identify that Hometap has obtained a mortgage on Plaintiffs' homes. *See, e.g.*, Ex. A Mortgage and Security Instrument; Ex. B Mortgage and Security Instrument.

b. Hometap's documents, in some places, do refer to the product as a "loan." *See* Ex. A Option Purchase Agreement § 6.2(h)(ii); Exs. B & C § 6.1(i)(ii) (referring to any additional indebtedness as a "Subsequent Loan").

c. Certain of Hometap's documents for the transaction refer to Plaintiffs as "borrowers." *See, e.g.*, Ex. A § 6.1(c)(i) ("As such, coverage shall cover Hometap but may not protect Borrower, Borrower's equity in the Property…")

d. Hometap also refers to the product as "financing." Hometap Homepage (referencing "a fresh take on financing"); Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing.

79. The product contains also various costs that are identical to those incurred with a loan.

80. In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus a profit—at a benefit to investors and a huge loss to homeowners.

81. As Hometap's own documents and statements recognize, its product is a mortgage loan.

### D. Hometap's predatory business practices contribute to its rapid expansion.

82. Hometap is a rapidly growing company, and it now boasts that it has over 14,000 customers across the U.S. Hometap, Home Equity Investments: The Tipping Point for Alternative Financing at 16 (back cover) (2025), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing

83. Getting homeowners to sign these mortgage loans is just the first step in Hometap's business model. The company then bundles and securitizes these residential mortgage contracts and sells them to investors.

84. In late 2025, Hometap entered its fifth substantial securitization, backed by $300 million in Hometap contracts, "reinforcing both its position as a leader in the asset class and its ability to deliver consistent access to capital for investors." Hometap Closes $300M Securitization of Hometap-originated Home Equity Investments, Citybiz (Sept. 8, 2025), https://www.citybiz.co/article/741421/hometap-closes-300m-securitization-of-hometap-originated-home-equity-investments/.

85. In June 2026, Hometap announced that it had expanded into five new states: Georgia, Montana, Tennessee, Idaho, and Delaware, claiming nearly 10,000 homeowners had reached out from these states in the preceding two years.[2]

86. As of today, Hometap's contracts equate to over $2 billion and impact more than 20,000 homeowners.

### E. Federal and state laws protect homeowners like Plaintiffs from Hometap's loan.

87. Congress and the California legislature have both passed laws to protect homeowners like Plaintiffs from complex and confusing financial products that can cause people to lose their homes.

88. While the Truth in Lending Act, 15 U.S.C. §1602 *et seq*. ("TILA"), protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

89. For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. *Id.* at § 1639c(a)(1).

[2] Hometap, Hometap Expands Home Equity Investment to Five States as Demand for Flexible Alternatives Grows, June 30, 2026, https://www.hometap.com/press-release/hometap-expands-home-equity-investment-to-five-states (last visited Sept. 30, 2026).



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

90. Companies originating mortgages must also be licensed under applicable federal and state laws. *Id.* at § 1639b(b)(1)(A).

91. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* at § 1639c(e)(1).

92. In addition to these protections for residential mortgage loans generally, TILA includes even further protections for "high-cost mortgage[s]." *Id.* § 1602(bb). These include pre-loan counseling and additional disclosures. *Id.* § 1639(a), (h), (u).

93. California requires disclosures and protections for mortgages generally, *see generally* Cal. Bus. & Prof. Code §§ 10240-10241. California also provides broad protections for consumer contracts, *see, e.g.,* Cal. Civ. Code §§ 1799.200-1799.207; 1799.209; Cal. Bus. & Prof. Code § 17200.

94. California also requires that only licensed mortgage lenders can offer these products. Cal. Fin. Code § 50002(a).

**F. Plaintiffs' facts are typical**

**1. Plaintiff Marlene Crawford**

95. In the late 1990s, Ms. Crawford purchased a home for herself and her family in Victorville, CA. She chose the home because it was in a desirable and safe location and hoped to raise her family there, intending to keep the home so that she could one day leave it to her children.

96. By 2020, Ms. Crawford was in financial distress. She was not working, was relying in part on government stimulus payments and support from her adult children, and was carrying bills she could not keep up with.

97. Ms. Crawford began looking for ways to address her financial situation but could not qualify for conventional financing. It was against this backdrop that Ms. Crawford turned to Hometap.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**i. November 20, 2020 Contract**

98. In or around October 2020, Ms. Crawford contacted Hometap by telephone to inquire about its product, and at Hometap's request, provided certain information about her home.

99. Ms. Crawford communicated with a Hometap Investment Manager, Devlin Keogh by telephone. Keogh asked Ms. Crawford how much equity she had in her home and how much money she needed. When she provided those figures, Keogh represented that the funds would be easy to obtain and that her request would be no problem. The ease of the process struck Ms. Crawford who had expected obtaining money be far more difficult.

100. At no point did Keogh represent that qualification turned on Ms. Crawford's income, employment or creditworthiness. To the contrary, Ms. Crawford was not required to document any income, and, to her knowledge, Hometap did not run a credit check on her. Qualification appeared to depend entirely on the equity in her home.

101. Keogh presented the product as a fast and simple way to draw cash from her home equity to pay her bills and other expenses, including a car payment, at a time when she was not working and could not qualify for other financing. Ms. Crawford was led to believe the transaction was a straightforward, low-risk way to access the cash she needed.

102. Keogh told Ms. Crawford she could expect to receive around $44,000, the amount she had requested based on what she needed to pay her bills. Ms. Crawford was informed that she qualified for more than this amount. The home was initially appraised at $305,973, making the requested amount roughly 13% of the home's appraised value.

103. Ms. Crawford never met in person with Keogh or anyone else from Hometap. On November 20, 2020, a settlement agent from the title company came to her home and had her sign the 2020 Contract documents in her garage. The agent

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

handed Ms. Crawford a stack of documents, did not sit down, and did not explain any of the documents to her. Instead, the agent simply pointed to where Ms. Crawford should sign, flipping through and turning the pages over quickly as Ms. Crawford signed. Ms. Crawford felt rushed throughout, and the entire process went by very fast. Ms. Crawford signed without any meaningful opportunity to read, understand, or negotiate the terms.

104. The Closing Package of the 2020 Contract stated that the required signatories for the contract were Homeowner, here Ms. Crawford, and Hometap Investment Partners II, L.P.

105. Hometap required Ms. Crawford to grant it a mortgage on her home, which secured her obligations under the contract on penalty of foreclosure (the "Mortgage and Security Instrument"). Ex. A Option Purchase Agreement § 1.2(a)(iv).

106. Ms. Crawford did not have any opportunity to negotiate the terms of the contract. Under Hometap's contract, the company was to give Ms. Crawford a stated amount of $44,000.00.

107. Ms. Crawford only received $40,664.38 of the loan amount due to the following deductions:

a. investment fee of $1,320.00
b. appraisal costs of $299.00
c. title charges of $595.00
d. "memorandum" costs of $120.00
e. "mortgage" costs of $231.00
f. payoff payments to Bank of America of $737.62.
g. "UCC financing statement" costs of $33.00

108. These fees exceed the actual cost for the services provided. For instance, the typical cost of recording a mortgage in San Bernardino County is under $100.

109. At the end of the contract, Ms. Crawford would be forced to pay Hometap 19.973% of the home's value at that time if the property value went down, or 23.967% of her home's value if the home's value increased.

110. The contract purports to subject this amount to a 20% annual rate of return cap.

111. Pursuant to the contract's terms, the contract ends at the first of the following events:

a. Ms. Crawford selling her home in a sale on terms permitted by Hometap;

b. Ms. Crawford defaults on property taxes, insurance, or homeowner's association dues on the property, or otherwise defaults on the contract terms;

c. The property is destroyed or condemned;

d. Ms. Crawford otherwise pays off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e. Ms. Crawford passes away; or

f. Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

112. Additionally, Ms. Crawford is required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home.

113. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

114. Ms. Crawford is also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

115. Ms. Crawford cannot repay that amount of money without either selling her home or sinking deeper into debt she cannot afford.

116. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Ms. Crawford must either buy out Hometap for thousands of

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

dollars that she doesn't have, or the company will force the sale of her home. Ex. A Option Purchase Agreement §§ 2.7, 3.1.

117. Ms. Crawford did not understand that Hometap could force her to sell her home in 10 years and only took out the loan to save her home. If she had understood the consequences, she never would have signed the contract.

118. Being forced out of her home would be a personal and financial disaster for Ms. Crawford, who would have to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from her home.

**ii. July 14, 2021 Contract**

119. By July 2021, Ms. Crawford's bills remained high, and she still had not been able to obtain assistance elsewhere. Needing additional funds, she contacted Hometap a second time and asked whether she could receive more money.

120. As with the first transaction, Ms. Crawford communicated with Hometap Investment Manager Devlin Keogh, who was not required to document her income, and qualification again appeared to turn on her available home equity rather than her income, employment, or credit.

121. To Ms. Crawford's recollection, she requested additional funds, around $54,000. Keogh told her they would give her the maximum amount that she qualified for, which was $57,459.00 and net proceeds of $53,555.23.

122. At no point did Keogh represent that qualification turned on Ms. Crawford's income, employment or creditworthiness. To the contrary, Ms. Crawford was not required to document any income, and, to her knowledge, Hometap did not run a credit check on her. Qualification appeared to depend entirely on the equity in her home. Ms. Crawford was led to believe the transaction was a straightforward, low-risk way to access the cash she needed.

123. The home was initially appraised at $367,889.00.

124. The Closing Package of the 2021 Contract stated that the required signatories for the contract were Homeowner, here Ms. Crawford, and Hometap Investment Partners II, L.P.

125. Hometap required Ms. Crawford to grant it a mortgage on her home, which secured her obligations under the contract on penalty of foreclosure (the "Mortgage and Security Instrument"). Ex. B Option Purchase Agreement § 1.2(a)(iv).

126. Ms. Crawford did not have any opportunity to negotiate the terms of the contract. Under Hometap's contract, the company was to give Ms. Crawford a "loan amount" of $57,459.00.

127. This loan amount was roughly equivalent to 14.5% of the appraised value of the home.

128. Ms. Crawford only received $53,555.23 of the loan amount due to the following deductions:

a. investment fee of $1,723.77
b. appraisal costs of $299.00
c. title charges of $595.00
d. "memorandum" costs of $117.00
e. "mortgage" costs of $228.00
f. payoff payments to Bank of America of $833.00
g. "UCC financing statement" costs of $108.00

129. These fees exceed the amount of the actual cost for the services provided. For instance, the typical cost of recording a mortgage in San Bernardino County is under $100.

130. At the end of the contract, Ms. Crawford would be forced to pay Hometap 21.692% of the home's value at that time if the property value went down, or 26.031% of her home's value if the home's value increased.

131. The contract purports to subject this amount to a 20% annual rate of return cap.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

132. Pursuant to the contract's terms, the contract ends at the first of the following events:

a. Ms. Crawford selling her home in a sale on terms permitted by Hometap

b. Ms. Crawford defaults on property taxes, insurance, or homeowner's association dues on the property, or otherwise default on the contract terms;

c. The property is destroyed or condemned;

d. Ms. Crawford otherwise pays off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e. Ms. Crawford passes away; or

f. Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

133. Additionally, Ms. Crawford is required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home.

134. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

135. Ms. Crawford is also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

136. Ms. Crawford cannot repay that amount of money without either selling her home or sinking deeper into debt she cannot afford.

137. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Ms. Crawford must either buy out Hometap for thousands of dollars that she doesn't have, or the company will force the sale of her home. Ex. B §§ 2.7, 3.1.

138. Ms. Crawford did not understand that Hometap could force her to sell her home in 10 years and only took out the loan to save her home. If she had understood the consequences, she never would have signed the contract.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

139. Being forced out of her home would be a personal and financial disaster for Ms. Crawford having to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from her home.

**2. Plaintiff Michael Saunders**

140. In December 2020, Plaintiff Michael Saunders decided to move from his previous accommodations and purchase a home in Calabasas, CA with his father, a retired military colonel, for $889,000.

141. Through his father, Mr. Saunders was able to access VA financing to assist with the purchase, and escrow closed on February 1, 2021. Because VA financing required a single borrower, the home was initially titled in his father's name alone. Mr. Saunders later assumed the loan and took title to the home.

142. During this period, Mr. Saunders was able to manage the monthly payments with help from his live-in partner. When that arrangement ended, he was left carrying the mortgage alone on a sharply reduced income. Mr. Saunders receives Social Security Disability Insurance ("SSDI") and is no longer able to work full-time; his income consists of a monthly SSDI payment and modest part-time earnings, against which he carries substantial and recurring healthcare costs.

143. By 2025, Mr. Saunders was in financial distress, facing growing medical expenses. Looking for a way to draw on the equity in his home, he researched a home equity line of credit and a reverse mortgage, but could not obtain conventional financing.

144. In or around December 2025, Mr. Saunders learned about home equity investment companies and began doing some research. It was against this backdrop that Mr. Saunders turned to Hometap.

145. Shortly thereafter, Mr. Saunders contacted Hometap by telephone to gather more information about his potential options.

Specifically, Mr. Saunders communicated with a Hometap Investment Manager, Yesenia Campisi. Over the course of eight to ten conversations, Ms. Campisi



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

discussed Mr. Saunders's goals; Mr. Saunders never explicitly told Ms. Campisi exactly how much money he needed and never requested a specific amount.

146. The first few calls were introductory in nature but soon Ms. Campisi inquired about Mr. Saunders's credit and asked about his income, including his tax returns and W2s, and wanted copies of his SSDI benefits. Ms. Campisi also inquired about the ownership status of Mr. Saunders's property.

147. Although Hometap requested and received this documentation, it made no determination that Mr. Saunders had the capability of repaying the amount the contract would require of him. Ms. Campisi never represented that Mr. Saunders's qualification turned on his income, employment or creditworthiness. On the contrary, Ms. Campisi informed him that Hometap does not care much about credit and instead cares about where one lives and what the home is worth. Consistent with this representation, qualification appeared to depend entirely on the equity in Mr. Saunders's home.

148. Hometap knew, at the time it entered into the contract, that Mr. Saunders's income consisted of a monthly SSDI payment and modest part-time earnings and that he carried substantial healthcare costs.

149. Ms. Campisi presented Hometap as a fast and simple way for Mr. Saunders to draw cash from his home equity to pay bills and other expenses at a time when he was unable to work full-time and could not qualify for other financing. Mr. Saunders was led to believe the transaction was a straightforward, low-risk way to access the cash he needed.

150. During one of their phone calls, Ms. Campisi told Mr. Saunders that the house was to be appraised. Hometap selected the appraiser, andand Mr. Saunders had no ability to contest the appraised value of $1,100,000.

151. Ms. Campisi represented that based on the appraisal Mr. Saunders could receive up to $111,000, roughly 10% of the home's appraised value. Ms. Campisi

advised Mr. Saunders to take the maximum amount Hometap would advance against his home. Following Ms. Campisi's guidance, Mr. Saunders agreed.

152. Mr. Saunders never met in-person with Ms. Campisi or anyone else from Hometap. On February 7, 2026, a settlement agent from the title company came to his home as a messenger to obtain signatures and had him sign his Option Purchase Agreement, attached to a Hometap Investment Term Sheet and a legal description of the property. The documents purported to include a Security Instrument, and a Notice of Right to Cancel, yet Mr. Saunders never received either document in his Closing Package. To date, Mr. Saunders does not have either document.

153. The agent handed Mr. Saunders a stack of documents, did not sit down, and did not explain any of the documents to him. Instead, the agent simply pointed to where Mr. Saunders should sign, flipping through and turning the pages over quickly as he signed. Mr. Saunders felt rushed throughout the entire process and signed without any meaningful opportunity to read, understand, or negotiate the terms. The other signatory for the contract was Daniel Amato, authorized signatory of Hometap Equity Partners, LLC.

154. At the time of the transaction, title to the home was held in a trust, of which Mr. Saunders is the trustee and sole beneficiary. Mr. Saunders entered into the Hometap contract both individually and in his capacity as trustee. At no point prior to closing or during closing did anyone from Hometap explain how the transaction would operate against property held in trust.

155. Hometap required Plaintiff Saunders to grant it a mortgage on his home, which secured his obligations under the contract on penalty of foreclosure (the "Security Instrument"). Ex. C, Option Purchase Agreement § 1.2(a)(iv).

156. Plaintiff Saunders did not have any opportunity to negotiate the terms of the contract. Under Hometap's contract, the company was to give Plaintiff Saunders a stated amount of $111,000.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

157. Plaintiff Saunders only received $98,499.87 of the loan amount due to the following deductions:

a. investment fee of $4,995.00
b. appraisal costs of $560.00
c. title charges of $650.00
d. title insurance cost of $430.00
e. recording fee of $395.00
f. filing fee of $225.00
g. additional recording fee of $47.00

158. These fees exceed the actual cost for the services provided. For instance, the typical cost of recording a mortgage in Los Angeles County is under $100.

159. Hometap made a payment to Mr. Saunders's mortgage servicer, Freedom Mortgage, of $5,198.13. This payment was never discussed in any of Mr. Saunders's earlier conversations with Ms. Campisi, and he was not told before closing that Hometap would make a payment on his mortgage or that the amount would be deducted from what he received.

160. When he inquired, Mr. Saunders was told that the mortgage could not have a balance.

161. Accounting for this payment, Mr. Saunders received $98,499.87 of the stated $111,000 Investment Amount.

162. Mr. Saunders applied these funds to pay off and close out outstanding balances that he had accumulated as he covered the mortgage and his medical costs on a reduced income.

163. At the end of the contract, Mr. Saunders would be forced to pay Hometap 15.136% of the home's value at that time if the property value went down, or up to 20.182% of his home's value if the home's value increased.

164. The contract purports to subject this amount to a 20% annual rate of return cap.

165. Pursuant to the contract's terms, the contract ends at the first of the following events:

a. Mr. Saunders selling his home in a sale on terms permitted by Hometap;

b. Mr. Saunders defaults on property taxes, insurance, or homeowner's association dues on the property, or otherwise defaults on the contract terms;

c. The property is destroyed or condemned;

d. Mr. Saunders otherwise pays off the Hometap Share pursuant to the terms set by Hometap ("Owner Repurchase");

e. Mr. Saunders passes away; or

f. Hometap Option Exercise is implemented by Hometap after the expiration of the 10-year term wherein Hometap sells the home to a third party and receives payment for its percentage interest.

166. Additionally, Mr. Saunders is required to cover 100% of the fees and costs associated with the end of the contract, including all costs related to any sale or refinancing of the home.

167. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

168. Mr. Saunders is also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract.

169. Mr. Saunders cannot repay that amount of money without either selling his home or sinking deeper into debt he cannot afford.

170. The contract's 10-year "Expiration Date" makes it especially dangerous. After 10 years or less, Mr. Saunders must either buy out Hometap for hundreds of thousands of dollars that he doesn't have, or the company will force the sale of his home. Ex. C Option Purchase Agreement, §§ 2.7, 3.1.

171. Mr. Saunders did not understand that Hometap could force him to sell his home in 10 years. If he had understood the consequences, he never would have signed the contract.

172. Being forced out of his home would be a personal and financial disaster for Mr. Saunders, who would have to pay sales costs and fees and then qualify to purchase a new home, while Hometap drained most of the equity from his home.

## V. CLASS ACTION ALLEGATIONS

173. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of the proposed classes defined as follows:

> **TILA Lookback Class:** All persons who have entered into an Option Purchase Agreement with Hometap more than three (3) years before the filing of this action.
>
> **California Class:** All persons who have entered into an Option Purchase Agreement with Hometap at a time when they were residents of California and/or where the property was located in California.

174. Plaintiffs reserve the right to amend the definitions of the classes above based on discovery or legal developments.

175. **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all is impractical. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements in the State of California and nationwide.

176. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the Class, and predominate over the questions affecting only individual members. The common legal and factual questions include, among others:

a. Whether Hometap's Option Purchase Agreements are mortgage loans;

b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

c. Whether Hometap's Option Purchase Agreements violate federal and state consumer protection laws;

d. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to rescission of their agreements, as well as statutory, actual and punitive damages;

e. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

f. Whether Hometap acted willfully, intentionally and/or recklessly in violating federal and state consumer lending laws.

177. **Typicality. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each Class member. Plaintiffs have the same claims for statutory, actual and punitive damages that they seek for absent class members.

178. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate representative of the Class. Their interests are aligned with, and are not antagonistic to, the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in such litigation, and they intend to prosecute this action vigorously.

179. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the class.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## VI. CAUSES OF ACTION

**COUNT 1**

**Truth-in Lending Act, 15 U.S.C. §1602 *et seq*.**

**By Plaintiff Crawford on behalf of herself and the TILA Lookback Class**

**Against All Defendants**

180. Plaintiff Crawford incorporates by reference each allegation set forth above as if set forth at length herein.

181. The contracts at issue from Hometap involved an extension of consumer credit as described by TILA, 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

182. The contracts at issue are "residential mortgage loans" as defined by 15 U.S.C. § 1602(dd)(5).

183. The contracts are for the extension of credit and require the payment of a finance charge, as those terms are defined in 15 U.S.C. §§ 1602(f) and 1605 and 12 C.F.R. § 1026.4; specifically, the difference between the Investment Amount and the Hometap Share includes a finance charge.

184. The credit was offered to a consumer for personal, family, or household purposes.

185. The contracts are secured by Plaintiff Crawford's dwelling.

186. Hometap is named as the payee on the face of the contract and regularly makes this type of contract pursuant to the requirements of TILA, rendering it a creditor subject to TILA.

187. Hometap violated TILA including but not limited to by:

a. entering into the contracts with Plaintiff Crawford while being unlicensed to originate mortgage loans in California, 15 U.S.C. §1639b(b)(1)(A);

b. failing to make a reasonable and good faith determination that Plaintiff Crawford had the ability to repay the loans, 15 U.S.C. § 1639c(a);

c. failing to provide Plaintiff Crawford with any of the disclosures required by TILA for residential mortgage loans, including those required by 15 U.S.C. §§ 1638(a), 1639(a); 12 C.F.R. §§ 1026.19, .23, .31, .37, and .38;

d. including a mandatory arbitration clause in the contract, 15 U.S.C. § 1639c(e); and

e. in the alternative, failing to comply with TILA's reverse mortgage protections, including failing to provide the required disclosures, despite that the loan (alternatively) is a reverse mortgage as defined by statute, 15 U.S.C. §§ 1602(cc), 1648, 12 C.F.R. § 1026.33.

188. Plaintiff Crawford hereby rescinds and requests that the Court enforce the rescission of her transactions with Hometap, pursuant to 15 U.S.C. § 1635.

189. Plaintiff Crawford suffered an ascertainable loss of money or property as the result of Defendants' conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiff's interest in each respective property.

190. As a result of the violations of TILA, pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiff Crawford, on behalf of herself and the Nationwide TILA Class, seeks: a declaration that Plaintiff and the Nationwide TILA Class have the right to rescind their loans, pursuant to 28 U.S.C. § 2201; rescission of the transactions, including a declaration that Plaintiff Crawford and the Class are not liable for any finance charges or other charges imposed by Defendants; termination of any security interest in Plaintiff Crawford's property created under the transaction; return of any money or property given by the Plaintiff to anyone, including the Defendants, in connection with this transaction; actual damages; an amount equal to the sum of all finance charges and fees paid; an award of reasonable attorney's fees and costs; and all other appropriate relief to the class as permitted by statute or law.

191. Although 15 U.S.C. § 1640(e) ordinarily requires that an action for damages be commenced within one year from the date of the violation, the limitations period is subject to equitable tolling in appropriate circumstances. Tolling is

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

warranted where, among other circumstances, the defendant's own conduct prevented Plaintiff Crawford from discovering the violation or from timely asserting her rights.

192. Defendants' Option Purchase Agreement was drafted and deployed in such a manner calculated to dissuade consumers like Plaintiffs from recognizing or pursuing her federal rights under TILA. In particular, the Option Purchase Agreement explicitly states that the product is not a loan and hides its true characterization by claiming Defendants are providing an equity investment. The Agreement also contains a mandatory arbitration and class action waiver.

193. This action was filed within one year of Plaintiff Crawford's discovery of the violations. The limitations period of § 1640(e) is therefore tolled, and Plaintiff Crawford's claims are timely. To hold otherwise would reward Defendants who concealed their violations long enough to time-bar their victims' remedy.

**COUNT 2**

**Unlawful Business Practices**

**Cal. Bus. & Prof. Code § 17200**

**By Plaintiffs on behalf of the California Class**

**Against All Defendants**

194. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

195. The California Unfair Competition Law ("UCL") prohibits acts of unfair competition, including business practices that are unlawful. Cal. Bus. & Prof. Code §§ 17200 *et seq*.

196. A business practice that violates any other provision of law, be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, is an unlawful business practice under the UCL.

197. Defendants' conduct violates the California Constitution's prohibition on usury, Article XV, Section 1.

198. Defendants' conduct is unconscionable and prohibited by common law and statute, see Cal. Civ. Code § 1670.5; Cal. Fin. Code § 22302.

199. Defendants' conduct violates California's Financial Code and related statutes, including by the following conduct:

a. Defendants' products are residential mortgage loans, Cal. Fin. Code §§ 50002(a), 50003(p); Defendants acted as a mortgage loan originator, Cal. Fin. Code § 22013; Cal. Bus. & Prof. Code § 10166.01, while not being so licensed as required by California law, Cal. Fin. Code §§ 22109.4, 22109.6, 22100(f), 22755; Cal. Bus. & Prof. Code §§ 10166.01, 10166.02;

b. Defendants' product is a consumer loan, Cal. Fin. Code § 22203, but Hometap was not and is not a licensed lender and therefore is unlawfully "engaged in the business of making consumer loans." Cal. Fin. Code §§ 22009, 22100(a);

c. Defendants violated Cal. Fin. Code § 22161 by (1) making materially false or misleading statements or representations to a borrower about the terms or conditions of the loan, as described herein, including but not limited to that the product was not a loan, that the borrower might not have to pay the loan back, that the loan had no interest, and that Hometap and the homeowner shared equally in the risks and rewards of the product, § 22161(a)(1); (2) making statements and representations in advertising about the rates, terms, and conditions of its loan that were false, misleading, deceptive, or omitted material information, including information revealing the true cost and risks of the transaction, § 22161(a)(3); (3) knowingly misrepresenting, circumventing, or concealing material aspects or information regarding the transaction as described herein, § 22161(a)(6); and (4) engaging in dishonest dealings, § 22161(a)(7);

d. Defendants failed to provide full and clear disclosure of interest rates, charges, and loan costs, in violation of Cal. Fin. Code § 22164;

e. Defendants' contract is unconscionable under Cal. Fin. Code § 22302;

f. Defendants violated Cal. Fin. Code § 22332 by failing to accurately disclose the amount of the loan and the interest rate on the loan;

g. Defendants violated Cal. Fin. Code § 22755 by engaging in unlawful conduct as a mortgage originator, including but not limited to the following conduct alleged herein and below: (1) directly or indirectly employing any scheme, device, or artifice to defraud or mislead borrowers; (2) engaging in unfair and deceptive practices; (3) failing to disclose financing terms; (4) failing to make disclosures required by law; (5) failing to comply with other requirements of the Financial

Code; and (6) making false or deceptive statements or representations as to rates and financing terms, and engaging in bait-and-switch advertising.

200. Each of Defendants' violations of California's Financial Code was willful. The loan is therefore void under Cal. Fin. Code § 22750(b). Defendants have unlawfully collected or received principal, charges, or recompense in connection with its transactions.

201. In the alternative, if these violations were not willful, all interest on Defendant's loans is uncollectable. Cal. Fin. Code § 22752(a). Hometap has unlawfully collected or received interest in connection with its transactions.

202. Defendants' conduct also violates California's laws on reverse mortgages:

a. The product is a reverse mortgage under California law. Cal. Civ. Code § 1923. Its product is a nonrecourse loan secured by real property. Hometap provides a cash advance to a borrower based on the equity or the value of the borrower's owner-occupied principal residence. The loan requires no payment of principal or interest until the entire loan becomes due or payable. However, in violation of California reverse mortgage laws, Defendants are not a lender licensed or chartered pursuant to the laws of California or the United States.

b. Defendants fail to comply with the requirements for reverse mortgages, including but not limited to prepayment penalty prohibitions, disclosure requirements, and independent counseling obligations. §§ 1923.2, 1923.5, 1923.6.

203. Defendants' conduct violates California's laws on real property loans, including but not limited to by charging a fee for an appraisal but failing to provide Plaintiffs and class members a copy of that appraisal at or before closing. Cal. Bus. & Prof. Code § 10241.3.

204. Each of these violations of other statutes is an unlawful business practice under the Unfair Competition Law.

205. These violations have caused and continue to cause harm to Plaintiffs and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

interest to Defendants. These harms are caused by Defendants' unlawful conduct. For example, Defendants do not meet the requirements for licensing as a lender, such that it could never have offered these contracts to Plaintiffs or the class. Additionally, even if Defendants had been properly licensed, it could not have engaged in harmful and unlawful conduct towards Plaintiffs and the class. For example, the reporting requirements imposed on licensed lenders and mortgage originators would have required Defendants to regularly disclose to California regulators lending and marketing practices that are not in compliance with state law. *See, e.g.,* Cal. Bus. & Prof. Code § 10166.07; Cal. Fin. Code § 22159; Cal. Code Regs. Tit. 10, § 1430 *et seq.* Had Defendants failed to make disclosures, it could then have faced penalties and further enforcement. On information and belief, this reporting requirement or reporting would have prevented Hometap from engaging or continuing to engage in these practices.

206. Plaintiffs and the class seek equitable relief, rescission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

207. Plaintiffs seek public injunctive relief on behalf of themselves and the general public. Specifically, they seek a declaration that Defendants' Option Purchase Agreement is unlawful and an order prohibiting Hometap from offering the unlawful Defendants' Option Purchase Agreements to Californians. This relief applies to all persons who own or may in the future own residential property in California.

208. Plaintiffs also seek an injunction prohibiting Hometap from enforcing the unlawful terms of the Defendants' Option Purchase Agreements against all persons who own residential property in California.

/ / /

/ / /

/ / /

**COUNT 3**

**Unfair Business Practices**

**Cal. Bus. & Prof. Code § 17200**

**By Plaintiffs on behalf of the California Class**

**Against All Defendants**

209. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

210. The Unfair Competition Law prohibits unfair business practices and provides a cause of action for these violations. Cal. Bus. & Prof. Code § 17200.

211. Defendants' contracts are unfair under both the balancing test and the tethering test. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).

212. Hometap's contracts are immoral, unethical, oppressive or unscrupulous and cause injury to consumers that outweighs the utility of Hometap's conduct, including but not limited to the following ways:

a. Homeowners provide highly disproportionate returns to Hometap in comparison to the advances they receive;

b. Even though Defendants receive a disproportionate payout from the value of the home, it requires that homeowners like Plaintiffs bear all costs in order to protect and increase Defendants' profits, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

c. These products can destroy intergenerational transmission of wealth, especially for working-class families;

d. Homeowners can lose their homes, which are often their financial anchor and largest asset, or get virtually nothing for homes they have spent decades working hard to pay off;

e. Defendants offer these products without sufficient independent counseling about their lengthy contracts, which contain complex and convoluted terms that are difficult for ordinary homeowners to understand;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

f. Defendants include these highly one-sided terms in order to increase its profits and returns to its own investors; and

g. There are other viable methods for homeowners to access equity in their homes that do not involve these predatory features and are far less dangerous to homeowners, including but not limited to the California Dream for All program and Home Equity Lines of Credit.

213. Plaintiffs and the class could not have reasonably avoided these unfair terms because Defendants' contract is misleading, complex, confusing, and presented as a contract of adhesion on a take-it-or-leave-it basis.

214. Plaintiffs and the class cannot reasonably avoid their future payment obligations to Defendants, since each outcome of the contract requires payment to Defendants. The only scenario in which Defendants will not "exercise" its purported option to require payment is one in which the housing market experiences a catastrophic collapse, which is not an outcome in the control of Plaintiffs or the class.

215. Defendants' contracts are also in violation of legislatively declared policy, including but not limited to the policy reflected in laws limiting interest rates in consumer loans; requiring significant disclosures and independent counseling when homeowners are using their homes as security; and disproportionate returns on shared-appreciation products. Cal. Civ. Code §§ 1917.006(a), 1917.006(a)(1), 1917.006(c), 1923.2(k), 1923.

216. These violations have caused and continue to cause harm to Plaintiffs and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Defendants.

217. Plaintiffs and the class seek equitable relief, rescission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

218. Plaintiffs seek public injunctive relief on behalf of themselves and the general public. Specifically, they seek a declaration that Defendants' Option Purchase Agreement is unfair, an order prohibiting Defendants from offering the unfair the

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Option Purchase Agreement to Californians. This relief applies to all persons who own or may in the future own residential property in California.

219. Plaintiffs also seek an injunction prohibiting Hometap from enforcing the unfair terms of the Option Purchase Agreement against all persons who own residential property in California.

**COUNT 4**

**Deceptive Business Practices/Omissions**

**Cal. Bus. & Prof. Code § 17200**

**By Plaintiffs on behalf of the California Class**

**Against All Defendants**

220. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

221. The Unfair Competition Law prohibits deceptive and misleading practices. Cal. Bus. & Prof. Code § 17200.

222. Defendants' contract documents contain several statements that are likely to deceive members of the public.

223. The contracts Defendants provided to Plaintiffs and the class repeatedly state that it will pay the homeowner an Investment Amount that is a specific percentage of the home value that is typically thousands of dollars. This is likely to deceive reasonable consumers into believing that they would be receiving this sum of money from Defendants. However, as explained above, the actual percentage is far less than expected due to a number of fees tacked on by Defendants. This payment is therefore illusory. This deceptive statement is material, since a reasonable consumer would attach significant importance to whether they would receive certain payments from entering into the contract with Defendants.

224. Defendants' contract also misleadingly omits the true cost of its loan. This is a material omission, since the amount a homeowner will have to pay Defendants will be very important to their decision of whether to enter into this contract.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

225. Defendants' contracts also misleadingly omitted the fact that Defendants are not licensed to engage in lending, mortgage lending, or mortgage origination through its purported equity sharing agreements. A reasonable consumer is likely to be deceived by this omission, since they would not suspect that Defendants' products are illegal, unlicensed loans. This omission is also material, since a reasonable consumer would attach importance to the fact that the company placing a mortgage on her home and lending her money is doing so illegally.

226. Upon information and belief, Defendants' representations regarding the fees assessed for the origination of the contract are false and/or misleading, in that Defendants profit from certain fees while indicating that they are bona fide fees reflecting the costs of the transaction.

227. These violations have caused and continue to cause harm to Plaintiffs and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Defendants.

228. Plaintiffs and the class seek equitable relief, recission, restitution, attorneys' fees, costs, and such other relief as is equitable and just.

229. Plaintiffs seek public injunctive relief on behalf of themselves and the general public. Specifically, they seek a declaration that Defendants' Option Agreement and advertisements of the agreement are deceptive, and an order prohibiting Defendants from offering the Option Agreements to Californians in a deceptive manner. This relief applies to all persons who own or may in the future own residential property in California.

230. Plaintiffs also seek an injunction prohibiting Hometap from enforcing the terms of the Option Agreement against all persons who own residential property in California because Defendants obtained the purported agreements by deceptive means.

**COUNT 5**

**Usury**

**California Constitution, Article XV § 1**

**By Plaintiffs on behalf of the Californai Class**

**Against All Defendants**

231. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

232. The California Constitution, Article XV, Section 1 prohibits the charging of interest on a loan above 10%.

233. Defendants' product is a loan.

234. The effective Annual Percentage Rate on Defendants' product far exceeds 10%. If a triggering event were to happen today, Plaintiff Crawford's contracts each contain an effective simple interest rate of at or over 20%. Plaintiff Saunders's contract contains an effective simple interest rate of at or above 20%.

235. Defendants are consciously and voluntarily requiring and taking more than the legal rate of interest. Since Defendants structure their contracts to require return rates that will far exceed 10%, Hometap willfully intended to enter into usurious transactions.

236. As such, Defendants have violated the California Constitution, Article XV, Section 1.

237. Plaintiffs and the class are entitled to relief, including Hometap's forfeiture of all interest on its contract and penalties. *See* Cal. Civ. Code § 1916-3.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**COUNT 6**

**Unconscionability**

**Cal. Civ. Code § 1670.5 and/or Common Law**

**By Plaintiffs on behalf of the California Class**

**Against All Defendants**

238. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

239. As described above and set forth herein, the agreement is substantively and procedurally unconscionable, including but not limited to the following:

a. Defendants are large financial companies engaged in the business of soliciting homeowners and placing them in agreements like the one entered by Ms. Crawford;

b. Defendants and Plaintiffs, and other similarly situated consumers, occupied and occupy significantly unequal bargaining positions, including in that Hometap has complex methods of market and financial analysis whereas consumers do not;

c. Defendants drafted all documents, amounting to several pages in the funding package, and presented them as contracts of adhesion;

d. Defendants provided no meaningful explanation of the true costs of the contracts;

e. Defendants failed to provide accurate disclosures related to the transaction and cost of credit as required by law, and instead provided purported disclosures that were misleading, misstated the risks and costs of the transaction, and were confusing;

f. Defendants drafted the documents to be confusing and embedded the terms in fine print, some of which could only be located on the website, others of which were never disclosed, and the contracts themselves are written in small print, are extremely lengthy, contain legalese, repeatedly cross reference other documents, and include extremely difficult to understand terms;

g. Defendants drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that consumers like Plaintiffs would not and could not understand the full nature and consequences of the transaction;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

h. Upon information and belief, Defendants have artificially decreased the purported "original value" of consumers' homes to increase Defendants' future profits, which will be based on a valuation of the house that won't be artificially decreased;

i. Defendants drafted the contract to limit the ability of homeowners to pay off the obligation before three years elapsed, thereby further guaranteeing Defendants' high rate of return and the homeowner's increased loss;

j. Defendants required that homeowners, such as Plaintiffs, transfer wealth from themselves to Defendants by requiring the homeowners to bear all costs in order to protect and increase Defendants' profit, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

k. The terms of the transaction further benefit Defendants at the cost of consumers like Plaintiffs because the majority of Defendants' purported "purchase price" that it pays homeowners is only paid out of funds from the sale of the home that the homeowner would receive without having entered the contract, such that it is illusory;

l. The actual cost of the transaction to Plaintiffs and similarly situated consumers is extremely high; and

m. The terms of the transaction are substantially one-sided in favor of Defendants, which drafted the documents and their terms, and guarantee a substantial rate of return to Defendants at very limited cost or risk, while placing an outsized burden of the costs and risks on Plaintiffs, and similarly situated consumers, as described above.

240. As described herein, the transactions are procedurally unconscionable, in that Defendants use their unequal bargaining power with respect to their targeted borrowers to allow them to insert oppressive terms that would come as a surprise to borrowers, once discovered.

241. As described herein, the transactions are substantively unconscionable, in that Defendants trap borrowers in contracts that yield overly harsh and one-sided results in Defendants' favor.

242. Because the contracts were unconscionable, Plaintiffs are thus entitled to and respectfully request, for themselves and all others similarly situated, all available relief, including that the court declare that the contract cannot be enforced under Cal.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Civ. Code § 1670.5 and/or declare that the contract is void pursuant to the common law contract defense of unconscionability.

**COUNT 7**

**Declaratory Relief**

**Cal Code Civ. Proc. § 1060**

**By Plaintiffs on behalf of the California Class**

**Against All Defendants**

243. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

244. Plaintiffs are both respectively a "person interested under a written instrument … or under a contract or who desires a declaration of his or her rights or duties with respect to another." Cal. Civ. Code § 1060.

245. These contracts and written instruments impose ongoing and future obligations upon Plaintiffs, and also encumber Plaintiffs' respective properties.

246. Plaintiffs seek a declaration of the validity of their contracts with Defendants, as well as their rights and duties under those contracts. Specifically, Plaintiffs seek a declaration that their contracts with Defendants are void, voidable, invalid, or otherwise unenforceable in whole or in part.

247. Plaintiffs seek declarations including:

a. Defendants' contracts are void under Cal. Fin. Code § 22750(b);

b. That the contracts are unconscionable and unenforceable under Cal. Civ. Code § 1670.5 and/or common law; or

c. In the alternative, that all interest under the contracts is uncollectable under Cal. Fin. Code § 22752(a).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the Defendants as follows:

A. An Order certifying the Classes above;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

B. An Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

C. An Order awarding monetary damages, including but not limited to any statutory, actual, punitive and treble damages, in an amount to be determined by the Court or jury;

D. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

E. An Order awarding Plaintiffs reasonable costs and expenses of suit, including attorneys' fees;

F. An Order declaring the Defendants jointly and severally liable;

G. Such further relief as this Court may deem just and proper.

## VIII. JURY DEMAND

248. Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand trial by jury as to all issues in the above matter.

Dated: September 30, 2026

**CLARKSON LAW FIRM, P.C.**

*/s/ Kristen Simplicio*
Kristen Simplicio
Chimaraoke Iko

**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis
Lauren KW Brennan

*Attorneys for Plaintiffs and the Putative Classes*